# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KATHY E. ADAMS, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Civil Action No.:05CV00941(EGS) |
| v. | ) |
|  | )ECF |
| CONDOLEEZZA RICE, in her capacity as | ) |
| United States Secretary of State, | )PUB LIC VERSION |
|  | ) |
| Defendant. | ) |
|  | ) |

## DEFENDANT'S MOTION TO DISMISS OR,
## IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant Condoleeza Rice, Secretary, United States Department of State, in her official capacity, hereby moves to dismiss or, in the alternative, for summary judgment under Fed. R. Civ. P. 12(b)(6) and 56. In support of the motion, Defendant refers the Court the attached Memorandum of Law and Authorities, the Statement of Material Facts as To Which There is No Genuine Dispute, and the accompanying Exhibits. A Proposed Order is also attached.

Dated: September 19, 2005                    Respectfully Submitted,


_____/s/_____

KENNETH L. WAINSTEIN, D.C. BAR #451058
United States Attorney


_____/s/_____

R. CRAIG LAWRENCE, D.C. BAR #171538
Assistant United States Attorney

_____/s/_____
JOHN C. TRUONG, D.C. BAR #465901
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 307-0406

Attorneys for Defendant

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHY E. ADAMS, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No.:05CV00941(EGS) |
| v. | ) |
| | )ECF |
| CONDOLEEZZA RICE, in her capacity as | ) |
| United States Secretary of State, | )**PUBLIC VERSION** |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### I.    Introduction

This case must be viewed through the lens of the world healthcare systems and Plaintiff Kathy E. Adams' breast cancer diagnosis in 2003, when Defendant Department of State denied her the necessary medial clearance to join the Foreign Service. As a result, Ms. Adams files this one-count lawsuit alleging that Defendant violated the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, when it denied her the medical clearance to enter Foreign Service based on a perception of a physical handicap (breast cancer). Complaint (Compl.) at ¶¶ 1,13.

This lawsuit has it genesis in the requirement that members of the U.S. Foreign Service be available for assignment to posts anywhere in the world, including "hardship posts." Hardship posts are characterized by their lack of adequate medical facilities and health care. As found by Congress, a combination of unsanitary conditions, tropical diseases, inadequate hospitals, and a shortage of adequately trained doctors and nurses present considerable health

hazards to individuals serving at many of these hardship posts. As a result, the State Department is mandated by statute to provide medical care to Foreign Service members. In addition, the State Department is required to medically examine all Foreign Service applicants to determine whether they suffer from any physical or mental conditions that preclude them from being worldwide available. If a candidate has a condition that cannot adequately be monitored or cared for at posts overseas, thereby putting the candidate at medical risk, he or she will not be accepted into the Foreign Service.

Ms. Adams was diagnosed with Stage I breast cancer in August 2003, during the process of her application to the Foreign Service. Compl. at ¶ 11. Based upon this information, the State Department's Office of Medical Services ("MED"), responsible for the health care of Foreign Service employees, determined that the local health care facilities at the majority of posts overseas were inadequate to provide for Ms. Adams' medical needs at that time, which included, inter alia, a semi-annual breast examination by a qualified health care professional for five years following surgery. As a result, Ms. Adams was denied the necessary medical clearance and a position with the Foreign Service.

Under the facts, Ms. Adams cannot establish a prima facie case of disability discrimination because she cannot show that she was a disabled individual or that Defendant regarded her as one. Even assuming that she was an individual with a disability in 2003, Ms. Adams was not otherwise qualified to perform the essential functions of her job. Finally, Ms. Adams' suggested accommodations were not reasonable accommodation and would impose an

undue hardship on Defendant.[1]  For these reasons, the Court should grant Defendant's motion to dismiss, or in the alternative, for summary judgment.

## II.  BACKGROUND

### A.  The Worldwide Availability Requirement

Section 504(a) of the Foreign Service Act of 1980 provides that "[c]areer members of the Service shall be obligated to serve abroad and shall be expected to serve abroad for substantial portions of their careers."  22 U.S.C. § 3984(a); see also 22 U.S.C. § 3901(a)(4)("members of the Foreign Service should be . . . available to serve in assignments throughout the world").  The legislative history of these provisions stresses that availability for "worldwide service" is at the core of the Foreign Service.  See Taylor, 2005 WL 913221, at *1-2 (citing, inter alia, H.R. Rept. 96-992 (1980), Pt. 2, at 68 ("Section 504(a) sets forth the fundamental criterion for membership in the Foreign Service–availability for worldwide assignment"); see also Local 1812 v. Dep't of State, 662 F. Supp. 50, 51 (D.D.C. 1987).  Indeed, a central purpose for amending the Foreign Service Act in 1980 was to respond to the "atrophy" of this requirement and the fact that many older Foreign Service Officers were not available for service other than in Europe and Washington, D.C.  As explained by the House Committee on Foreign Affairs:

> [A]vailability for worldwide assignment must be clearly expressed and understood as a basic requirement for admission to the Foreign Service as well as for retention and promotion in the Foreign Service throughout the individual's career.  One of the basic problems giving rise to this new legislation is the atrophy of this fundamental requirement.  More than half of the individuals between ages 50 and 60 who are serving

---

[1]      As discussed infra, Ms. Adams' Complaint fails to specify the reasonable accommodation requested of Defendant; however, her EEO complaint did ask that Defendant allow her to visit physicians every six months for follow up monitoring of her breast cancer condition.

today in the Foreign Service are not available for worldwide service.  The result has been a concentration of such individuals in Europe and Washington and the inability of the foreign affairs agencies to insure adequate staffing of the more difficult posts overseas.

H.R.Rep. 96-992 (1980), Pt. I, at 9 (1980); see also id., Part II, at 37.

The "more difficult" (hardship) posts that are of special concern to Congress share various characteristics, among them, "inadequate hospitals, a shortage of doctors or nurses, and few flights in and out of the capital city..." H.R. Rept. 96-992 (1980), Part I, at 7.  Owing to these conditions, as found by Congress, individuals wishing to represent the United States abroad must be willing to accept obligations dramatically different from and more extensive than those in the Civil Service.  Acceptance into the Foreign Service requires "acceptance of worldwide assignment." Id. at 4.   The State Department makes no secret of this fact, and applicants to the Foreign Service are notified in advance of hardship posts and the worldwide availability requirement, as explained, inter alia, on the Department's website (http://careers.state.gov).

**B.     The State Department's Health Care Program**

Pursuant to the Foreign Service Act of 1946, as amended by the Foreign Service Act of 1980, codified at 22 U.S.C. §§ 3901-4026 (1990), the State Department maintains a "health care program to promote and maintain the physical and mental health of members of the [Foreign Service]. 22 U.S.C. § 4084(a); Brown Decl. at ¶ 2 (Exh.1).  In-service Foreign Service employees undergo a comprehensive physical examination roughly every two years to determine whether any physical or mental health conditions exist that might limit their future availability for assignment to hardship posts. See 3 Foreign Affairs Manual ("FAM") at 1931.3 (Exh.5).

MED also evaluates the availability of health care facilities, in comparison to the care

available in the United States, for each post around the world.  Brown Decl. at ¶ 9 (Exh. 1).

Based on a survey of a post's local medical and laboratory facilities, MED evaluates both the

facilities and the expertise of medical personnel in the area of an overseas post, and maintains a

Post Capabilities Database with this information.  Id.

By comparing an employee's medical needs to the information in the Post Capabilities

Database and other sources, MED is able to issue medical "clearances" for Foreign Service

personnel. Those whose health status allows service worldwide receive a "Class 1" medical

clearance.  Brown Decl. at ¶¶ 10-11 (Exh. 1).   Those who develop a medical condition that can

be treated adequately at some but not all posts outside of the United States receive a Class 2

clearance.  Id.; see also 3 FAM 1931.3-1 (Exh. 5).  If an in-service Foreign Service employee

develops a medical condition that cannot be cared for at any post outside the United States, he or

she receives a Class 5 clearance.  Brown Decl. at ¶ 11 (Exh.1).

### C.      The Pre-Employment Clearance Process for FSO Candidates

Foreign Service Officer (FSO) candidates apply to one of several career tracks or

"cones": Political, Economic, Public Policy, Consular, and Management.  They  typically

undergo rigorous examinations, both written and oral.  See 22 C.F.R. § 11.1(b) and (c).  Those

who pass also must pass a background security examination and a medical examination.  22

C.F.R. § 11.1(d), (e).

Applicants to the U.S. Foreign Service undergo medical examinations that are essentially

similar to those for in-service employees.  See 22 U.S.C. § 4084(b)(1)(authorizing the State

Department to conduct "medical examinations for applicants for employment"); see also 22

U.S.C. § 3941(b)("the Secretary shall prescribe, as appropriate,...physical...examinations for

appointment to the Service"); see also Local 1812, 662 F. Supp. at 51 (describing the required medical examination process for Foreign Service employees). Federal regulations further describe this requirement. 22 C.F.R. § 11.1(e)(2)(2003). This medical examination is comprehensive and includes tests for a wide variety of conditions such as cardiac or metabolic diseases, hypertension or hypotension, tumors and cancers, arthritis, pulmonary disease, sexually-transmitted diseases, allergies and parasitic diseases, liver disease, neurological disease, mental disorders, diabetes, Hepatitis B, and Hepatitis C. Brown Decl. at ¶ 8 (Exh. 1).

Candidates for the Foreign Service who successfully complete the clearance process, including issuance of a Class 1 medical clearance by MED, will have their names placed on a functional rank-order register or special-order register for which they are qualified. 22 C.F.R. § 11.1(f). Rank order is determined by the numerical grades received during the candidates' examinations. 22 C.F.R. § 11.1(c)(5). Candidates are thereafter considered for appointment to the Foreign Service according to rank order and the needs of the Service. If, after 18 months, a candidate has not been appointed because of a lack of vacancies, the candidate is removed from the register. 22 C.F.R. §§ 11.1(g)(2), 11.1(h).

Candidates who are not issued a Class 1 clearance by MED are automatically flagged by MED as having a Class 5 clearance. Brown Decl. at ¶ 12 (Exh. 1); see also Taylor, 2005 WL 913221, at * 3 (citing 3 FAM 1931.1(b)). Such candidates may not be hired unless the Department grants a waiver of the worldwide availability requirement. See 22 C.F.R. § 11.1(e).

### D.    Waivers of the Worldwide Availability Requirement

FSO candidates who are rejected because a medical condition renders them unavailable for assignment worldwide may apply for an administrative waiver of this requirement. Such

requests are ultimately granted or denied by the Director General of the Foreign Service or his or her delegatee. 22 C.F.R. § 11.1(e)(5). An advisory committee called the Employment Review Committee ("ERC") normally considers such requests.

> The nature of this appeal is critical to understand: neither the ERC nor anyone else has authority to second-guess MED's determination that the candidate suffers from a medical or mental health condition that renders him or her unavailable for worldwide assignment....Rather, the issue before the ERC is whether the candidate possesses special skills for which the Foreign Service has a compelling need that could outweigh any limitations on the candidate's worldwide availability....As part of this review, the ERC considers the percentage of posts to which the candidate could be assigned, whether the candidate's condition is progressive, temporary or permanent, the specific position for which the candidate is applying, and whether the candidate "possesses some extraordinary skill or experience the value of which would outweigh her or his inability to be assigned worldwide.

Taylor, 2005 WL 913221, at * 4 (citing 3 FAM 1931.2); see also Declaration of Bruce L. Cole (Cole Decl.) at ¶¶ 8-13 (Exh.12) (describing the procedures and factors used to determine worldwide availability waiver application); Declaration of John M. O'Keefe (O'Keefe Decl.) at ¶ 8 (Exh.2) (describing factors considered for worldwide availability waiver).

Few FSO candidates have been granted waivers in recent years, due to the high interest in serving in the Foreign Service. Cole Decl. at ¶ 14 (Exh. 12). Of the 33 requests for a waiver that were considered by the ERC in 2004, the same year that Plaintiff's request for a waiver was considered, none were granted. Id. at ¶ 14.

**E.    Chronology of Events Leading to the Present Lawsuit**

Ms. Adams applied to become a Foreign Service Officer and had passed both the written and oral examinations in accordance with 22 C.F.R. § 11.1(b) and (c), by April 2003. Compl. ¶¶ 7-8. She initially received a Class 1 medical clearance from MED on July 10, 2003. Compl. at ¶ 9. In mid-August of 2003, however, she was diagnosed with Stage I breast cancer. Compl. at ¶

12. She did not report this medical development to Defendant until October 10, 2003, after she had undergone surgery. See October 10, 2003 Email from Ms. Adams to Ms. Evans (Exh. 17). By then, she had already been placed on the register for Consular officers awaiting appointment into the Foreign Service. See September 25, 2003 Letter (Exh. 7).

MED personnel, upon learning this new information, immediately asked Ms. Adams a number of questions about her diagnosis, including a question about the "[t]reatment plan detailing the type and frequency of follow-up care/monitoring needed." See October 10, 2003 Email from Ms. Forman to Ms. Adams (Exh. 15). Ms. Adams would need, inter alia, a semi-annual breast examination by a qualified health care professional for five years following surgery. See November 19, 2003 Letter from Dr. Mark A. O'Rourke (Exh. 9). MED therefore issued a Class 5 clearance to Ms. Adams (not worldwide available). See December 12, 2003 Letter (Exh. 11). MED's assessment was that only 53% of all Foreign Service posts had the professional and technical support required for such follow-up care. See Memorandum for Employment Review Committee dated March 23, 2004 ("2004 Memo") (Exh. 13). Ms. Adams applied for a waiver of the worldwide availability requirement but that request was denied. See March 29, 2004 Letter (Exh. 14).

Ms. Adams timely initiated EEO counseling and the Department conducted an investigation of her complaint pursuant to 29 C.F.R. § 1614. Ms. Adams initially filed a request for a hearing before the Equal Employment Opportunity Commission (EEOC), but that suit was dismissed when she filed the present lawsuit. See May 20, 2005 Letter and May 24, 2005 Order (Exh. 4).

## III.    Standard of Review

### A.    Rule 12(b)(6) Standard of Review

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint and dismissal is appropriate where the "plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Browning v. Clinton, 292 F.3d 235, 241(D.C. Cir. 2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  The Court is to treat the complaint's factual allegations as true, see Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), and must grant plaintiff "the benefit of all inferences that can be derived from the facts alleged," Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir.1979).  However, "the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by the facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions." Akintomide v. United States, 99-MS-0055 (PLF), 2000 WL 1693739, at *1 (D.D.C. Oct. 31, 2000) (citing National Treasury Employees Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996) and Kowal v. MCI Communication Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

### B.    Rule 56 Standard of Review

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if there is no genuine issue of material fact in dispute.  Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, the moving party, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Plaintiff, in response to defendant's motion, must

identify for the Court specific facts showing that there is a genuine issue for trial.  Id. at 324
(internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the
nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar
summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To be
material, the factual dispute must be capable of affecting the substantive outcome of the litigation;
to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable
trier-of-fact could find for the nonmoving party.  Laningham v. U.S. Navy, 813 F.2d 1236, 1242-
43 (D.C. Cir. 1987); Liberty Lobby, 477 U.S. at 251 (the court must determine "whether the
evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-
sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is
not sufficiently probative, summary judgment may be granted."  Liberty  Lobby, 477 U.S. at 249-
50 (internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are
insufficient to defeat an otherwise proper motion for summary judgment."  Williams v. Callaghan,
938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there
is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of
identifying those portions of the record that demonstrate the absence of a genuine issue of
material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing
that there is a genuine issue for trial.'"  Id. at 587 (citing Fed. R. Civ. P. 56(e)).

Importantly, "[w]hile summary judgment must be approached with specific caution in
discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by

-10-

affidavits or other competent evidence showing that there is a genuine issue for trial." Morgan v. Fed. Home Loan Mortgage Corp., 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting Calhoun v. Johnson, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998), aff'd, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 1999)); see also Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases"). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." Marshall, 276 F. Supp. 2d at 47 (quoting Celotex Corp., 477 U.S. at 327).

## IV.    Argument

### A.    Ms. Adams Cannot Establish a *Prima Facie* Case of Disability Discrimination.

Ms. Adams does not allege that she was disabled, but rather that Defendant regarded her as having a disability. Compl. at ¶¶ 1, 13. Specifically, Ms. Adams alleges that Defendant violated the Rehabilitation Act by "denying her employment *based on the perception* that she had a disability." Comp. at ¶13. Under the Rehabilitation Act, a plaintiff can establish that she is an "individual with a disability," for purposes of establishing a *prima facie* case, if she "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." Mack v. Strauss, 134 F. Supp.2d 103, 110 (D.D.C. 2001); see also 29 U.S.C. § 705(20)(B).[2]

---

[2]    Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, provides federal employees and applicants for federal employment their sole cause of action for claims of discrimination based on disability. Taylor v. Small, 350 F.3d 1286, 1291 (D.C. Cir. 2003). Liability under section 501 is determined under the standards applicable under Title I of the Americans with Disabilities Act of 1990 ("ADA"). See 29 U.S.C. § 791(g) (ADA standards

To meet the "regarded as having such an impairment" definition of disabled, a plaintiff must show that the defendant (1) regarded the plaintiff as having an impairment; and (2) the defendant believes the impairment limits one or more major life activities. See Mack, 134 F. Supp.2d at 11; Haynes v. Williams, 279 F. Supp.2d 1, 11-12 (D.D.C. 2003). See also Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 200-201)(2002). "Major life activities," as that term is used in the Rehabilitation Act/ADA, refers to "those activities that are of central importance to daily life." Toyota, 534 U.S. at 197.   Here, Ms. Adams cannot meet these two prongs to show that Defendant perceived that she had a disability.  Each is discussed below.

### (i)    Defendant Did Not Regard Ms. Adams as Having a Disability.

As for the first prong, Ms. Adams' Complaint fails to allege how Defendant came to believe that she had a disability.  Ms. Adams appears to claim that Defendant regarded her as disabled simply because Defendant denied her the necessary medical clearance to work in the Foreign Service.  Defendant, however, had not formed any opinion whether Ms. Adams had a disability.  As part of the medical examination process, Defendant made inquiries into Ms. Adams' breast cancer condition by asking her to provide information on her prognosis and the type of treatment she would require.  See October 10, 2003 E-mail (Exh. 15).  These questions were not to ascertain whether Ms. Adams could do her job, but rather to determine whether MED could do its job of providing Ms. Adams with adequate medical care while she was posted overseas.  See Brown Decl. at ¶ 28.  Defendant's concern for Ms. Adams' well being does not by itself show that Defendant regarded her as disabled.  See Mack ,134 F. Supp.2d at 110 (holding

---

apply to section 501 claims "alleging nonaffirmative action employment discrimination"); 29 C.F.R. § 1614.203 (ADA standards govern section 501 claims under the Rehabilitation Act).

that "[defendant's] concern for plaintiff's health does not establish that [defendant] regarded plaintiff as disabled.").

Moreover, the fact that Defendant did not grant Ms. Adams the necessary medical clearance to join the Foreign Service does not equate to regarding her as disabled. See Murphy v. UPS, 527 U.S. 516, 524 (1999) (holding that defendant did not regard plaintiff as disabled when plaintiff's medical condition prevented him from obtaining the required Department of Transportation certification for the job); see also Taylor, 2005 WL 913221, at * 1-17 (holding that the State Department did not violate the Rehabilitation Act when it denied plaintiff medical clearance for the Foreign Service due to plaintiff's medical condition). Defendant denied Ms. Adams the medical clearance because she could not be safely assigned to approximately 50% of the overseas posts. It did not deny the clearance because Defendant regarded her as disabled, nor did Defendant discriminate against her because of that perceived disability. Accordingly, Ms. Adams has not met the first prong of this two-prong test to establish a *prima facie* case of "regarded as" disability discrimination.

**(ii)    Working for the Foreign Service is Not a Major Life Activity.**

As for the second prong, Ms. Adams fails to allege that Defendant believed her breast cancer condition limited her major life activities. Ms. Adams, however, seems to allege that she was limited in the major life activity of working because Defendant denied her the medical clearance for the Foreign Service. This claim fails as a matter of law because working as Foreign Service Officer is not a "major life activity."

Establishing "that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA..." Ross v. Campbell Soup Co., 237

-13-

F.3d 701 (6th Cir. 2001). The very notion of including "work" as a "major life activity" is

problematic. In <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471 (1999), the Supreme Court noted:

> there may be some conceptual difficulty in defining "major life activities" to include
> work, for it seems to "argue in a circle to say that if one is excluded, for instance, by
> reason of [an impairment, from working with others]...then that exclusion constitutes an
> impairment, when the question you're asking is, whether the exclusion itself is by reason
> of handicap." Tr. of Oral Arg. in <u>School Bd. Of Nassau Co. v. Arline</u>, 481 U.S. 1024,
> 1987 U.S. LEXIS 1785, 95 L.Ed.2d 519, 107 S. Ct. 1913, O.T. 1986, p. 15 (argument of
> Solicitor General). Indeed, even the EEOC has expressed reluctance to define "major life
> activities" to include working and has suggested that working be viewed as a residual life
> activity, considered, as a last resort, only "if an individual is not substantially limited
> with respect to any other major life activity." 29 C.F.R. pt. 1630, App. §
> 1630.2(j)(1998).

527 U.S. at 492.

The D.C. Circuit has not squarely addressed whether "working" can constitute a "major

life activity." <u>Duncan v. Washington Metropolitan Area Transit Authority</u>, 240 F.3d 1110,

1117-18 (D.C. Circ. 2001)(Randolph, J. Concurring)(setting forth the difficulties this issue

presents). The D.C. Circuit, however, has made clear that, "to establish substantial limitation of

working activity under the ADA, a plaintiff must allege and prove that in his particular

circumstances . . . his impairment prevents him from performing a 'substantial class' or 'broad

range' of jobs otherwise available to him." <u>Id</u>. at 1115. <u>See also</u> <u>Kalerkiristos v. CTS Hotel</u>

<u>Mgmt. Corp.</u>, 958 F. Supp. 641, 658 (D.D.C. 1997) (noting that "[a]n individual is substantially

limited in the major life activity of working if his disability disqualifies him from a class of jobs

or a broad range of jobs."); 29 C.F.R. §1630.2(j)(3)(ii) (same).

Here, it cannot be seriously argued that working for the Foreign Service is considered a

major life activity. Indeed, Defendant knows of no other field of work aside from the U.S.

Foreign Service, which requires employees to have medical clearance to be assigned <u>anywhere</u>

-14-

in the world, including any number of hardship areas where medical care is virtually nonexistent and transportation in and out of the country can be extremely challenging.  See Cole Decl. at ¶ 5 (Exh. 12); Brown Decl. at ¶¶ 5-8 (Exh. 1).  See also Defendant's website at http://www.careers.state.gov, (stating "[w]hile a candidate may effectively manage a chronic health condition or limitation within the United States or in specific areas outside of the U.S., the Office of Medical Services might well determine that the same individual is not eligible for a worldwide ("Class One") medical clearance.").  This uniquely stringent medical requirement for admission to the Foreign Service arises from the nature of the Service and its medical program as mandated by the Foreign Service Act of 1980.

In that respect, this case is similar to Murphy v. UPS, 527 U.S. 516 (1999), in which the petitioner claimed that he was "regarded as disabled" by UPS when UPS discovered that he had hypertension.  UPS removed petitioner from his job because his hypertension condition prevented him from qualifying for a driving certification under the Department of Transportation regulations governing the operation of commercial motor vehicles.  527 U.S. at 489.  In affirming the grant of summary judgment, the U.S. Supreme Court found that:

> the evidence that petitioner is regarded as unable to meet the DOT regulations is not sufficient to create a genuine issue of material fact as to whether petitioner is regarded as unable to perform a class of jobs utilizing his skills.  At most, petitioner has shown that he is regarded as unable to perform the job of mechanic only when that job required driving a commercial motor vehicle–a specific type of vehicle used on a highway in interstate commerce....Petitioner has put forward no evidence that he is regarded as unable to perform any mechanic job that does not call for driving a commercial motor vehicle and thus does not require DOT certification.

527 U.S. at 524.

Here, as in Murphy, Defendant has a hiring requirement that all candidates for the Foreign Service receive a Class 1 medical clearance.  Ms. Adams failed to receive such a

clearance due her breast cancer condition.  As a consequence, Defendant denied her a position

with the Foreign Service.  This denial, however, does not mean that Defendant considered Ms.

Adams unable to perform a class of jobs requiring international travel.  It simply means she is

ineligible for a particular job in the U.S. Foreign Service.  See Murphy, 527 U.S. at 523 (holding

that "to be regarded as substantially limited in the major life activity of working, one must be

regarded as precluded from more than one particular job."); Kalekiristos, 958 F. Supp. at 658

(holding that "the inability to perform one aspect of a job while retaining the ability to perform

the work in general does not amount to substantial limitation of the activity of working.")

(internal citation omitted).  Therefore, under the law, Ms. Adams' inability to work for the

Foreign Service due to her medical condition is not an impairment that substantially limited her

major life activities.

     Moreover, the record indicates that Ms. Adams can perform a variety of jobs.

Specifically, her doctor indicated that Ms. Adams "has no job limitations whatsoever."

O'Rourke Letter (Exh. 9).  Dr. O'Rourke also indicated that Ms. Adams could "undertake a full

schedule of work."  Id.  In her own Statement of Interest, Ms. Adams set forth a variety of jobs

that she had held.  See Statement of Interest of Kathy E. Adams (Exh. 16).  For instance, Ms.

Adams stated that she used to practice law, then she worked as a corporate trainer and

management consultant for about twelve years.  Id.  To the extent that Ms. Adams wishes to

serve her country – as she indicated in her Statement of Interest – she can work in some other

capacity in the State Department, including working as a Civil Service employee or, using her

legal skills, as an attorney in the Legal Adviser's Office.  There is nothing in the record to show

that Ms. Adams' breast cancer condition would prevent her from performing this "broad range"

of jobs. Most importantly, the record is devoid of any purpose or intention to discriminate against Ms. Adams due to her medical condition. Accordingly, Ms. Adams fails to meet the second prong of the "regarded as" test and, therefore, fails to establish her *prima facie* case.

**B.      Ms. Adams Posed a Direct Threat to Herself if Assigned to Hardship Posts.**

Even assuming that Ms. Adams can establish that she was disabled or that Defendant regarded her as disabled, Defendant is not liable under the Rehabilitation Act – for not giving her the necessary medical clearance to join the Foreign Service – because Ms. Adams posed a direct threat to herself. See Taylor, 2005 WL 913221, at *11 (noting that "an employer may escape liability under the Rehabilitation Act if it can establish that the employee poses a direct threat to himself or others in the workplace.").

A disabled employee poses a direct threat to herself if she faces a "significant risk" to her own health or safety. Id. (citing 42 U.S.C. § 12111(3)). In determining whether the person poses a direct threat, the court must make individualized assessments as to whether that person can safely perform the essential function of the job. Id. (citing Chevron U.S.A., Inc. v. Echazabal, 563 U.S. 73, 86 (2002)). Indeed, the Supreme Court held that "[t]he direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or best available objective science,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." Echazabal, 563 U.S. at 86.

Here, Ms. Adams' breast cancer condition posed a direct threat to herself. In August 2003, Ms. Adams was diagnosed with Stage I breast cancer and underwent surgery that same

month.  Compl. at ¶ 13.

See Brown Decl. at ¶ 15 (Exh. 1).

ι. O'Rourke Letter (Exh. 9) ; see also Dec. 5, 2003 E-mail from Ms. Adams to Ms. Forsman (Exh. 10).

months is not a trivial matter because such an exam is not available in approximately 47% of the overseas posts.  See Employee Review Committee Memo (Exh. 13) (noting that *only* "[a]pproximately 53% of all Foreign Service posts have the professional and technological support required in this case").  The consequences to Ms. Adams of foregoing her necessary checkups could be life-threatening were her cancer to reappear.  Dr. Brown, Director of MED, explains the nature and severity of the harm by noting that, "[e]arly recognition of cancer recurrence provides a window for useful intervention and cure.  The longer a recurrence goes unrecognized, the lower are chances for a less radical treatment course or for cure of the cancer." Brown Decl. at ¶ 19 (Exh. 1).

In addition, Ms. Adams

See O'Rourke Letter (Exh. 9)

(recommending that Ms. Adams take                               s).

i.

Brown Decl. at ¶ 16 (Exh. 1).  Therefore, it is vital that Ms. Adams receive

n        . Brown Decl. at ¶¶ 17-19 (Exh. 1).  Without such monitoring, Ms. Adams

isk

cancer, which is life-threatening.  Id.

If Ms. Adams had joined the Foreign Service as a junior officer, she would have had an

80% chance of being assigned to a hardship post.  O'Keeke Decl. at ¶ 4 (Exh. 2) (noting that

junior officers have an 80% chance of being assigned to a hardship post).  Only 53% of all posts

worldwide have the required "professional and technical support" to care for Ms. Adams.  See

March 2004 Memo (Exh. 13); see also Cole Decl. at ¶ 5 (Exh.12) (describing that the

infrastructures of hardship posts can be inadequate, including poor public health care system).

Overseas posts that lack these capabilities are primarily hardship posts.  Under these facts, Ms.

Adams would pose a direct threat to herself if Defendant allowed her to join the Foreign Service.

Accordingly, Defendant cannot be held liable for denying Ms. Adams the medical clearance to

join the Foreign Service because of the health threat to herself.  See Taylor, 2005 WL 913221, at

* 11-13 (as one of the bases in granting summary judgment in the State Department's favor, the

court found that plaintiff would pose a direct threat to himself for being assigned to hardship

posts).

**C.    Ms. Adams' Requested Accommodations Were Unreasonable and Would Subject Defendant to An Undue Hardship.[3]**

The Complaint fails to specify the accommodation she requested from Defendant.  See Compl. at ¶ 1.[4]  However, Ms. Adams' Formal Complaint of Discrimination appears to describe the requested accommodation.  Specifically, the Formal Complaint states, "[t]he Department of State has ended my candidacy without any discussion whatsoever of the possibility of a reasonable accommodation to allow me to visit a physician or nurse-practitioner for my 6-month physical breast exam that takes only minutes.  I only need this accommodation and my Tamoxifen tablets for four (4) years."  See Formal Complaint of Discrimination (Exh. 8).

In addition, Ms. Adams also requested that Defendant waive its worldwide availability requirement – the essential function of Foreign Service.  See Cole Decl. at ¶¶ 1,4 (Exh. 12); see

---

[3]    It is unclear whether Ms. Adams is making a failure to accommodate claim.  See Compl. at ¶ 1, 13.  Even assuming that she alleges such a claim, her "failure to accommodate" claim may not be available under the law because Ms. Adams does not claim that she was disabled but only that Defendant regarded her as disabled.  The D.C. Circuit has not addressed this issue.  However, the Fifth, Sixth, Eighth, and Ninth Circuits embrace the conclusion that reasonable accommodation is *not* available to an employee merely regarded or perceived as disabled.  See Kaplan v. City of N. Las Vegas, 323 F.3d 1226, 1231-33 (9th Cir. 2003); Weber v. Strippit, Inc., 186 F.3d 907, 916-17 (8th Cir. 1999); Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999); Newberry v. E. Texas State Univ., 161 F.3d 276, 280 (5th Cir. 1998).  The First, Third, and Tenth Circuits take the opposite view.  See Kelly v. Metallics West, Inc., 410 F.3d 670, 675 (10th Cir. 2005); Williams v. Philadelphia Housing Auth. Police Dep't, 380 F.3d 751, 773-76 (3d Cir. 2004); Katz v. City Metal Co., Inc., 87 F.3d 26, 33 (1st Cir. 1996).  In any event, at least one district court in the D.C. Circuit has opined that "it is doubtful that plaintiff can even claim failure to accommodate given its logical inconsistency with a claim that he was regarded as disabled." Mack, 134 F. Supp. at 111 n.3 (citing  Weber v. Strippit, Inc., 186 F.3d 907, 916-17 (8th Cir. 1999)).  Assuming *arguendo* that Ms. Adams could overcome this legal hurdle, her requested accommodations were not reasonable and would impose an undue hardship on Defendant.

[4]    As a matter of law, Ms. Adams' "failure to accommodate" claim – to the extent that she alleges one – is legally deficient for failure to articulate the requested accommodation. See Flemmings v. Howard Univ., 198 F.3d 857, 861 (D.C. Cir. 1999).

also Taylor, 2005 WL 913221, at * 9-10 (holding that worldwide availability is the essential

function of the Foreign Service). These two requested accommodations are addressed *seriatim*.

>    (i)    **Ms. Adams' Request to Allow Her To Travel for Physical**
>           **Examination Every Six Months Was Unreasonable.**

Under the Rehabilitation Act, a federal agency is required to make reasonable

accommodation to allow the employee with a disability to perform the essential function of her

job without imposing undue hardship on the employer. Chincillo v. Powell, 236 F. Supp.2d 18,

23 (D.D.C. 2003); see also Taylor, 2005 WL 913221, at * 14. "In determining whether an

accommodation would impose an undue hardship burden, factors to be considered include, but

are not limited to, the nature and cost of the accommodation." Taylor, 2005 WL 913221, at * 14

(citing 29 C.F.R. §1613.704(c)(3)).[5]

The possibility of reasonably accommodating a Foreign Service candidate by allowing

the candidate to travel periodically for routine medical monitoring was specifically considered

and rejected by the court in Taylor. In Taylor, a Foreign Service candidate with HIV requested

that, *inter alia*, the State Department allow him to leave his post as necessary to visit cities

known to provide quality care for his HIV condition. Id. at *14. The Court in Taylor rejected

this requested accommodation and explained that:

>    Even if the Court were to accept [plaintiff's] conservative estimate concerning how
>    much travel time he would need to receive the appropriate treatment, it cannot be said
>    that allowing an employee to miss several days to obtain medical care in another city or
>    country at the government's expense is a reasonable accommodation. See generally
>    [Carr v. Reno, 23 F.3d 525 (D.C. Cir. 1994)], at 530 ("an essential function of any
>    government job is an ability to appear for work..."). In addition, the proposed
>    accommodation contravenes the State Department's prohibition against authorizing FSOs

---

[5]    To determine whether a proposed accommodation is reasonable or whether it
imposes an undue hardship are generally two separate inquiries, but the analyses often overlap.
See Taylor, 2005 WL 913221, at * 14 n.11.

to travel for routine medical examinations and immunizations. <u>See</u> Def. Reply at 23 (citing 3 FAM 686.1-4). One of the reasons for this prohibition is that MED considers it unsafe to post individuals in locations where they cannot locally receive routine medical care. <u>Id.</u> An accommodation that undermines the State Department's policies, which were created based on legitimate concerns for the safety of its employees, is not reasonable.

<u>Taylor</u>, 2005 WL 913221, at * 14.

Here, similar to <u>Taylor</u>, to allow Ms. Adams to travel every six months for medical exam would be unreasonable because it would be unsafe and costly. Specifically, Dr. Brown opines that it is not safe for the State Department to allow individuals to travel to get routine medical exams. Brown Decl. at ¶ 22 (Exh. 1). He explains that "[t]ransportation in and out of many overseas locations to which we send members of the Foreign Service is unreliable and often even dangerous. In Kabul and Baghdad, for example, any trip from the embassy compound to the airport usually requires an armed escort." <u>Id</u>. <u>See</u> <u>Taylor</u>, 2005 WL 913221, at * 14 (in granting summary judgment the court held, <i>inter alia</i>, "[a]n accommodation that undermines the State Department's policies, which were created for the safety of its employees is not reasonable.").

Dr. Brown further explains that it would be costly to the Defendant to allow employees to travel to get routine medical exams. Id. at ¶ 23. He estimates that it would cost Defendant approximately $12,414 each year that Ms. Adams served in a hardship post. <u>Id</u>. at ¶ 24. <u>See</u> <u>Taylor</u>, 2005 WL 913221, at * 17 (rejecting plaintiff's proposed accommodation that would allow him to travel to another country to get periodic medical exam as undue hardship because it was too expensive for the agency).

Moreover, as explained in <u>Taylor</u>, allowing Ms. Adams to travel to obtain routine medical examination contravenes Defendant's established regulations that prohibit Foreign Service officers from traveling to obtain routine medical check-ups. Brown Decl. at ¶ 21 (Exh.

-22-

1). Under these circumstances, Ms. Adams' requested accommodation allowing her to visit a doctor every six month was not reasonable as it would impose an undue hardship on Defendant.

### (ii).    Worldwide Availability is an Essential Function of the Foreign Service That Cannot Be Waived.

Ms. Adams' second request for accommodation was for Defendant to waive its worldwide availability requirement.  See Cole Decl. at ¶¶ 1, 15 (Exh. 12).  However, under the law, Defendant is not required to waive the essential function of the Foreign Service – worldwide availability – as a form of reasonable accommodation for Ms. Adams.  See Barth, 2 F.3d 1180, 1187 (D.C. Cir. 1993) (holding that an accommodation imposes an undue burden if it requires a fundamental alteration in the nature of employer's program).  See e.g., Peters v. City of Mauston, 2001 WL 1753497, at * 8 (W.D. Wis. Dec. 20, 2001) (holding that an employer is not required to waive the essential functions of the job or reassign those functions to other workers to accommodate plaintiff); Davis v. Cottage Hill Baptist Church, 1995 WL 795673, at * 5 (S.D. Ala. Aug;. 29, 1995) (holding an employer is not required to waive the essential functions of a job or relocate those functions).

Here, worldwide availability is an essential function of the Foreign Service, as established by federal statute, legislative history, and regulations of the Foreign Service Act of 1980, as amended.  See Taylor, 2005 WL 913221, at * 10 (noting that courts defer to the employer to determine what functions are considered essential and holding that worldwide availability is an essential function of the Foreign Service); Local 1812, 662 F. Supp. at 51 (explaining that worldwide availability is a basic requirement for Foreign Service).  Indeed, Congress specifically determined that worldwide availability is an essential function of a Foreign Service Officer.  See 22 U.S.C. § 3901(a)(4)("the members of the Foreign Service should be. . .

available to serve in assignments throughout the world"). Moreover, the legislative history of the Foreign Service Act specifically emphasizes that "availability for worldwide assignment must be clearly expressed and understood <u>as a basic requirement for admission to the Foreign Service</u> as well as for retention and promotion in the Foreign Service throughout the individual's career." H.R. Rep. 96-996, Part I, at 9 (emphasis added); <u>see also</u> H.R. Rept. 96-992, Pt. II, at 68 (1980)("Section 504(a) sets forth the <u>fundamental criterion</u> for membership in the Foreign Service–availability for worldwide assignment")(emphasis supplied).

Congress also made clear that any exceptions to the worldwide availability requirement must take into account the Service's overall staffing needs. <u>See</u> H.R. Rep. 96-992, Part I, at 7 (noting that although "absolute and universal insistence on 'worldwide availability'" is not required, it must be defined in a manner to provide for "effective staffing patterns overseas," and exceptions to worldwide availability cannot be made "without regard to the agency's overall staffing needs." ). <u>See also</u> <u>Taylor</u>, 2005 WL 913221, at * 9 ("Given the limited number of Foreign Service personnel and the range of assignments at the large number of hardship posts which must be filled, service at hardship posts is one of the inescapable aspects of a Foreign Service career"); Cole Decl. at ¶ 6 (Exh. 12); Declaration of Lussier (Lussier Decl.) at ¶¶ 7-8 (Exh. 3).

The fact that some in-service FSOs are not available for service worldwide and are retained does not change the fact that "reasonable availability worldwide" is an essential function of employment in the Foreign Service. <u>Taylor</u>, 2005 WL 913221, at * 9-10. "A function may be considered essential for several reasons, including . . . the fact that there are a limited number of employees among whom the performance of the function can be distributed." <u>Kalekiristos</u>, 958 F. Supp. at 660. <u>See also</u> <u>Barth v. Gelb</u>, 2 F.3d 1180, 1189 (D.C. Cir. 1993)

-24-

(rejecting the argument that an agency's medical accommodation of current employees requires it to extend the same accommodation to applicants, explaining, <u>inter alia</u>, that "[a] willingness to accommodate incumbent employees increases the likelihood that they–and their knowhow–will be retained by the employing agency"). While in-service employees with medical restrictions can usually be accommodated, if Defendant were required to abandon the worldwide availability requirement with regard to Foreign Service candidate, other Foreign Service Officers would have to serve additional hazardous post assignments on Ms. Adams's behalf. <u>See</u> O'Keefe Decl. at ¶ 5 (Exh. 2).

This would be inherently unfair and would have a negative impact on morale. <u>Id.</u>; <u>see</u> <u>Barth v. Gelb</u>, 2 F.3d at 1189-90 (employees' morale can be considered when determining whether a proposed accommodation is reasonable). <u>See also</u> O'Keefe Decl. at ¶ 5 (Exh. 2). Foreign Service Officers understand that, although service at hardship posts as junior officers is generally required, they will likely have the opportunity to work in Europe or other sought-after posts when they become more senior. O'Keefe Decl. at ¶ 5 (Exh. 2). "In other words, if you serve in Bujumbura, you might someday serve in Paris." <u>Id.</u> However, "[s]omeone who can only serve in Paris forces someone else to serve only in Bujumbura." <u>Id.</u> This result is fundamentally at odds with the purposes of the Rehabilitation act and ADA. <u>See</u> 29 C.F.R. Pt. 1630, App. (Background)("the ADA is intended to enable disabled persons to compete in the workplace based on the same performance standards and requirements that employees expect of persons who are not disabled").

Moreover, if the Foreign Service were required to waive the worldwide availability requirement on behalf of Ms. Adams, it would effectively be obligated to extend like relief to all other applicants to the Foreign Service who have medical conditions that limit the number of

posts overseas to which they could be assigned. Such a result would, over time, dramatically shrink the pool of Foreign Service Officers that is available for worldwide assignment. Lussier Decl. at ¶ 8 (Exh. 3); Taylor, 2005 WL 913221, at * 10. Moreover, any change in current policy would undermine Defendant's efforts to assign junior personnel, who are relied upon to serve in many of the hardship locations. Taylor, 2005 WL 913221, at * 11 n.8; O'Keefe Decl. at ¶ 4 (Exh. 2).

Finally, a waiver of the worldwide availability requirement on Ms. Adams's behalf would be contrary to one of Congress' express purposes for enacting the Foreign Service Act of 1980. See H.R. Rept. 96-922, Pt. I at 9 ("One of the basic problems giving rise to this new legislation is the atrophy of this fundamental requirement [the worldwide availability requirement]"). The ADA (and, in turn, the Rehabilitation Act) does not require this frustration of congressional intent. See Southeastern Community College v. Davis, 442 U.S. 397, 410 (1979)(an employer is not required to fundamentally alter its program). Nor, as demonstrated above, does the Rehabilitation Act require an employer to waive an essential function of a position. See Taylor, 2005 WL 913221, at * 16 (holding that the law does not require the State Department to waive the worldwide availability requirement because such a waiver would ultimately change the very nature of its program).

In short, there simply is no form of reasonable accommodation for Ms. Adams that would allow her to perform the essential functions of the position to which she applied. Accordingly, she fails to establish a prima facie case of disability discrimination.

## IV.    Conclusion

For the foregoing reasons, the Court should grant Defendant's Motion to Dismiss or, in the alternative, for Summary Judgment and dismiss this case with prejudice.

Dated: September 16, 2005          Respectfully Submitted,


_____/s/_____
KENNETH L. WAINSTEIN, D.C. BAR #451058
United States Attorney


_____/s/_____
R. CRAIG LAWRENCE, D.C. BAR #171538
Assistant United States Attorney

_____/s/_____
JOHN C. TRUONG, D.C. BAR #465901
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 307-0406


Attorneys for Defendant


OF COUNSEL:
Lara Ballard, Esq.
U.S. Department of State

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KATHY E. ADAMS,                               )
                                              )
                                              )
                    Plaintiff,                )
                                              ) Civil Action No. 1:05CV00941(EGS)
            v.                                )
                                              )ECF
CONDOLEEZZA RICE, in her capacity as          )
United States Secretary of State,             )
                                              )
                    Defendant.                )
                                              )

## DEFENDANT'S MOTION TO DISMISS OR,
## IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Upon consideration Defendant's Motion to Dimiss or, in the alternative, for Summary

Judgment, the Opposition thereto, and the entire record herein, it is this _____ day of ____,

2005,

ORDERED that efendant's Motion to Dimiss or, in the alternative, for Summary

Judgment be and is hereby GRANTED; and it is

FURTHER ORDERED that the above-captioned action be and is hereby DISMISSED

with prejudice.

SO ORDERED.


_____

U.S. District Judge