UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHY E. ADAMS, <br>                   Plaintiff, <br>   <br> v. <br>   <br> CONDOLEEZZA RICE, in her capacity <br> as United States Secretary of State, <br>   <br>                   Defendant. | Civil Action No. 1:05CV00941 |

## DECLARATION OF LAURENCE G. BROWN

I, Laurence G. Brown, Director of the Office of Medical Services ("MED"), United States Department of State, do hereby declare as follows:

1. I have served in my current position as Director of MED since March 2003. I was the Clinical Director from November 2002 to March 2003, when Dr. Cedric Dumont was the Medical Director. I have been employed as a Foreign Service physician for the U.S. State Department since 1982, and have served as a Foreign Service Regional Medical Officer in Islamabad, Pakistan; Jakarta, Indonesia; London, United Kingdom; and Vienna, Austria. I have also served in Washington, D.C. variously as the Chief of Clearances, Director of Foreign Programs, and Deputy Medical Director. I graduated from the College of Medicine, Ohio State University in 1973, completed my Family Practice Residency at E.W. Sparrow Hospital in Lansing, Michigan, and am board certified in Family Practice. I also hold certificates in Advanced Trauma Life Support, Advance Cardiac Life Support, and Chem-Bio Preparedness.

GOVERNMENT EXHIBIT 1

2.      MED is charged with implementing the State Department's health care program, which is authorized by section 904 of the Foreign Service Act of 1980. The purpose of this health care program, as stated in the Foreign Service Act, is to promote and maintain the physical and mental health of members of the Foreign Service, and (when incident to service abroad) other designated eligible Government employees, and members of the families of such members and employees.

3.      MED currently employs 65 physicians (including 15 psychiatrists), 73 health practitioners (nurse practitioners and physicians assistants), and 8 clinical laboratory technologists as Foreign Service Medical Providers. All MED providers are required to maintain certification by their appropriate specialty or practice board and to be licensed to practice in at least one state or the District of Columbia. The Department provides approximately 50 hours of continuing medical education a year to each practitioner in order for them to remain current in their practices and to meet certification requirements. Like all members of the Foreign Service, Foreign Service Medical Providers spend a significant portion of their careers at U.S. missions overseas. They provide primary health care to members of the Foreign Service and their families, recommend medical and dental evacuations, evaluate the quality of local and regional health care providers and facilities, establish and maintain professional relationships with local providers and other health care facilities, monitor environmental health and safety conditions, and perform a myriad of other functions related to the health and safety of U.S. government employees posted overseas. In addition, virtually all medically related travel of those in the Foreign Service health care program is paid for and arranged by MED.

4.  The Office of Medical Services is responsible for our Foreign Service population 24 hours a day, 7 days a week. The policy of the Department of State is to:

   a.  Promote the health of every individual under its care by encouraging prevention of illness and facilitating access to health care;

   b.  Assist all eligible U.S. citizen employees and their eligible family members where assigned, to obtain quality medical care endorsed by MED;

   c.  Provide essential medical services, including direct patient care when authorized;

   d.  In the event local and regional medical facilities are inadequate to provide essential services, authorize and facilitate medical evacuation at government expense to locations where necessary medical care can be obtained; and

   e.  Provide an environmental health and preventive medicine program that focuses on the protection of employees and their eligible family members from post specific health risks.

5.  With 265 U.S. missions abroad, the Foreign Service has many more posting locations than there are Foreign Service Medical Providers. Only 169 of our 265 missions have a health unit. Of those 169, 73 are staffed by a Foreign Service health practitioner, a Foreign Service physician, or both. Locally hired nurses staff the remaining 96 health units. That leaves 96 overseas posts without a health unit. In most

places around the world we rely on local medical resources for routine and emergency medical care. Unfortunately many areas lack medical care that is even basic or adequate by American standards.

6. One duty that the Foreign Service physicians and health practitioners have is to evaluate local medical care and resources in their region of responsibility. In posts without a health unit, personnel self refer to local physicians based on a list of referral doctors developed by the Foreign Service providers. Even in posts with a health unit and a Foreign Service physician, local care may be used for specialty consultations, laboratory testing, and surgery if needed in urgent situations. In cases where local care is inadequate, patients with urgent needs are medically evacuated to the nearest point with adequate medical care. That point is frequently many hours by air, and given the time to arrange a medical evacuation, the actual time from medical need to receipt of care may be two or three days.

7. A few examples may help to illustrate some typical challenges faced by the Department's medical program in trying to assure adequate medical care overseas:

- In Yaounde, Cameroon, a 12-year-old boy came to the health unit with abdominal pain. After initial examination it was thought he might have appendicitis. A local surgeon could not be found, and other hospital facilities and anesthesia were felt to be inadequate. Although an air ambulance was called in immediately (it came from Switzerland), it was over 24 hours before the boy reached adequate surgical care in Switzerland. By then he had a ruptured appendix. He recovered successfully.

- In Islamabad, Pakistan, a young woman presented with new onset of seizures. No local laboratories were adequate for needed diagnostic studies of spinal fluid; there were no CT or MRI scanners available. She was stabilized by our embassy physician and flown to London for evaluation, the medical evacuation taking about 48 hours since there are only 3 flights/week from Islamabad to London.

- A child with asthma was living in Kiev with her parents. She had an acute exacerbation of her illness, and needed hospital care. The only place in the hospital in Kiev that had oxygen was their "intensive care" unit. Despite treatment she rapidly worsened. By the time the medical evacuation aircraft was in place, she was critically ill, so much so that the plane stopped in Stuttgart, Germany, instead of flying to the planned site of London.

- A middle-aged man in Santiago developed pancreatitis and required immediate surgery. He could not be medically evacuated. He was kept on a respirator for three weeks following the surgery and developed a narrowing of his trachea because of the prolonged respirator time. It is unlikely that complication would have occurred in the US.

- In Bahrain a man suffered a myocardial infarction (heart attack) and initial stabilization was attempted at the local hospital. He worsened, and was transferred to the cardiac center for the country. There, an overdose of medication led to an acute lowering of his blood pressure that caused his infarction to extend. He required emergency 5-vessel bypass surgery and a prolonged stay in the facility.

8. For these reasons, MED conducts medical examinations and issues medical "clearances" to all Foreign Service employees and their families on a regular basis. The medical examination is comprehensive and includes tests for a wide variety of conditions such as cardiac or metabolic diseases, hypertension or hypotension, tumors and cancers, arthritis, pulmonary disease, sexually-transmitted diseases, allergies and parasitic diseases, liver disease, neurological disease, mental disorders, diabetes, Hepatitis B, and Hepatitis C. The clearance process permits MED to assess whether a candidate has a health condition that the Department is unable properly to provide for at some or all posts and whether an individual may serve or live at a post without posing a danger to others or to him or herself. For example, if an individual has chronic obstructive lung disease (emphysema or bronchitis) he will not be recommended for posting to Quito or La Paz or Addis Ababa because of the high altitude at that location. Similarly, if an individual is severely asthmatic, she will not be posted to any location that does not have ready access to both 24-hour emergency room care —acute asthma flares may require intravenous medications, nebulizer treatments and even respirator support — and a general medical practitioner for routine maintenance and treatment on an outpatient basis for less severe bronchial infections and the like. MED regularly consults standard guidelines for the treatment of various medical conditions, in order to determine what types of facilities and medical personnel are required to manage and monitor such conditions.

9. MED also maintains a Post Capabilities Database on its Intranet site, which is regularly updated by MED physicians and health practitioners who survey local medical and laboratory facilities and evaluate both the adequacy of facilities and the level of expertise of medical personnel. This database is, to my knowledge, the only one of its

kind in the world, given that U.S.-trained medical personnel who personally inspect local medical facilities compile it. Facilities and medical specialists are given a rating between 0 and 4:

> 0-No facility or service available
>
> 1-Facility or service poor, only use in extreme emergencies
>
> 2-Facility or service fair, adequate for minor problems, not routine care
>
> 3-Facility or service good, recommended, not equal to U.S. standards
>
> 4-Facility or service excellent and equal to U.S. standards

The database is updated on an ongoing basis. It is one tool among many used by MED personnel to assess whether any particular post can meet an individual's medical needs.

10. MED assesses each individual's clearance on a case-by-case basis. Limiting physical conditions that do not involve medical treatment (e.g., non-progressive blindness), do not serve as the basis for denial of a Class 1 clearance. However, any physical or mental conditions that require medical management and/or follow-up monitoring are noted in the individual's file. The Medical Clearance section reviews that file and makes a final determination on the individual's clearance level.

11. A member of the Foreign Service is assigned a clearance class by MED to ensure as much as possible a medically appropriate overseas assignment. When an individual is considered medically able to serve at any overseas location, MED issues her a "Class 1" clearance. Individuals with a Class 1 clearance are considered "worldwide available." Those who can serve at some overseas locations but not others are given "Class 2" clearances. Those who cannot serve at any location outside the United States are given "Class 5" clearances. There are approximately 500 members of the Foreign Service who

have Class 2 clearances, and usually around a dozen who have Class 5 clearances. The most common diagnoses that bring about either a Class 2 or Class 5 clearance include (in no particular order) breast cancer, diabetes, depression, other mental health issues, alcohol problems, cardiac problems, back pain, and seizures.

12. A Foreign Service candidate normally undergoes an initial medical examination upon receiving a conditional offer of employment with the Foreign Service. The purpose of this examination, which may be conducted either by a private physician or by MED's examination clinic, is to determine whether the individual is medically eligible to receive a Class 1 clearance; *i.e.*, is available for service worldwide. Under the State Department's current hiring policies, new Foreign Service candidates are generally not appointed to the Foreign Service unless they receive a Class 1 clearance from MED. For this reason, Foreign Service candidates who do not receive a Class 1 clearance are flagged by MED as Class 5 for pre-employment purposes. When a Foreign Service candidate is denied a Class 1 clearance, MED notifies the individual by letter. Then, if the individual chooses, she can apply for a waiver of the worldwide availability requirement to the Director General of the Foreign Service.

13. If the individual chooses to apply for a waiver, the Medical Clearances section will provide the Director General and/or an advisory committee appointed by the Director General with the reason or reasons for the denial of a Class 1 clearance, and the percentage of posts at which the individual may be able to serve. My understanding of the waiver process is that it is not an opportunity to review MED's findings; rather, its purpose is to determine whether the worldwide availability requirement should be waived, based on the needs of the Service, for that particular individual. If a Foreign

Service employee actually disputes MED's medical findings, there is an internal MED appeal process whereby a three-physician panel will consider the employee's medical status in greater detail and can overturn MED's initial assessment. However, the Director General generally does not send individuals to overseas postings against MED's advice, and accordingly, does not review the medical accuracy of MED's findings as part of the waiver process. If a waiver is granted, the individual is normally given a Class 2 clearance, and cleared for a post that can support the individual's medical needs.

14.   I understand that Ms. Kathy Adams disclosed to MED in October 2003, while she was still pending an appointment to the Foreign Service, that she had been diagnosed ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ .n August 2003. On that basis, MED determined that she was not eligible for service worldwide and issued a "Class 5" medical clearance, for a number of reasons.

15.    Among many published guidelines that speak to breast cancer follow-up are those from the American Society of Clinical Oncology (see Journal of Clinical Oncology 1999; 17:1080); the Breast Committee of the National Comprehensive Cancer Network (see Clinical Practice Guidelines in Oncology, available at http://www.nccn.org/professionals/physician_gls/default.asp (Accessed 3/7/05)); the

Steering Committee on Clinical Practice Guidelines for the Care and Treatment of Breast Cancer of Health Canada (Canadian Medical Association Journal 1998; 158 Suppl 3:S65), and the National Health and Medical Research Council of Australia (see Clinical Practice Guidelines for the Management of Early Breast Cancer. Woolloomooloo, NSW, NHMRC NBCC, 2001. pp 97-102). All of these sources agree that routine history and physical examination and regularly scheduled mammograms are the basis of breast cancer follow-up. Other studies show that the history and physical examination are the principal means of detecting breast cancer recurrences. See, for example, de Bock, GH, Bonnema, J, van der, Hage J, et al. Effectiveness of routine visits and routine tests in detecting isolated locoregional recurrences after treatment for early-stage invasive breast cancer: a meta-analysis and systematic review, Journal of Clinical Oncology 2004; 22:4010.

16. In addition, Ms. Adams 

17. Therefore,

in this case. MED based this figure on a search of the post capability database for surgeons and/or oncologists at a particular post.

19. The consequence of foregoing appropriate monitoring for breast cancer recurrences can be significant. Early recognition of a cancer recurrence provides a window for useful intervention and cure. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ However, the lack of careful, regular monitoring and access to appropriate evaluation of any abnormal signs or symptoms could allow an abnormal situation to develop beyond the point of easy solution.

20. Ms. Adams may believe that it would be a minor matter to simply allow her to serve at any developing country she is assigned to, and then allow her to fly out twice a year to a developed country where she can have her routine monitoring and follow-up done by a qualified physician. However, unlike most domestic employers, the U.S. State Department is obligated to arrange for travel for members of the Foreign Service and their families posted overseas, when the medical attention they need is not available where they are posted. The Office of Medical Services (MED) provides and arranges all medically related travel to which members of the Foreign Service and their families are entitled.

21. MED anticipates that, even under the best of circumstances, individuals posted overseas with the Foreign Service can develop medical conditions that cannot be adequately treated by local medical personnel and facilities. For this reason, the Foreign



This is according to the American College of Obstetricians and Gynecologists (see ▬▬▬▬▬▬▬▬. ACOG Committee Opinion 232. ACOG 2000; Washington, DC).

18. Ms. Adams was found to be medically disqualified for worldwide service in 2003 because the Department could not guarantee at that time that access to the required medical follow-up and surveillance for her condition would be available at all overseas assignments. Medical facilities and expertise needed to conduct such monitoring was not available worldwide in 2003 and is not available at present. In particular there is a lack in many overseas areas of clinicians experienced in breast cancer detection and in the physical examination of breast cancer patients with emphasis on detection of cancer recurrences. At the time of Ms. Adams' clearance determination in 2003, approximately 53% of all Foreign Service posts had the professional and technological support required

Affairs Manual (FAM) at 3 FAM 686.1-1 provides that "Any employee or any of the employee's eligible dependents...who require medical care for illness, injury, or medical condition including obstetrical care, while located or stationed abroad in a locality where there is no adequate medical facility to provide such care...shall be eligible to travel at government expense to the nearest facility where suitable medical care can be obtained, whether or not the medical care is at government expense."  However, 3 FAM 686.1-4 states, "Travel will not be authorized for employees or eligible dependents to take routine medical examinations or to receive routine immunizations."

22.    There are several reasons why the Department does not pay for travel for routine medical examinations, and instead requires that members of the Foreign Service and their eligible family members only be posted overseas where the routine follow-up care they require for their medical conditions can be provided locally.  First and foremost, MED considers it unsafe to post individuals where they cannot receive their needed routine care locally; from our perspective, if a person's routine medical needs cannot be addressed at that post, any acute complications that might arise related to the person's medical condition(s) cannot be treated there either.  Transportation in and out of many overseas locations to which we send members of the Foreign Service is unreliable and often even dangerous.  In Kabul and Baghdad, for example, any trip from the embassy compound to the airport usually requires an armed escort.  In many posts in Africa, there may not be more than 2 or 3 commercial flights per week.  Private air ambulances can often take between 12 and 48 hours just to arrive at the patient's location.  Thus, we do not find it acceptable to place an individual in a situation where there is an increased likelihood that

Case 1:05-cv-00941-EGS    Document 21-4    Filed 03/07/2006    Page 14 of 16

we will have to put lives at risk in order to get that individual to the specialized medical care he or she needs.

23. Second, changing the Department's policy, and allowing individuals to start traveling from country to country at government expense for routine medical care, would represent an enormous increase in the Department's expenditures for medical travel. During the past fiscal year, MED authorized 1072 "medical evacuations" (the term "medical evacuations" as used by MED includes not only emergency evacuations, but any medically-related travel authorized pursuant to 3 FAM 686). This is average to below-average for a given year; some years the number of medical evacuations may be as high as 1500. Out of MED's total operating budget, $6,654,000 was spent on the 1,072 evacuations. This averages about $6,207.00 per medical evacuation. This high cost is due to the fact that, when an individual travels at government expense to another location to receive medical care or monitoring, MED pays not only for the airfare (which must consist of refundable tickets purchased at the government rate), but also for accommodations and a per diem allowance. Most individuals who go on medical travel tend to be traveling for 3-5 days; it takes 1-2 days each way to reach the destination, one day for medical testing, and then 1-2 days for consultations with the physician and possible follow-on tests depending on the initial test results. Thus, even a trip from Mexico City to Washington, DC for routine medical testing can easily cost the government $2000-$3000.

24. Therefore, if the Department were obligated to fly Ms. Adams to a developed country for her routine monitoring twice per year, at an average cost of $6207 per medical evacuation, it would cost MED approximately $12,414 per year each year that

Ms. Adams served in a hardship post with no adequate medical care available locally. Moreover, if MED were to pay and arrange for travel for all members of the Foreign Service and their family members who need routine follow-up care that is not available worldwide, the result would be to reverse longstanding Department policy and essentially nullify the provisions in 3 FAM 686.1-4. There are several thousand participants in MED's health care program who have "Class 2 clearances," which in most cases means that they require routine follow-up care that is not available worldwide. The costs of providing travel benefits to each individual who wanted to be posted in a location where his or her routine follow-up needs could not be met locally could be astronomical.

25.    For all of these reasons, we simply do not consider it feasible to post individuals at overseas locations where the follow-up care and monitoring they require under standard treatment guidelines is not available locally.

26.    MED's overall assessment is that individuals requiring follow-up care and monitoring following breast cancer treatment can currently serve safely at only about 50% of U.S. missions worldwide. This determination has nothing to do with whether Ms. Adams can engage in certain activities or perform the essential functions of a Foreign Service Officer. Instead, it is an assessment of whether *MED* can perform *its* job of providing or arranging for the type of care Ms. Adams would need while posted overseas. This assessment is based upon MED's substantial expertise in arranging care for other members of the Foreign Service who have undergone cancer treatment.

I hereby attest under the penalty of perjury that the foregoing is true and correct.

*[signature]*
LAURENCE G. BROWN
Director, Office of Medical Services
U.S. Department of State

This 12th day of September, 2005.