UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHY E. ADAMS, )<br>      Plaintiff, )<br>)<br>v. )<br>)<br>CONDOLEEZZA RICE, in her capacity )<br>as United States Secretary of State, )<br>)<br>      Defendant. )<br>) | Civil Action No. 1:05CV00941 |

### DECLARATION OF JOHN M. O'KEEFE

I, John O'Keefe, Deputy Assistant Secretary in the Bureau of Human Resources, United States Department of State, do hereby declare as follows:

1. I have served in the Bureau of Human Resources since July, 2003. I have been in my current position since April 2004. Prior to that date, I served as the Director of the Office of Career Development and Assignments (HR/CDA). I am also a career Foreign Service Officer, having joined the Foreign Service in 1975. I have served seven overseas tours, with six of those at hardship posts.

2. Within HR, I currently supervise the Offices of Overseas Employment, Performance Evaluations, Casualty Assistance, Employee Relations (which handles requests for accommodations from disabled individuals), and the Family Liaison Office. In addition, I preside over the Employment Review Committee (ERC), the committee that makes recommendations to the Director General with regard to waivers of the worldwide availability requirement. As director of HR/CDA, my previous position, I was responsible for coordinating all assignments within the Foreign Service.

GOVERNMENT EXHIBIT 2

3. There are a large number of posts overseas that are considered "hardship posts," and that are often characterized by unreliable air service, poor or non-existent medical facilities, and unreliable postal and other delivery systems. The Department's Office of Allowances assigns each post a "hardship differential" that enables each individual serving at that post to receive an allowance of between 5 and 25 percent of his or her base pay, depending on the degree of hardship. Posts may also receive an additional allowance for duty deemed dangerous.

4. Service at hardship posts is one of the unavoidable aspects of a Foreign Service career. This is particularly the case with regard to untenured Foreign Service Generalists, known as Junior Officers (JOs). HR/CDA is responsible for directing JOs to their first two assignments, seeking to give them experience in a variety of skills and settings in order to prepare them for a Foreign Service career and to assure that they are competitive when they are considered for tenure.

4. JOs are highly likely to receive a "hardship post" for their first assignment. Typically, approximately 80 percent of new JOs go to posts with some hardship and/or danger differential. The high proportion of hardship assignments is for several reasons. First, we expect all untenured FSOs, regardless of their "cone" (career track), to spend at least one year doing consular work (i.e., protecting American citizens abroad and processing visa applications). This is where the bulk of the entry-level work is in the Foreign Service. Consular work, especially visa work, tends to be most labor-intensive in Asia and Latin America. Many of these locations are hardship posts. In addition, many of our smaller posts, such as those in parts of Africa, have staffing patterns that include numbers of JOs.

5. If JOs were not worldwide available, and could not be assigned to hardship posts, others necessarily would have to take those postings in their place. One person would have to serve back-to-back in hardship posts, for instance, so that someone who was not worldwide available could serve back-to-back in non-hardship posts. This would be perceived as fundamentally unfair, and would have a negative impact on morale. Foreign Service Officers understand that, as a general matter, they are required to work in hardship posts when they are junior, and that they will likely have the opportunity to work in non-hardship, more sought-after locations when they become more senior. In other words, if you serve in Bujumbura, you might someday serve in Paris. Someone who can only serve in Paris forces someone else to serve in Bujumbura. Furthermore, a JO who is not worldwide available would not be able to answer the nation's highest needs—such as Iraq and Afghanistan—requiring others to fill those posts, perhaps multiple times.

6. It is now a requirement that Foreign Service Officers serve at a 15 percent or greater hardship post in order to compete for the Senior Foreign Service, and therefore all senior positions. This rule would have to be suspended in part or discarded entirely for individuals who would be medically exempt from hardship service for their entire careers. Such individuals would have to be subject to special assignment bidding procedures and promotion considerations. In addition, many of our policies and procedures, as well as our organizational culture, encourage and reward hardship service. Promotion boards, for example, generally look favorably on hardship service—not necessarily because of the hardship service itself but because the work at those posts is often the most critical to the United States. At present, mid-level officers serving at

higher than 15 percent hardship posts are allowed to bid on posts one grade above their own grade, which may give them an advantage in promotion. The committees that choose candidates for senior positions, such as Deputy Chiefs of Mission, also look favorably on hardship service.

7. I understand that Ms. Kathy Adams applied in 2003 to become a Foreign Service Generalist in the Consular cone. I understand that she was denied a medical clearance by our Office of Medical Services, who felt that she could serve safely at only about 53% of all posts worldwide due to the follow-up care and monitoring she would need in recovering from Stage I breast cancer, and that she subsequently applied for a waiver of the worldwide availability requirement, which was denied in March 2004 at a meeting of the Employment Review Committee. I was not present at this March 2004 meeting, but I am not surprised that she was denied a waiver of the worldwide availability requirement and would likely make the same decision today if such a request came before me.

8. Pursuant to Department regulations set forth in the Foreign Affairs Manual ("FAM"), the ERC, in considering requests for waivers of the worldwide availability requirement, considers the following factors: (1) To what percentage of posts is the candidate currently available to be assigned?; (2) Is the disqualifying condition considered permanent and/or temporary in nature? (3) What is the nature of the specific position for which the candidate is applying; and (4) Does this candidate otherwise possess some extraordinary skill or experience the value of which would outweigh her or his inability to be assigned worldwide? The purpose of the ERC is not to second-guess MED, but to determine whether the candidate possesses special skills for which the

4

Foreign Service has a compelling need that could outweigh the fact that he or she is not worldwide available.

9. Ms. Adams was, according to MED, only available for half of all overseas posts. I understand that she needed ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ Ms. Adams was applying to become a consular officer. In 2004, we did not have any shortage of applicants to the consular "cone" who met the requirements for worldwide availability; hence, we had no reason to hire an individual who could not meet those requirements. In addition, I know of no extraordinary skills or experience possessed by Ms. Adams. Thus, I can see no basis for waiving the worldwide availability requirement with regard to Ms. Adams, either in 2004 or at present.

10. I understand that Ms. Adams has stated that she cannot understand why the Department could not post her anywhere overseas, and then simply transport her to medical appointments in another country twice a year so that she can receive her required monitoring and follow-up care. From a human resources perspective, that would be unworkable. For example, some posts in regions of special U.S. interest like central Asia have only one consular officer (whose job it is to review and grant or deny requests for visas) and limited transportation. With other sections similarly staffed, the absence of the consular officer would place an undue burden on the post to ensure that visas are issued properly and not to any individual who seeks to do harm to the United States. In places like Afghanistan and Iraq, those at the embassy and working in the field in provincial reconstruction teams (PRTs) must arrange their schedules around critical foreign policy events like elections. The absence of a team member during one of these critical events

5

could have a significant negative impact on vital U.S. interests. It can take up to five days for an individual on a PRT simply to travel from the PRT to a location where she could get transport from that country. Thus, an individual on a PRT simply cannot attend regularly scheduled medical appointments in another country twice per year and still serve as an effective member of the team. These are just two examples of the types of responsibilities that can be placed on Foreign Service Officers overseas, that are incompatible with a need to receive sophisticated routine medical care.

11.  It is for all the reasons stated above that we maintain the requirement of worldwide availability for all new entrants to the Foreign Service. Without this requirement, the State Department would be limited in its ability to respond quickly to crises by deploying employees anywhere around the world. Removing the requirement would hurt morale, by making it more difficult to reward those who had done the toughest service with a more comfortable post. And it would take away from the esprit of the Service, which relies in part on the pride we take in shared sacrifice in the nation's interest.

I hereby declare under the penalty of perjury that the foregoing is true and correct.

John M. O'Keefe
Deputy Assistant Secretary,
Bureau of Human Resources

This 7th day of September 2005.