UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHY E. ADAMS,<br>     Plaintiff,<br><br>v.<br><br>CONDOLEEZZA RICE, in her capacity<br>as United States Secretary of State,<br><br>     Defendant. | Civil Action No. 1:05CV00941 |

## DECLARATION OF PHILIPPE A. LUSSIER

I, Philippe A. Lussier, Chief of the Workforce Planning Division and Acting Office Director in the Bureau of Human Resources, Office of Resource Management and Organization Analysis for the United States Department of State, do hereby declare as follows:

1. I have been in my current position since Novemenber 2004. Prior to that time, I was a workforce planning consultant and Program Director for the Logistics Management Institute (LMI) for eight years, providing workforce planning for both the Foreign Service and Civil Service; developing management systems and models for analyzing and reporting on the Department's workforce including the Foreign Service Flow-Through model and the Department's Domestic Staffing Model. The Bureau of Human Resources, Office of Resource Management and Organization Analysis, of which I am currently the Acting Office Director, is charged with providing workforce planning and human resource management for the State Department; the design and implementation of classification and compensation policies for both the Foreign Service and Civil Service; and the development and implementation of computer models and data bases to analyze and report on the Department's direct hire American workforce.



GOVERNMENT EXHIBIT 3

2. My office was tasked with analyzing the impact on the Foreign Service ("FS") employee populations, both current and future, in the event that the worldwide availability requirement was waived for all applicants to the FS. To accomplish this task, we reviewed the population of worldwide available and non-worldwide available FS Generalists ("Generalists") and FS Specialists ("Specialists") over the past five years by grade to estimate the size of the initial pools. We also examined FS applicant data over the last three years to determine how many applicants, who pass both the written and oral examinations, were found by the State Department's Office of Medical Services not to be worldwide available. We then determined what impact the waiver of the worldwide availability requirement for initial applicants would have on the available pools of worldwide available and non-worldwide available FS employees.

3. As part of this analysis, we first looked at the existing population at the end of fiscal year ("FY") 2004 to determine the proportion of FS employees that have medical restrictions. 15% of the Generalists and 16% of the Specialists are currently restricted from worldwide availability due to medical conditions. Notably, this quantifies only the status of the employee. For purposes of assigning FS officers to posts overseas, the Department takes into consideration on a case-by-case basis family members with special medical needs. The data set forth herein does not quantify or capture the medical restrictions that result from family member conditions. If these were included, the number of FS employees with special medical needs would increase from those stated.

4. We also looked at the trend of worldwide availability over the four previous years. In general the population of FS officers who are not worldwide available has averaged 15% for Generalists and 17% for Specialists over the last four years. These figures remained fairly stable

during this time frame. As expected, as the FS officer ages (reflected by increasing grade), the proportion of the population that is not worldwide available increases to where nearly 1 in 4 at the senior grades are not worldwide available.

5. In order to determine the potential number of FS applicants that may apply for a medical waiver, we used applicant data for the past 3 years to determine how many potential Generalists and Specialists who had passed written and oral exams were disqualified for not passing the medical exam. Using applicant data from the last three years produces an annual average of 39 Generalists and 79 Specialists who were denied entry to the Foreign Service because of medical conditions. Notably, it could be expected that a greater number of persons with prior medical conditions would apply to the Foreign Service each year if it were known that the world-wide availability requirement were no longer in effect. As a result, use of the above data probably underestimates the effect that a discontinuation of the worldwide availability requirement would have.

6. Finally, we "aged" the population of Generalists and Specialists 20 years, allowing for intake of non-world-wide available personnel to simulate the effect of waiving the pre-employment medical requirements. For FS Generalists, allowing 40 (reflects annual average of 39 Generalists who failed medical exam) employees to enter annually who are not worldwide available increases the pool nearly 50% over 20 years, from a current of 835 to 1234. At that point in time, the pool of non-worldwide available would comprise 29% of the Generalists population. For FS Specialists, allowing 80 (reflects annual average of 79 Specialists who failed medical exam) employees to enter annually who are not worldwide available more than doubles the pool over 20 years, from 733 current to 1548. This would comprise 53% of the Specialist

...

population. The result for Specialists is due to the fact that the pool is smaller to begin with over all, and the number who fail initial pre-employment medical screening is larger, twice as large as the Generalists who fail. Therefore, waiving or changing the policy has a much larger effect.

7. Based on the above analyses, we have determined that waiving or eliminating the world-wide availability policy for FS applicants can have a dramatic effect on the size of the pool of FS employees who are worldwide available. Specifically, we determined that the worldwide available FS employees would drop from a current 85% to just over 70% for Generalists after 20 years. Specialists would have an even more pronounced effect, dropping from 84% to 47% of the employees that would be worldwide available after 20 years.

8. This result would certainly increase the burden on FS officers who are worldwide available by increasing the number and frequency of rotation to hardship posts to which they would have to be assigned over the course of their career. Over the long term, this could be expected to negatively affect the Department's ability to recruit and retain FS employees for a full career. Additionally, career development and staffing a larger pool of employees with special medical needs may require additional career development and assignment staff who manage the bidding and assignment process since these are handled on an individual case-by-case basis.

I hereby declare under the penalty of perjury that the foregoing is true and correct.

Philippe A. Lussier
Acting Office Director
Bureau of Human Resources
Office of Research Management and
    Organization Analysis
United States Department of State

This **13th** day of July, 2005.