UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHY E. ADAMS,<br>      Plaintiff,<br><br>v.<br><br>CONDOLEEZZA RICE, in her capacity<br>as United States Secretary of State,<br><br>      Defendant. | )<br>)<br>)<br>) Civil Action No. 1:05CV00941<br>)<br>)<br>)<br>)<br>)<br>) |

### DECLARATION OF BRUCE L. COLE

I, Bruce L. Cole, Deputy Director, Office of Recruitment, Examination and Employment (REE), Bureau of Human Resources (HR), United States Department of State, do hereby declare as follows:

1. In my capacity as the Deputy Director in HR/REE, I have supervisory responsibility over all Foreign Service hiring. I also meet regularly with the Employment Review Committee (ERC). The ERC makes recommendations to the Director General of the Foreign Service, who heads HR, whenever a Foreign Service candidate who fails to receive a Class 1 clearance from the Office of Medical Services ("MED") requests a waiver of the worldwide availability requirement that normally applies to all entrants to the Foreign Service. I was present at a meeting of the ERC on March 23, 2004, when Kathy Adams was denied a waiver of the worldwide availability requirement.

2. The Foreign Service consists of both Foreign Service Specialists and Foreign Service Generalists. Foreign Service Specialists consist of, among others, construction engineers, financial management officers, information technology specialists, regional security



officers, medical personnel, and office management specialists. Foreign Service Generalists, on the other hand, carry out what is more commonly thought of as traditional diplomatic responsibilities, including representational work, political and economic reporting, trade promotion, public/media relations and outreach, and consular services and protection, which, along with management, are regarded as the bedrock functions of U.S. foreign policy.

3. Ms. Kathy Adams applied in 2003 to become a Foreign Service Officer. She was interviewed and later received a conditional offer of employment in July 2003.

4. Upon receiving a conditional offer of employment, all Foreign Service candidates must undergo both a background/security examination and a medical examination. The purpose of the medical examination is to determine the candidate's fitness to perform the duties of a Foreign Service officer on a worldwide basis, which is a requirement for appointment to the Foreign Service.

5. There are a large number of overseas locations in which our personnel must serve that are considered "hardship posts." The designation of an overseas location as a "hardship post" is made by our Office of Allowances. Hardship posts can be isolated and have unreliable air service, poor or non-existent internet and telecommunications connections, and unreliable postal and other delivery systems, all of which adversely impacts upon the post's ability to bring in required medical supplies or services and to provide for timely medical evacuations. The infrastructure at such posts can also be inadequate, including a poor public health care system, bad sanitation, unreliable electricity, and lack of potable water. Communicable diseases, including malaria, dengue fever, typhoid and tuberculosis, might also be present. Many of our overseas posts do not have their own health care units, and the local medical facilities might be

very poor or non-existent. Hardship posts are not few in number and are not confined to specific geographic areas.

6. The State Department must ensure that all posts are sufficiently staffed with personnel who have the necessary job skills in their respective specialties to fulfill the post's obligations and responsibilities. Service at hardship posts is one of the inescapable aspects of a Foreign Service career. The State Department makes no secret of this fact, and Foreign Service candidates are notified in advance of the nature of hardship posts and the need for Foreign Service Officers to be worldwide available. These matters, for example, are set forth at some length on the Department's website at www.careers.state.gov.

7. Foreign Service employees and candidates who are determined to have no medical condition(s) that cannot adequately be treated at all posts worldwide are considered "worldwide available" and receive a "Class 1" clearance from our Office of Medical Services. Other medical designations include Class 2 (conditions which can be treated adequately at some but not all posts outside the United States), and Class 5 (conditions which cannot be treated adequately at any post outside the United States). For administrative reasons, if MED does not give a Foreign Service candidate a Class 1 clearance, the candidate is automatically designated Class 5.

8. Medical clearance determinations are made by the Department's Office of Medical Services (MED), not HR. HR, moreover, does not have the authority to overrule or disregard MED's determination that a candidate has a medical condition that cannot adequately be treated at any post(s) outside of the United States. Also, in order to protect the candidate's privacy, MED does not even inform HR of the nature of the candidate's medical condition.

9. A candidate who has been denied a worldwide availability clearance can authorize and request review of his or her case by the Director General of the Foreign Service. The purpose of this review is to determine whether the candidate possesses special skills that might fill a compelling need of the Service, notwithstanding the fact that the candidate is not available for service worldwide.

10. The procedures for this review are governed by regulations at 22 C.F.R. § 11.1(e)(2003), and the Foreign Affairs Manual ("FAM") at volume 3, section 1931.2. Under current regulations, the waiver request is initially considered by an advisory committee that is normally chaired by a Deputy Assistant Secretary who reports directly to the Director General. This advisory committee is referred to as the Employment Review Committee (ERC). The ERC may recommend to the Director General that ineligibility caused by lack of worldwide availability be waived because of a compelling Service need. However, all final authority to waive such ineligibility rests with the Director General. The advisory committee consists of representatives from MED, HR, the Legal Adviser's office, and the Office of Civil Rights. At the meetings of this committee, MED will normally provide all attendees with a one-page fact sheet that describes the candidate, including the cone or specialty in which the candidate seeks employment. The fact sheet, as authorized by the individual requesting the review, further identifies the medical reason or reasons that the individual is not worldwide available, and estimates the percentage of posts at which the individual could serve. The committee members consider the skills or background each candidate would bring to the Foreign Service and whether the Foreign Service has at that time a compelling need for those skills.

13. The committee might ask the MED representative questions about why an individual's condition precludes a finding of worldwide availability. However, the committee

cannot second-guess or overturn MED's professional opinion. Rather, the purpose of convening the advisory committee is to permit the Deputy Assistant Secretary to consult with others from relevant offices before deciding whether there is a compelling Service need to hire the individual candidate despite the candidate's lack of worldwide availability. For this purpose, most of the discussion therefore focuses on the following factors, as set forth in the Foreign Affairs Manual (FAM), volume 3, section 1931.2:

(1) To what percentage of posts is the candidate currently available to be assigned?;

(2) Is the disqualifying condition considered permanent and/or temporary in nature? (i.e., is it likely that in the future the percentage of posts to which the candidate can be assigned will remain the same or increase or decrease);

(3) What is the nature of the specific position for which the candidate is applying (e.g., Will this person be a specialist with skills the Foreign Service is in great need of at this time? How many posts have this type of position and where are those posts generally located?); and

(4) Does this candidate otherwise possess some extraordinary skill or experience the value of which would outweigh her or his inability to be assigned worldwide?

If the worldwide availability requirement is waived, the individual will then normally receive a Class 2 clearance and will only be posted to those locations at which MED believes he or she can serve safely.

14.   Waivers have become increasingly rare because Department recruitment efforts have gradually resulted in a larger and more competitive body of Foreign Service candidates over the last 3-4 years. Of the 33 requests for a waiver that were considered by the ERC in 2004, none were granted.

15. Because we considered so many waiver requests in 2004, I have no specific recollection of Ms. Adams' waiver request or any specific deliberations that might have occurred regarding his case. However, I have examined the fact sheet that MED prepared on Ms. Adams for our March 2004 deliberations, and it is clear to me that I would have recommended a denial of her request at that time, for several reasons.

16. First, Ms. Adams had applied to be a Foreign Service Officer in the consular "cone," a particular area of specialty that involves assisting U.S. citizens overseas and reviewing requests for immigrant and travel visas. We had no shortage of consular applicants in March 2004. Therefore, there was no compelling service need to consider a waiver of the worldwide availability requirement.

17. Second, Ms. Adams did not indicate to us that she has any extraordinary skills that are in such short supply in the Foreign Service that they would outweigh the fact that she is not worldwide available. She submitted a letter from her doctor regarding her good general prognosis, but this did not address whether she had any extraordinary skills.

18. Finally, MED informed the ERC that Ms. Adams' required monitoring following her cancer treatment rendered her available to serve at approximately 53% of our overseas posts, which I understand restricts her from serving in a large number of hardship posts. We generally have no problem staffing non-hardship posts, and most of our postings for consular officers, particularly at the entry level, tend to be in hardship locations.

I attest under the penalty of perjury that the foregoing is true and correct.

_____
Bruce L. Cole
Deputy Director,
Office of Recruitment, Examination and
Employment
Bureau of Human Resources

This 13th day of September 2005.