# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

KATHY E. ADAMS,                )
                              )
                 Plaintiff,    )
                              )
       v.                      )      Civil Action No.: 05CV00941
                              )
CONDOLEEZZA RICE,              )
United States Secretary of State, )
                              )
                 Defendant.    )
                              )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
## SECOND MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

David H. Shapiro
Ellen K. Renaud
Swick & Shapiro, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C.  20005

March 20, 2006                          Attorneys for Appellant

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    **Adams Is Cleared to Become a Foreign Service Officer** . . . . . . . . . . . . . . . . . . . . 3

II.   **Adams Is Hospitalized and Treated for Breast Cancer** . . . . . . . . . . . . . . . . . . . . 3

III.  **Upon Learning That Adams Had Breast Cancer, but Before Learning Her
      Medical Follow-Up Requirements, Defendant Withdrew Adams' Clearance** . . . . . . 5

IV.   **Adams' Oncologist Informs Defendant That Any Doctor or Nurse-
      Practitioner Is Competent to Conduct Adams' Follow-Up** . . . . . . . . . . . . . . . . . . . 6

V.    **Defendant Ignores Adams' Oncologist and Issues Her a Class 5
      (Disqualifying) Medical Clearance Based on Alleged Need for a "General or
      Oncological" Surgeon to Perform Her Breast Exams** . . . . . . . . . . . . . . . . . . . . . . 9

VI.   **Discovery Will Likely Reveal That Ms. Adams Could Receive a Breast Exam
      at Any Overseas Post** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VII.  **Defendant Ignores Ms. Adams' Treating Oncologists Who Agree That Ms.
      Adams Faced No Increased Health Risks Overseas** . . . . . . . . . . . . . . . . . . . . . . . . 12

VIII. **Unaware That She Was, in Fact, Worldwide Available, Ms. Adams Requests
      a Waiver of the Worldwide Availability Requirement** . . . . . . . . . . . . . . . . . . . . . . 13

IX.   **Defendant Denies Ms. Adams' Waiver Without Considering the Critical
      Skills She Brings to the Foreign Service, as Required by its Own Guidelines** . . . . . 16

X.    **Defendant's Determination That Ms. Adams Is Not Worldwide Available
      Precludes Her from Obtaining a Vast Range of Employment** . . . . . . . . . . . . . . . . . 17

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I.    **Ms. Adams' Complaint Sufficiently States a Cause of Action** . . . . . . . . . . . . . . . . 20

II.   **Even Without Discovery, Ms. Adams Has Raised an Inference of Disability
      Discrimination** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.    **Summary Judgment Standard** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**B.**     **Ms. Adams Has Presented Sufficient Evidence for a Reasonable Juror to Find That Defendant Violated the Rehabilitation Act When it Refused to Hire Her** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    **1.**     **Ms. Adams is an individual with a disability within the meaning of the Rehabilitation Act** . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        **a.**     **Defendant's rejection of Ms. Adams based on her diagnosis alone demonstrates that it regarded her as disabled** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        **b.**     **Defendant's perception that Ms. Adams' need for a biannual breast exam posed a dire threat shows that it regarded her as disabled** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        **c.**     **Defendant regarded Adams as disabled from a class of jobs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    **2.**     **Ms. Adams can perform the essential functions of a foreign services officer without any accommodation** . . . . . . . . . . . . . . . . . . . 33

    **3.**     **Defendant admits that it refused to hire Ms. Adams because she had breast cancer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**C.**     **Ms. Adams Would Not Pose a Direct Threat to Herself or Anyone Else If She Were Assigned to a Hardship Post** . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## INTRODUCTION

Kathy E. Adams has sued the United States Foreign Service of the Department of State for disability discrimination in hiring. The Foreign Service admits that it did not hire Ms. Adams as a Junior Foreign Service Officer because she is a breast cancer survivor. Yet, defendant asks this Court to dismiss Ms. Adams' complaint, or grant summary judgment before discovery is conducted.

Defendant contends that its actions did not violate the Rehabilitation Act because Ms. Adams is not disabled and is thus not protected by the Rehabilitation Act and, if she were, because it could not reasonably accommodate her disability. However, Ms. Adams meets the definition of disability in the Rehabilitation Act under any of the three alternative definitions. First, she has a history of a disability in that she was hospitalized three times due to her breast cancer, a fact the United States Supreme Court has found sufficient to meet the definition of disability. Second, Ms. Adams is substantially limited from sexual contact by virtue of the physical and psychological scars of her cancer. Finally, defendant has treated Ms. Adams as if she is unable to hold any job that requires being stationed overseas and thus regards her as substantially limited in the major life activity of working. Accordingly, even without discovery, there is an issue of fact regarding whether Ms. Adams has the protection of the Act.

In its second, revised, dispositive motion, defendant argues that it did not violate the Rehabilitation Act because it based its denial of employment on Ms. Adams' breast cancer and not on the limits that breast cancer has placed on her sexual intimacy, which is what qualifies her as disabled under the Act. Defendant's argument is easily refuted by Supreme Court precedent. The high court has never required a victim of disability discrimination to show that an employer has used a victim's impairment as a reason for an adverse action rather than the victim's disability status.

Defendant's argument that it cannot accommodate Ms. Adams' "medical impairment" is

equally without merit.  Ms. Adams does not need any accommodation to perform the essential functions of a Junior Foreign Service Officer.  Other than routine medical care provided to every woman her age, the only medical follow-up Ms. Adams requires is a semi-annual breast exam by any general physician or a certified nurse practitioner.  Defendant argues that it cannot provide this exam at half of its overseas posts by constructing an artificial requirement for the exam: defendant claims that a breast exam can only be performed by a general or oncological surgeon.[1]  The need for a specialist to perform that monitoring is explicitly disproved by the testimony of Ms. Adams' treating health care providers.  While discovery may reveal more supportive evidence, even without discovery, there is an issue of fact regarding whether Ms. Adams needs an accommodation.

Because defendant's brief does not establish that there is no set of facts under which Ms. Adams can sustain her claim of disability discrimination, its motion to dismiss should be denied. Its motion for summary judgment should also be denied, because there are genuine issues of fact regarding whether she is entitled to the protection of the Rehabilitation Act and whether she requires the accommodation that defendant claims it cannot provide.

---

[1]  At various times, defendant claims that an oncologist, rather than an oncologic surgeon, must perform the breast exam.

## STATEMENT OF FACTS

I.    **Adams Is Cleared to Become a Foreign Service Officer.**[2]

Kathy Adams passed the Foreign Service Written Examination in September 2002, and the Oral Assessment on April 1, 2003. Plaintiff's Exhibit (Pl.'s Ex.) 19 (Adams Decl.) at ¶¶ 2-3. On April 21, 2003, Richard Vail, M.D., Ms. Adams' regular doctor and an internist, conducted the medical examination Ms. Adams needed for her Medical Clearance. *Id.* at ¶ 5. Based on Dr. Vail's examination, the U.S. Department of State Office of Medical Services (MED), on July 10, 2003, awarded Ms. Adams a Class 1 Unlimited Medical Clearance for Worldwide Assignment. Pl.'s Ex. 8.

On October 2, 2003, Ms. Adams learned that she received her Final Clearance and was eligible for appointment as a Junior Foreign Service Officer. *See* Defendant's Exhibit (Def.'s Ex.) 7 (Evans letter of 9/25/03). Ms. Adams also learned that she ranked 7th out of 200 consular candidates on the Register and 21st out of 66 on the List of Eligible Hires (LEH). Pl.'s Ex. 7. Given this ranking, Ms. Adams was certain to have the opportunity to serve as a Foreign Service Officer.

II.   **Adams Is Hospitalized and Treated for Breast Cancer**.

On August 1, 2003, Ms. Adams consulted Dr. Vail, her regular physician, about a lump in her breast. Pl.'s Ex. 19 (Adams Decl.) at ¶ 9. Dr. Vail referred her immediately to surgeon James

---

[2] To be eligible to work as a Foreign Service Officer, applicants must meet the following five requirements:

1.    Foreign Service Written Examination (*See* Pl.'s Ex. 14 (How to Become a Foreign Service Officer at http://careers.state.gov/officer/join/index.html) at ¶ 3);

2.    Foreign Service Oral Assessment (*Id.* at ¶ 4);

3.    Medical Clearance  (*Id.* at ¶ 7);

4.    Background Investigation (*Id.* at ¶ 6); and

5.    Final Review.  (*Id.* at ¶ 10).

Childs, M.D. After conducting an incisional biopsy at the hospital, on August 11, 2003, Dr. Childs told Ms. Adams that the lump was breast cancer. *Id*. On September 15, 2003, Ms. Adams had a mastectomy with simultaneous reconstructive surgery. *Id*. at ¶ 10. She remained in the hospital for two full days after her surgery. *Id*. In addition, after her discharge, Ms. Adams returned to the hospital every two days for three weeks so the doctor could remove fluid from her back. *Id*. at ¶ 11. During this time, Ms. Adams was unusually fatigued because the large surgical wounds on her back and chest made it difficult for her to sleep. *Id*. at ¶ 12. Her ability to move her right arm was impaired for several weeks, making it impossible for her to care for herself properly or to drive. *Id*. Given her condition, during the two weeks following her surgery, her mother performed her daily household chores, assisted with her personal care, and drove her to her doctor's appointments. Additionally, Ms. Adams did not return to work for nearly a month after her surgery. *Id*.

About three months later, as part of her treatment for breast cancer, Ms. Adams underwent surgery to remove her ovaries and fallopian tubes on December 1, 2003. Pl.'s Ex. 4 (Smith Decl.) at ¶ 2; Pl.'s Ex. 19 (Adams Decl.) at ¶ 27. When she was released from the hospital she needed two days of bed rest following the surgery, and again relied on her mother to care for her. Pl.'s Ex. 19 (Adams Decl.) at ¶ 27. On December 9, Ms. Adams sent Ms. Forsman, MED's nurse consultant, the pathology report from the removal of her ovaries indicating that the pathology findings were unremarkable. Pl.'s Ex. 3.

In Spring 2004, Ms. Adams had two outpatient procedures to reconstruct her nipple. Pl.'s Ex. 19 (Adams Decl.) at ¶ 27. Following these procedures, Ms. Adams took about one week away

4

from work for her recovery.[3]  *Id.*

While Ms. Adams has recovered physically from her breast cancer, she continues to suffer psychologically.  *See* Pl.'s Ex. 19 (Adams Decl.) at ¶ 49 (describing her "deep-seated fear that prospective suitors will reject [her] because of [her] history of cancer, loss of a breast, and current physical appearance").  Because of the physical disfigurement left by her surgery, medication that suppresses libido, and the mistreatment she has suffered because of her history of breast cancer, she is intensely afraid of physical intimacy.  *Id.* at ¶¶ 49-50.  Thus, she is unable to enter into romantic relationships or engage in sexual contact.  *Id.*

## III.  Upon Learning That Adams Had Breast Cancer, but Before Learning Her Medical Follow-Up Requirements, Defendant Withdrew Adams' Clearance.

Three weeks after having her mastectomy, on October 7, 2003, Ms. Adams voluntarily notified MED and the Office of Recruitment and Examination and Employment, Bureau of Human Resources at the Department of State (HR/REE) about her treatment for breast cancer.  Pl.'s Ex. 19 (Adams Decl.) at ¶¶ 16-22; Pl.'s Ex. 15 (Evans Decl.) at 1; *see also* Pl.'s Ex. 23 (E-mail from Adams to Dr. O'Rourke stating that although she had no obligation to inform the State Department about her cancer, she felt honor bound to inform them of her treatment).  This caused the Department of State to revoke her medical clearance.  Patricia Evans, the Human Resource Specialist who initially notified Ms. Adams of her eligibility for appointment to the Foreign Service, admitted:

---

[3]  It was during this period of two surgeries and recovery that defendant complains that Ms. Adams concealed her diagnosis from defendant because she did not notify defendant about it until October 2003. Def. Brief at 7-8.  However, Ms. Adams had no duty whatsoever to inform defendant of her treatment for breast cancer.  Pl's Ex. 19 (Adams Decl.) at  ¶¶ 16-18.  Furthermore, defendant had told Ms. Adams on September 30, 2003 that her background check (and, therefore, her final clearance) was still pending.  *Id.* at ¶ 19.  *See also* Pl.'s Ex. 26 (E-mail to Ms. Adams from Mr. Shivers 9/30/2003) (stating that as of September 30th, Ms. Adams security clearance (and, therefore, her Final Clearance) was still pending).

> It was only because Ms. Adams brought her medical problem to my attention and that of the Office of Medical Clearances that her medical clearance was changed from Class 1 (worldwide available) to Class 5 (not worldwide available). Therefore, but for the change in her medical condition that led to a change in her medical clearance, and barring some unforeseeable catastrophe of some sort, Ms. Adams would have received a confirmed offer of appointment to join the A-100 class that began in January 2004.

Pl.'s Ex. 15 (Evans Decl.) at 2.

Indeed, long before December 5, 2003, when it received the medical files explaining Ms. Adams' diagnosis, treatment, and prognosis, and the actual medical follow-up monitoring she required, MED withdrew Ms. Adams' medical clearance and stated that they were unlikely to restore it. In an e-mail message, dated October 10, 2003, Ms. Forsman, a Nurse Consultant in MED, stated that "there is a significant possibility that we will not be able to re-issue a Class One medical clearance . . ." Def.'s Ex. 15 (Forsman e-mail). Similarly, during an October 10, 2003, telephone conversation Ms. Forsman remarked that it would be in Ms. Adams' best interest to remain in the United States to receive medical treatment after an occurrence of breast cancer, rather than join the Foreign Service and live outside the U.S. Pl.'s Ex. 19 (Adams Decl.) at ¶ 24. These statements show that MED made a knee-jerk decision based on Ms. Adams' history of breast cancer rather than on her actual medical requirements, which they did not receive until December 2003.

## IV.  Adams' Oncologist Informs Defendant That Any Doctor or Nurse-Practitioner Is Competent to Conduct Adams' Follow-Up.

On December 5, 2003, Ms. Forsman received Ms. Adams' medical records, including a letter, dated November 19, 2003, from Ms. Adams' oncologist, Dr. Mark O'Rourke, M.D., senior partner in Hematology and Oncology at the Cancer Centers of the Carolinas.[4] Pl.'s Ex. 2 (O'Rourke Decl.)

---

[4] Dr. O'Rourke is Board-Certified in Internal Medicine, Oncology, and Geriatrics. Pl.'s Ex. 1 (O'Rourke letter of 1/12/04) at ¶ 1. Dr. Blackwell, Ms. Adams' consulting oncologist at Duke

at ¶ 1; *see also* Pl.'s Ex. 19 (Adams Decl.) at ¶ 28.  Dr. O'Rourke commented on her excellent
recovery and outlined the routine monitoring she required for the next 5 years, none of which was
extensive:

- tamoxifen for 5 years (a hormonal therapy drug which can be ordered in supplies of
  three months or longer);[5]

- an annual mammogram of her remaining breast; and

- a clinical breast exam at six month intervals for the next 5 years.

Def.'s Ex. 9 (O'Rourke letter of 11/19/03).  He also stated that her bout with cancer would in no way
prevent her from living overseas for extended periods of time.  He further stated that "a physician"
could provide the minimum follow-up she needed, a statement which shows that Ms. Adams did not
need the continuing care of a specialist.  He also invited interested parties to call him if they needed
further information.  *Id.*

Indeed, Dr. O'Rourke has repeatedly stated that Ms. Adams does not require a specialist's care
and that a nurse-practitioner meeting defendant's qualifications set forth in 3 FAM 682.2-1(b)[6] is
competent to perform Ms. Adams' six-month breast exam in between her annual physicals.  Pl.'s Ex.
1 (O'Rourke Letter of 1/12/04) at ¶¶ 13-14; Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 13, 14, 21, 22.  Dr.

---

University, is Board-Certified in Oncology.  Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶ 1.  None
of the staff of the Office of Medical Services staff has oncological certification, expertise, or
experience treating breast-cancer patients comparable to that of Dr. O'Rourke or Dr. Blackwell.

[5]  In late April 2005, at Ms. Adams' six-month check-up, Dr. O'Rourke changed her
medication from tamoxifen to a newer and more effective drug, Aromasin.  There would be no
appreciable threat to Ms. Adams' health if her supply of Aromasin were interrupted by up to six
months.  Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 23-24, 26.

[6]  These regulations are attached for the Court's convenience as Attachment A. *See* 3 FAM
682.2, detailing the qualifications for nurse practitioners in the Foreign Service.

O'Rourke specifically states:

> I also emphasize that any primary care provider -- physician or nurse-practitioner -- can perform Ms. Adams's 6-month breast examinations between her annual physicals; an oncologist, general or oncologic surgeon, or other specialist is not necessary. Indeed, part of the skill set of a primary care physician or nurse-practitioner is the clinical breast exam performed in a screening setting.

Pl.'s Ex. 2 (O'Rourke Decl.) at ¶ 14. Dr. O'Rourke has also emphasized that:

(a)    Ms. Adams had fully recovered from her surgeries with excellent results.

(b)    Her post-cancer status in no way diminishes her physical fitness to perform the duties of a Foreign Service Officer on a worldwide basis.

(c)    She will require no emergency treatment dictated by her post-cancer status, so unreliable transportation links and inadequate emergency medical facilities do not pose problems for her.

(d)    Her post-cancer status is in no way incapacitating.

(e)    Her post-cancer status in no way prevents her from living and working anywhere in the world for prolonged periods of time.

(f)    Her post-cancer status presents no physical, neurological, or mental condition that would render her unable to function on a worldwide basis or which otherwise might adversely affect her assignment to any post in the world.

Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶¶ 2, 4-8; see Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 3, 15-19. Dr. Kimberly Blackwell, M.D., the breast-cancer oncologist Ms. Adams consulted at Duke University, concurs with Dr. O'Rourke's assessment, as reflected in her letter of January 18, 2005. Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶¶ 7-11. In particular she writes that Ms Adams does not require specialized medical care, she does not have to remain in the United States to receive the

8

minimal medical services she requires, and that a nurse practitioner would be competent to perform Ms. Adams' semi-annual breast exams. *Id*. at ¶¶ 17, 19. Finally, J. David Smith, M.D., the Board-Certified gynecologist who removed her ovaries and continues to follow Ms. Adams, verified that he needs to see Ms. Adams only on an annual basis. Her yearly gynecological exam is routine and does not require him to provide any additional services over and above that which he renders to any other patient. Pl.'s Ex. 4 (Smith Decl.) at ¶¶ 3, 4, 5.

**V.     Defendant Ignores Adams' Oncologist and Issues Her a Class 5 (Disqualifying) Medical Clearance Based on Alleged Need for a "General or Oncological" Surgeon to Perform Her Breast Exams.**

Dr. Laurence Brown, Director of MED, informed Ms. Adams by letter, dated December 12, 2003, that MED revoked Ms. Adams' Class 1 clearance and had assigned her a Class 5 clearance that disqualified her from employment with the Foreign Service. Def.'s Ex. 11 (Brown letter of 12/12/03).

Defendant disqualified Ms. Adams from the Foreign Service because it believed that her semi-annual breast exams needed to be performed by a surgeon or an oncologist. However, MED's stated policy is that "applicants . . . who have no need of more frequent . . . medical monitoring than once annually . . . would not be denied a worldwide medical clearance." Pl.'s Ex. 16 (Von Arx Decl.) at 5. The only care that Ms. Adams required more often than annually is her semi-annual breast exam that can be performed by any physician or even a nurse practitioner. Def.'s Ex. 13; Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶ 19. However, defendant concluded that Ms. Adams' two-minute breast exams could only be performed at 53% of posts and "based this figure on a search of the post capability database for surgeons and/or Oncologist." Def.'s Ex. 1 (Brown Decl.) at ¶ 18.

Despite her oncologist's opinions that any doctor or nurse practitioner could perform Ms.

9

Adams' two-minute breast exam, defendant insists that this care would not be sufficient.  Ms.
Forsman, a nurse consultant with MED, stated that Ms. Adams could not be given a clearance
because "she needed to be seen every six months for follow-up care (preferably by a specialist)."
Pl.'s Ex. 17 (Forsman Decl.) at 3.  Emil Von Arx III, M.D., the physician who rejected Ms. Adams'
application for a waiver, asserts that Ms. Adams needed her breast exam performed by "a general
or oncologic surgeon."  Def.'s Ex. 13.  Similarly, Mr. O'Keefe, Deputy Assistant Secretary in the
Bureau of Human Resources who supervises the Offices of Overseas Employment, claimed that Ms.
Adams could not serve overseas because he thought she needed "sophisticated routine medical care."
Def.'s Ex. 2 (O'Keefe Decl.) at ¶ 10.  Two months after receiving Dr. O'Rourke's letter that stated
unequivocally that any physician or nurse-practitioner was qualified to conduct Ms. Adams' follow-
up care (semi-annual two-minute breast exams), defendant made the determination that Ms. Adams
needed a general or oncologic surgeon[7] to follow Ms. Adams.  *Compare* Pl.'s Ex. 1 (O'Rourke Letter
of 1/12/04) (stating that any physician or certified nurse practitioner "would be competent to perform
Kathy's physical breast exams" dated January 12, 2004), *with* Def.'s Ex. 13 (Von Arx memo opining
that a "general or oncologic surgeon" should follow Ms. Adams, dated March 23, 2004).

Nowhere has defendant provided any medical authority for its conclusion or provided any
basis for rejecting the recommendations of Ms. Adams' doctors, both eminent oncologists.
Moreover, in denying Ms. Adams' medical clearance, defendant departs from its own practices as
declared to applicants on its website.  In response to a "frequently asked question" about medical

---

[7] Later, during the EEOC investigation in this case, Von Arx changed his assessment of the
qualifications of the health-care professional who should follow Ms. Adams to an "oncologist [sic]
or general surgeon."  Pl.'s Ex. 16 (Von Arx Decl.) at 4.  *But see* Def.'s Ex. 13 (claiming that Ms.
Adams' breast exam needed to be performed by "a general or oncologic surgeon").

10

eligibility, the website indicates that MED relies on the recommendation for follow-up care provided by the oncologist following a breast-cancer survivor to determine whether it could adequately provide that follow-up. *See* Pl.'s Ex. 11 (Medical Clearance FAQ at http://careers.state.gov/officer/medfaq.html) (indicating that to determine whether a breast-cancer survivor could receive a medical clearance "[a] full medical report *from the oncologist* is required to establish the type of follow-up that is needed.") (emphasis added). Here, however, MED rejected the oncologists' opinions of what follow-up care is needed in favor of an artificial standard that disqualifies Ms. Adams from the Foreign Service. *Cf.* Def.'s Ex. 1 (Brown Decl.) at ¶ 26 (stating that MED determined that Ms. Adams could not receive care at nearly half of all posts "based upon MED's substantial expertise in *arranging* care for other members of the Foreign Service who have undergone *cancer* treatment") (emphasis added).

## VI.    Discovery Will Likely Reveal That Ms. Adams Could Receive a Breast Exam at Any Overseas Post.

Absent discovery and without access to the Post Capabilities Database upon which defendant bases the claim that Ms. Adams could only receive a breast exam at 53% of overseas posts,[8] Ms. Adams researched and created her own "Post Capabilities Database" from information available at defendant's own website (http://foia.state.gov/MMS/postrpt/pr_view_start.asp) (Ms. Adams' analysis is found in the first tab labeled "Analysis" in the only hard copy exhibit submitted to the Court in a large white binder as Exhibit 21 and is hereafter referred to as "Post Report Analysis"). Pl.'s Ex. 19 (Adams Decl.) at ¶ 39 (describing how she researched and compiled the Post Report Analysis); *see*

---

[8] This figure is based on the false premise that Ms. Adams required an oncologist or surgeon. Def.'s Ex. 1 (Brown Decl.) at ¶ 18.

*also* Pl.'s Ex. 21.  The analysis reveals that there is a competent medical authority to conduct Ms.

Adams' six-month physical breast exam available in at least 249 of the 254 posts in the website list.

Pl.'s Ex. 19 at ¶ 42.

There were five posts without sufficient data to determine whether a professional was

available for a two-minute breast exam.  Pl.'s Ex. 21 (Analysis).  Two of these five posts are in

Kavala, Greece and Tangier, Morocco.  Both are Voice of America stations to which it is doubtful

Ms. Adams could be assigned.  Another of the five is in Kaohsiung, Taiwan, which has 2 medical

colleges in the city; the Post Report also indicates that Taiwan has "adequate medical care."  Pl.'s Ex.

21, Tab "T":  Post Report for Taiwan at 1-2.  A fourth post with insufficient data is Accra, Ghana,

which has an Embassy with 103 U.S. direct-hire employees and a MED Health Unit.  Pl.'s Ex. 21,

Tab "G":  Post Report for Ghana at 2.  Thus, discovery may well reveal that all of the posts have

someone available who is qualified to conduct a two-minute breast exam.

**VII.    Defendant Ignores Ms. Adams' Treating Oncologists Who Agree That Ms. Adams Faced No Increased Health Risks Overseas.**

Despite the fact that both Drs. O'Rourke and Blackwell stated that Ms. Adams' post cancer

status would not be "aggravated by hardship or render her more susceptible than other persons to

health problems," (Pl.'s Ex. 1 at ¶ 5; Pl.'s Ex. 5 at ¶ 8), defendant goes to great length to portray a

series of problems that could arise if Ms. Adams could not access appropriate medical care in the

case of a medical emergency.  Laurence Brown, the Director of MED, portrays a series of

transportation and medical hazards that could arise if complications arose at posts with minimal local

resources.  Def. Ex. 1 (Brown Decl.) at ¶ 7.  He does so by commenting on emergencies that arose

in five particular posts, none of which involve individuals who were cancer survivors.  Brown cited

the case of a 12-year old boy in Younde, Cameroon, whose appendix burst. *Id.* He also cited the case of a young woman with seizures who was evacuated from Islamabad, Pakistan, as well as an asthmatic child who could not receive adequate care in Kiev, Ukraine. *Id.* He further cited to the cases of a man in Santiago, Chile, who developed pancreatitis and a man who suffered from a heart attack in Bahrain. *Id.* Brown also insinuates that providing Ms. Adams with a breast exam in hot spots such as Kabul or Baghdad would expose others to harm since they would have to provide an armed escort to drive her to the hospital. *Id* at ¶ 22. Despite Brown's assertions, the country reports for each of these posts illustrate that Ms. Adams could easily receive the follow-up care her doctors recommended. *See* Pl.'s Ex. 21, Tab "C": Post Report for Cameroon; Tab "I": Post Report for Iraq; Tab "P": Post Report for Pakistan; Tab "U": Post Report for Ukraine; Tab "C": Post Report for Chile; Tab "B": Post Report for Bahrain; Tab "J": Post Report for Jordan; Tab "K": Post Report for Kuwait; Tab "I": Post Report for India.

## VIII.    Unaware That She Was, in Fact, Worldwide Available, Ms. Adams Requests a Waiver of the Worldwide Availability Requirement.

On December 17, 2003, Ms. Evans wrote Ms. Adams a letter informing her that the refusal of the Office of Medical Services to reinstate her Class 1 clearance would terminate Ms. Adams' candidacy unless she requested a waiver of the Class 1 clearance requirement. Def.'s Ex. 7. Accordingly, on January 12, 2004, Ms. Adams submitted her Application for Waiver of the Class 1 Medical Clearance Requirement. Pl.'s Ex. 12. Attached to it was a second opinion letter, also dated January 12, 2004, from Dr. O'Rourke that addressed specifically the minimal nature of the follow-up monitoring that she required; the competence required of the health-care professionals necessary to conduct that monitoring; and Ms. Adams' ability to live and work as well as anyone else

13

under the many hardship conditions described in the Department of State's website and other publications. Pl.'s Ex. 1.

In his letter in support of Ms. Adams' waiver, Dr. O'Rourke reiterated that the medical monitoring Ms. Adams' post-cancer status required included only:

(a)     an annual pelvic exam and an annual mammogram of her remaining breast, both of which would be recommended for any woman of Ms. Adams' age (any competent physician can perform Ms. Adams' examinations; an oncologist or other specialist is not required);

(b)     a physical breast exam every six (6) months for five (5) years (on an annual basis, one of these two exams could be performed during the physical exam described in item (a) above; and

(c)     adjuvant hormonal therapy consisting of her ingestion of one (1) 20-mg Tamoxifen pill daily for five (5) years. Ms. Adams began that course on October 13, 2003.

Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶¶ 9-10. Dr. O'Rourke again emphasized that Ms. Adams' post-cancer status does not require specialized medical care, and she does not have to remain in the United States to receive the minimal medical services she requires. She does not have to be assigned to a post near the medical service-providers or facilities where her follow-up care is performed; she need only be allowed to visit them briefly twice a year. Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶¶ 12-13; Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 14, 20, 21. Dr. Blackwell concurs with his assessment. Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶¶ 16-17. Moreover, both Drs. O'Rourke and Blackwell stated that a nurse practitioner meeting defendant's qualifications (set forth at 3 FAM 682.2(b)) would be competent to perform Ms. Adams's physical breast exams in between the annual exams, if a physician were not conveniently available. Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶ 14; Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 14, 22; Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶ 18-19. Dr. O'Rourke furthered explained that part of the skill set of a primary care physician or nurse-

14

practitioner is the clinical breast exam performed in a screening setting and that he would be "entirely comfortable" with her primary care provider conducting her follow-up."  Pl.'s Ex. 2 (O'Rourke Decl.) at ¶ 14.

In his January 12, 2004, letter, Dr. O'Rourke also explained that Ms. Adams' follow up would not be threatened by any emergency situations.  He stated there would not be a significant threat to Ms. Adams' health as a post-cancer patient if, due to unforeseeable exigent circumstances, any other examinations were delayed by up to six (6) months.  Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶ 17; Pl.'s Ex. 2 (O'Rourke Decl.) at ¶ 25; *accord* Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶ 22.  He also noted that the consequences of an unpreventable interruption in Ms. Adams's supply of tamoxifen of up to six (6) months would not present an appreciable threat to Ms. Adams's health. Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶ 18; *accord* Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶ 23.

Despite supporting letters from Ms. Adams' doctor, defendant denied Ms. Adams' request for a waiver, alleging that it would not be "in best interest of the Foreign Service."  Def.'s Ex. 14 (Cole letter of March 29, 2004).  Ms. Adams subsequently learned that the fundamental reason defendant denied her application for a waiver of the Class 1 clearance requirement was defendant's erroneous belief that Ms. Adams could serve in only 53% of posts.  Indeed, defendant continues to assert this inaccurate position in ¶ 11 of its Statement of Material Facts For Which There is No Dispute.  *Citing* Def.'s Ex. 1 (Brown Decl.) at ¶ 26. *But see* Pl.'s Ex. 21 (Analysis by Ms. Adams, concluding that Ms. Adams would likely be able to serve at 100% of defendant's overseas posts); Pl.'s Ex. 19 (Adams Decl.) at ¶ 39-43 (describing how she researched and compiled the Post Report Analysis).

IX.    **Defendant Denies Ms. Adams' Waiver Without Considering the Critical Skills She Brings to the Foreign Service, as Required by its Own Guidelines.**

In denying Ms. Adams' waiver application, defendant also failed to follow its own guidelines which require consideration of any critical needs that an applicant may fulfill for the agency. Def.'s Ex. 2 (O'Keefe Decl.) at ¶ 8. John Campbell, Deputy Assistant Secretary of Human Resources for the Department of State and Chair of the Employee Review Committee (ERC), stated that it was the ERC's practice to ask the representative from the Bureau of Examination, Employment and Recruitment about

> the particular skill group of the candidate under consideration. We needed to know whether there was a shortage of candidates with the . . . specialty skills of the candidate . . . .
>
> The ERC's focus is on whether there is a compelling Service need to waive the candidate's ineligibility and on the percentage of posts in which the candidate could serve if he/she were to be waived-in . . . It depends on the needs of the Service at any given time and the skills and background of the candidate.

Pl.'s Ex. 6 (Campbell Decl.) at 3-5; *see also* Def.'s Ex. 12 (Cole Decl., 9/13/05) at 3 (noting that it was his responsibility to "present anything additional that the candidate may have provided.").[9]

While Ms. Adams' waiver application was pending, the Agency had a "critical need" for

---

[9] The four factors ERC considers when deciding whether to grant waivers of the worldwide availability requirement are:

(1)    To what percentage of posts is the candidate currently available to be assigned?
(2)    Is the disqualifying condition considered permanent and/or temporary in nature?
(3)    What is the nature of the specific position for which the candidate is applying? and
(4)    *Does this candidate otherwise possess some extraordinary skill or experience the value of which would outweigh her or his inability to be assigned worldwide?*

Def.'s Ex.2 (O'Keefe Decl.) at ¶ 8 (emphasis added).  *See also* Pl.'s Ex. 22 (Information Memorandum from Bruce Cole about the functions of the ERC).

speakers of Russian.  Pl.'s Ex. 10.[10]  Ms. Adams has a B.A. (*magna cum laude*) in Russian Area

Studies and spoke Russian when she finished college.  Pl.'s Ex. 12 (Waiver Application) at 3-4.  Ms.

Adams emphasized her training in Russian in her waiver application.  *Id.* at 2-4.  The statements of

Bruce Cole, John Campbell, and John O'Keefe, who considered whether to grant her a waiver, all

indicate that the ERC did not even consider Ms. Adams' capacity to meet this critical need of the

Service when making their decision to deny her a waiver.  Def.'s Ex. 2 (O'Keefe Decl.) at ¶ 9; Pl.'s

Ex. 6 (Campbell Decl.) at 4.  Indeed, Bruce Cole states that there was "nothing in Ms. Adams's

experience for which there was a compelling need.  Thus, the recommendation was to turn her

down."  Def.'s Ex. 12 (Cole Decl., 9/13/05) at 4.

## X.    Defendant's Determination That Ms. Adams Is Not Worldwide Available Precludes Her from Obtaining a Vast Range of Employment.

Pursuant to 3 FAM 681.2(a) at least 50 agencies other than the Department of State require

a worldwide medical clearance from MED for applicants who will be working overseas:

> Agency for International Development (USAID), including PASA
> U.S. Information Agency (USIA)
> Peace Corps (excluding volunteers)
> Department of Agriculture Foreign Agricultural Service (FAS)
> Federal Grain Inspection Service (FGIS)
> Animal/Plant Health Inspection Service (APHIS)
> Agricultural Research Service (ARS)
> Office of Information, Cooperation and Development (OICD)
> Soil Conservation Service (SCS)
> Department of Commerce
> Foreign Commercial Service (FCS)
> Export Development (ED)
> Import Administration (IA)

---

[10]  Defendant continues to have such a critical need.  The website article *How to Become a Foreign Service Officer*, last updated on August 18, 2005, states in ¶ 11 that "[e]xtra points are given to candidates who pass language test in Critical Needs languages, currently defined as . . . Russian . . ."  Pl.'s Ex. 14 (http://careers.state.gov/officer/join/index.html).

Bureau of Census (Lagos only)
Department of Interior
Bureau of Reclamation (BUREC)
U. S. Geological Survey (USGS)
Office of the Inspector General (OIG)
Department of Transportation
Federal Aviation Administration (FAA)
Federal Highway Administration (FHA)
U.S. Maritime Administration (USMA)
Department of Justice
Drug Enforcement Administration (DEA)
Immigration and Naturalization Service (INS) (including Pre-Clearance Personnel)
U.S. Marshals Service (USMS)
Federal Bureau of Investigation (FBI)
Department of Treasury
U.S. Customs (USC)
U.S. Secret Service (USSS)
Office of International Affairs (OIA)
U.S. Saudi Arabian Joint Commission for Economic Cooperation (JECOR)
Internal Revenue Service (IRS)
Bureau of Alcohol, Tobacco and Firearms
National Aeronautics and Space Administration (NASA)
The Library of Congress
Environmental Protection Agency (EPA)
Department of Veterans Affairs (VA), Staff Employees Only
Office of the U.S. Trade Representative (USTR)
Inter-American Foundation (IAF)
Department of Health and Human Services
Centers for Disease Control (CDC)
National Institutes of Health (NIH)
Office of International Affairs (IAF)
Office of Human Development Services (OHDS)
Social Security Administration (SSA)
U.S. Postal Service (USPS)
African Development Foundation (AFD)
Department of Energy (DOE)
National Science Foundation (NSF)

3 FAM 681.1(c), found at Attachment A.[11]  Pl.'s Ex. 25 (Form DS-1843, Medical History and

---

[11]  These are the Agencies that participate by formal agreement in the MED program.  MED's obligation to provide medical services to an employee of an agency with such a formal agreement with defendant hinges on the employee's ability to obtain a medical clearance from MED, as revealed

Examination for Foreign Service) at 1 (asking applicants to check the box for the agency they are applying for and the type of employment).

In addition to the 50 agencies listed above, employees of agencies *without* formal agreements with MED who are posted overseas are also covered by MED's clearance process. 3 FAM 681.1(b) extends MED's coverage to designated U.S. Civil Service employees who are assigned abroad on temporary duty, if the employee's agency enters into an agreement with MED. 3 FAM 684.2-3(c) mandates that Civil Service employees assigned abroad on temporary duty for more than 60 consecutive days must have a current medical clearance. 3 FAM 684.7-7(a) specifies that the medical clearance process for an employee who has been selected by an agency for assignment abroad for 60 consecutive days or more is the same as for any other employee covered by MED. Per 3 FAM 684.7-1(c) and (d)(3), the employee's agency is notified of the employee's clearance via the same DS-823 form that was used by MED to issue both Ms. Adams' Class 1 and Class 5 clearances.

The clearance assigned by MED affects even Fulbright Scholars and employees of *contractors* to the U.S. Government:

- "American contractors of U.S. Government agencies, including Fulbright scholars, are permitted to use Health Unit facilities if they bring copies of (a) current medical clearance certified by a physician using State Department clearance standards for Yemen and (b) evacuation and hospitalization insurance." Pl.'s Ex. 21, Tab "Y": Post Report for Sanaa, Yemen.

- "Contractors must undergo medical examinations comparable to the State Department exam." Pl.'s Ex. 21, Tab "G": Post Report for Conakry, Guinea.

---

in the Post Report for Jakarta, Indonesia: "U.S. Mission employees whose agencies have agreements with the U.S. Department of State regarding health care may use this facility for themselves and their eligible family members, provided that they receive a medical clearance from the Department of State's Office of Medical Services." Pl.'s Ex. 21, Tab "I": Post Report for Jakarta, Indonesia. The Class 5 clearance assigned wrongfully to Ms. Adams would, therefore, disqualify her from any position overseas with any agency covered by MED's clearance requirement.

19

- "The Health Unit is located in the Chancery and provides primary care services for U.S.G direct-hire personnel, contractors, and eligible family members who qualify for the Department of State medical program."  Pl.'s Ex. 21, Tab "N":  Post Report for Managua, Nicaragua.

Given these guidelines, defendant's perception that Ms. Adams cannot serve at 47% of overseas posts would, if true, disqualify Ms. Adams from many more positions than just a Foreign Service Consular Officer.

## ARGUMENT

### I.     Ms. Adams' Complaint Sufficiently States a Cause of Action.

The purpose of a motion to dismiss is not to test whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim. *Glymph v. District of Columbia*, 180 F.Supp.2d 111, 113 (D.D.C. 2001).  The plaintiff's burden to survive a Rule 12(b)(6) motion to dismiss is to provide a complaint with a short and plain statement of the claim and the grounds on which it rests.  *See* Fed.R.Civ.P. 8(a)(2); *see also Pinnacle Airlines, Inc. v. National Mediation Bd.*, 2003 WL 23281961 * 1 (D.D.C., Nov 05, 2003) (*citing Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Thus, dismissal is appropriate only if defendant demonstrates that the plaintiff  "can prove no set of facts in support of his claim which would entitle him to relief."  *Conley,* 355 U.S. at 45-46; *accord Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987) (citations omitted); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C. Cir. 1979); *Judicial Watch, Inc. v. Clinton*, 880 F.Supp. 1, 7 (D.D.C. 1995).  In determining whether Ms. Adams has properly stated a claim, the allegations in the complaint must be presumed true and liberally construed in her favor. *Phillips*, 591 F.2d at 968 (*citing Miree v. DeKalb County, Georgia*, 433 U.S. 25, 27 n. 2 (1977)).  In addition, Ms. Adams must be given every favorable inference that may be drawn from her allegations of fact. *Scheuer v.*

*Rhodes*, 416 U.S. 232, 236 (1974).

More specifically, Ms. Adams is not required to set forth the elements of a *prima facie* case in her complaint. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (a complaint "need not plead law or match facts to every element of a legal theory"); *Atchinson v. Dist. of Columbia*, 73 F.3d 418, 421-22 (D.C. Cir.1996) (a complaint "need not allege all that a plaintiff must eventually prove").  To be sufficient, her complaint need only put the defendant on fair notice of the claim against it so it has an opportunity to file a responsive answer and to prepare an adequate defense. *Swierkiewicz*, 534 U.S. at 514.  Put more simply, all her complaint needs to say is that she was turned down for the Foreign Service because she has a disability. *See Sparrow*, 216 F.3d at 1115 (agreeing that "'I was turned down for a job because of my race' is all a complaint has to say to survive a motion to dismiss under Rule 12(b)(6).") (internal citation omitted).  Ms. Adams has so alleged. *See* Amended Complaint at ¶ 11 ("she was denied the right to become a Foreign Service Officer simply because she informed the State Department that she had been diagnosed with Stage I breast cancer in mid August of 2003.").  Accordingly, defendant's motion to dismiss must be denied.

## II.    Even Without Discovery, Ms. Adams Has Raised an Inference of Disability Discrimination.

### A.    Summary Judgment Standard.

Summary judgment is proper only where the moving party demonstrates that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If, and only if, the moving party meets this burden, the burden passes to the nonmoving

party to establish the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* at 321; Fed. R. Civ. P. 56(c). Where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, the motion for summary judgment cannot be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, the court must evaluate all of the evidence before it. *Celotex*, 477 U.S. at 323. In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court made clear that disputes over facts that might affect the outcome of the suit under the governing law, will preclude the entry of summary judgment. 477 U.S. 242, 248 (1986). Indeed, the evidence presented must always be construed in favor of the party opposing the motion for summary judgment, and it is that party who is also to be accorded the benefit of all favorable inferences that can be drawn from the record evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Washington Post Co. v. United States Dep't of Health and Human Srvs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

**B.    Ms. Adams Has Presented Sufficient Evidence for a Reasonable Juror to Find That Defendant Violated the Rehabilitation Act When it Refused to Hire Her.**

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Thus, to survive summary judgment on a disability discrimination claim, a plaintiff must produce evidence to create a genuine issue of material fact as to whether: (1) she had a disability within the meaning of the Act; (2) she can perform the essential functions of the position, with or without a reasonable accommodation; and (3) she suffered an adverse action because of her disability. *Duncan v. WMATA,* 240 F.3d 1110, 1114 (D.C. Cir. 2001); *Swanks v.*

*WMATA*, 179 F.3d 929, 934 (D.C. Cir. 1999); 42 U.S.C. § 12111(8).  For the reasons stated below, Ms. Adams has created a jury issue regarding each one of the elements of a prima facie case of disability discrimination.

**1.    Ms. Adams is an individual with a disability within the meaning of the Rehabilitation Act.**

A person has a disability within the meaning of the Rehabilitation Act if she:  "(i) has a physical or mental impairment which substantially limits one or more of the major life activities of such individual, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."  29 U.S.C. § 706 (8)(B).  Ms. Adams meets the definition of disability under any one of the three prongs.  First, her declaration raises an inference that she is substantially limited in the major life activity of sexual contact.  *See* Pl.'s Ex. 19 (Adams Decl.) at ¶ 49; *Doe v. District of Columbia*, 796 F.Supp. 559, 568 (D.D.C. 1992) (holding that "sexual contact" is a major life activity); *Keller v. City of Albuquerque*, 182 F.Supp.2d 1148, 1156 (D.N.M. 2001) (denying summary judgment and finding that plaintiff was substantially limited in the major life activity of sex based on the fact that she took tamoxifen which causes a loss of libido and makes sexual intercourse more painful); *see also* H.R. Rep. No. 101-485, pt. 3, at 28 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 451 ("Although the definition does not include a list of all the specific conditions, diseases, or infections that would constitute physical or mental impairments, examples include: . . . cancer . . .").

Second, Ms. Adams has presented the Court with sufficient evidence to create an issue of fact regarding whether she has a record of an impairment.  Both following her mastectomy and reconstructive surgery, she was unable to care for herself and unable to work.  Moreover, the surgery

to remove her ovaries "was serious enough to require hospitalization, a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment." *School Board of Nassau County v. Arline*, 480 U.S. 273, 281 (1987); *see also Berk v. Bates Advertising USA, Inc*, 25 F.Supp.2d 265, 266 (S.D.N.Y. 1998) (holding that breast cancer survivor's "hospitalization established a record of impairment as articulated by the Supreme Court in *Arline*."); *Mark v. Burke Rehabilitation Hosp.*, 1997 WL 189124 * 4 (S.D.N.Y.) (finding that hospitalization for cancer surgery constituted a record of impairment).

Third, Ms. Adams has created a genuine issue of fact regarding whether the Department of State regarded her as disabled. The evidence demonstrates that defendant treated Ms. Adams as if her breast cancer and the treatment for it substantially limited one or more of her major life activities. *Gaskins v. Runyon,* 921 F.Supp. 779, 782 & n.7 (D.D.C. 1994); 29 CFR § 1630.2(l)(1). In *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001), the Sixth Circuit explained that proving that an employee is regarded as disabled in the major life activity of working "is a question embedded almost entirely in the employer's subjective state of mind." 237 F.3d at 709. Thus, where, as here, there is "substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pretextual justification for that firing, the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute." *Id.* Accordingly, "resolution of that issue is properly left to the jury." *Id.*

> **a.    Defendant's rejection of Ms. Adams based on her diagnosis alone demonstrates that it regarded her as disabled.**

The evidence raises an inference that defendant rejected Ms. Adams because it was easier

to choose one of the many other applicants who were not breast cancer survivors than actually evaluating whether she could safely serve overseas. Thousands of applicants enter the intense competition every year to become Foreign Service (Generalist) Officers. Only a small percentage become eligible for appointment as did Ms. Adams. Indeed, as of October 3, 2003, there were 193 candidates standing in line behind Ms. Adams for the slot she had earned by her superior scores. Pl.'s Ex. 7 (Evans e-mail of 10/3/03). With so many applicants to choose from, statements of defendant's personnel reveal a great deal about their attitudes toward candidates with medical impairments:

> Waivers have become increasingly rare because Department recruitment efforts have gradually resulted in a larger and more competitive body of Foreign Service candidates over the last 3 - 4 years. Of the 33 requests for a waiver that were considered by the ERC in 2004, none were granted . . . . Ms. Adams had applied to be a Foreign Service Officer in the consular 'cone' . . . . We had no shortage of consular applicants in March 2004. Therefore, there was no compelling service need to consider a waiver of the worldwide availability requirement.

Def.'s Ex. 12 (Cole Decl.) at ¶¶ 14, 16.

> In Ms. Adams' [sic] case, she was applying for the position of junior officer in the Foreign Service. In March 2004 when the ERC met on her request for a waiver, as well as throughout the timeframe of January through March 2004, there was no shortage of these officers.

Pl.'s Ex. 6 (Campbell Decl.) at 5.

> In 2004, we did not have any shortage of applicants to the consular 'cone' who met the requirements for worldwide availability; hence, we had no reason to hire an individual who could not meet those requirements. In addition, I know of no extraordinary skills or experience possessed by Ms. Adams.

O'Keefe Decl. at ¶ 9 (Def.'s Ex. 2).

> The most common *diagnoses* that bring about . . . a Class 5 clearance include . . . breast cancer . . ..

Brown Decl. at ¶ 11 (Def.'s Ex. 1) (emphasis added).

Defendant's personnel have approached the hiring process with the mindset that there is no reason to accept candidates they perceive to be medically impaired when there are so many applicants to choose from. Defendant's threshold for a candidate's rejection is slight indeed; MED's personnel readily admit that they assign a Class 5 clearance to any candidate who must see a health-care professional more often than once a year, without consideration to MED's capacity to provide the minimal monitoring that a candidate may require. *See* Pl.'s Ex. 16 (Von Arx Decl.) at 5 (stating that applicants who have no need of more frequent medical monitoring than once annually would not be denied a worldwide medical clearance). *But see* Pl.'s Ex. 15 (Forsman Decl.) at 3 (stating that Ms. Adams could not be given a clearance because "she needed to be seen every six months for follow-up care (preferably by a specialist)."). In addition, the ERC failed to observe its obligation to consider not only the number of posts at which Ms. Adams could serve but also the temporary nature of her restriction as well as her capacity to meet a critical need of the Service. They were predisposed to reject Ms. Adams and went to extreme lengths to justify their decision, no matter that she presented them with evidence that she was worldwide available and that her appointment would serve one of its critical needs. Indeed, defendant's statements raise the inference that they decided to revoke Ms. Adams' clearance before seeing the medical files explaining Ms. Adams' diagnosis, treatment, and prognosis, and the actual medical follow-up monitoring she required. *See* Def.'s Ex. 15 (Forsman e-mail, October 10, 2003) ("there is a significant possibility that we will not be able to re-issue a Class One medical clearance . . ."); Pl.'s Ex. 19 (Adams Decl.) at ¶ 28 (stating that Ms. Forsman received Ms. Adams' medical records on December 5, 2003). Thus, defendant regarded Ms. Adams as a disabled person based on her status as a breast cancer survivor and not on the medical

treatment she required.

> **b.    Defendant's perception that Ms. Adams' need for a biannual breast exam posed a dire threat shows that it regarded her as disabled.**

This Court has held that where the evidence illustrates that the decision makers believe that severe problems can arise from an impairment, they "regard" the plaintiff as impaired. *See Taylor v. Gearan*, 979 F.Supp.1, 8 (D.D.C. 1997) ("As defendants' own affidavits attest to their belief that the problems that can arise from the diagnosed personality disorder are severe, it appears that there is at least a genuine issue of material fact as to whether defendants perceived plaintiff's alleged personality disorder as substantially limiting one or more of his major life activities."). In *Gaskins*, for example, the employer gave the employee use of a special chair, lowered her work area, and did not ask her to engage in heavy lifting. 921 F.Supp. at 780. The Court concluded that these acts demonstrated that defendant considered the plaintiff's back injury "significant and permanent" and that defendant "clearly treated plaintiff as if her ability to work was substantially limited." 921 F.Supp. at 782 n.6.

Inquiry into defendant's mindset reveals a hysteria about the "severe" problems that would arise if Ms. Adams were to serve overseas. The decision makers equate Ms. Adams' need for a two-minute breast exam with (a) an acute asthmatic attack, (b) a heart attack, (c) the need for emergency surgery, (d) 5-vessel bypass surgery, and (e) a prolonged hospital stay. Def.'s Ex. 1 (Brown Decl.) at ¶ 7. Defendant is also concerned that the consequences of Adams foregoing followup are "significant" and "could be fatal." *See id.* at ¶ 19. "As defendants' own affidavits attest to their belief that the problems that can arise from the diagnosed [breast cancer] are severe, it appears that there is at least a genuine issue of material fact as to whether defendants perceived plaintiff's [breast

27

cancer] as substantially limiting one or more of [her] major life activities." *Gearan*, 979 F.Supp. at 8. Such evidence of "discriminatory intent . . . and . . . pretext may also tend to show that [defendant] regarded [Ms. Adams] as disabled," particularly in cases such as this where the defendant ignores medical evidence in favor of irrational fear. *Ross*, 237 F.3d at 709.

Defendant's reaction to the news of Ms. Adams' breast cancer illustrates that they regarded her as having a disability. Dr. Laurence Brown, the MED Director, forecasted a series of transportation and medical hazards that would arise if complications arise, especially if emergency medical evacuation were required -- despite the fact that Ms. Adams' oncologists agree that Ms. Adams' post-cancer status will not present an emergency situation. Def.'s Ex. 1 (Brown Decl.) at ¶ 22. Dr. Brown goes to great lengths to cite examples of the "typical challenges" MED faces in providing health care because of a lack of minimal local resources, commenting on emergency situations that arose in five particular posts (none involved cancer). *Id*. at ¶ 7. An examination of each of the posts Dr. Brown cited reveals that the picture he painted of the inadequacy of overseas posts is decidedly misleading and has no bearing on the minimal follow-up Ms. Adams actually requires. In fact, the examples that Dr. Brown cited were all medical emergencies that could occur to any Foreign Service Officer regardless of whether he or she is a cancer survivor or not.

Dr. Brown cited the case of a 12-year-old boy in Younde, Cameroon, whose appendix ruptured during emergency evacuation to Switzerland. This emergency situation is irrelevant to whether Ms. Adams could serve at this post. Indeed, the post report shows that the medical facilities are more than adequate for her care. The Health Unit is staffed with a Foreign Service Health Practitioner ("FSHP"), either a U.S.-trained physician assistant or nurse practitioner, a locally employed Registered Nurse, and a Medical Technologist, as well as an Administrative Assistant.

Pl.'s Ex. 21, Tab "C": Post Report for Cameroon. In addition, pregnant women are permitted to remain in Cameroon until six weeks before delivery. *Id*. Accordingly, prenatal care, which generally includes a simple breast exam, is available.

Dr. Brown also cited the case of a young woman with seizures who was evacuated from Islamabad, Pakistan, to London. Again, a simple breast exam would not require evacuation from Islamabad as there is an RMO at that post, and the Health Unit provides "primary care,"[12] which Dr. O'Rourke has specifically stated is adequate for Ms. Adams. Pl.'s Ex. 21, Tab "P": Post Report for Pakistan; Pl.'s Ex. 1 (O'Rourke Decl.) at ¶ 14. Indeed, Dr. Brown mentioned that the young woman with seizures was stabilized by "our embassy physician," which indicates the presence of a health-care professional competent to perform Ms. Adams' semiannual breast exam.

Dr. Brown also recounted the case of an asthmatic child who could not receive adequate care in Kiev, Ukraine. Again, he has cited an emergency situation at a health unit that has adequate staff to perform a breast exam. The Embassy Health Unit, staffed by an FSHP and a local Ukrainian doctor, "operates under all the guidelines of the Department of State Medical Division." The RMO in Warsaw visits Kiev "regularly." Pl.'s Ex. 21, Tab "U": Post Report for Ukraine.

Dr. Brown further cited the case of a middle-aged man in Santiago, Chile, who developed pancreatitis and required immediate surgery. Def.'s Ex. 1 (Brown Decl.) at ¶ 7. This particular example, another emergency situation, directly contravenes the information about health care in Santiago set forth in the Post Report:

The Embassy's Health Unit is staffed by two Registered Nurses (RNs) . . .. The

---

[12] Dr. Brown should be aware that the facilities in Islamabad are adequate to perform a simple breast exam, as he was the Regional Medical Officer there. Def.'s Ex. 1 (Brown Decl.) at ¶ 1.

> Health Unit offers a full range of services to official personnel and their families, including emergency treatment, immunizations, treatment of minor illnesses, medical information and counseling, referral assistance, and monitoring of medical problems. The Regional Medical Officer who supports Santiago is based at Embassy Lima and makes quarterly visits to Santiago. Individuals with a chronic medical condition will be assisted in obtaining an appropriate doctor and consult with our nurses and the RMO as secondary caregivers. . . . .
>
> . . . . One of Santiago's attractions, however, is that medical conditions that would require medical evacuation at many other posts can be successfully treated in Santiago. . . . . Many local physicians . . . have obtained medical training in the U.S. or Europe. . . . . Several hospitals in Santiago provide full medical services, including 24-hour emergency services with ambulance transportation. The quality of care in these institutions approaches care in the U.S. Experienced Foreign Service personnel often say that Santiago has the best medical care of any of their overseas assignments.

Pl.'s Ex. 21, Tab "C": Post Report for Chile.

The last example Dr. Brown cited also refers to an emergency that is completely irrelevant

to Ms. Adams' situation:

> In Bahrain a man suffered a myocardial infarction (heart attack) and initial stabilization was attempted at the local hospital. He worsened, and was transferred to the cardiac center for the country. There, an overdose of medication led to an acute lowering of his blood pressure that caused his infarction to extend. He required emergency 5-vessel bypass surgery and a prolonged stay in the facility.

Pl.'s Ex. 21, Tab "B": Post Report for Bahrain.

The facilities are adequate for Ms. Adams' needs: "Embassy personnel may make limited

use of U.S. Naval Support Activity (NSA) clinic . . . . Most health care provided at [Bahraini

hospitals] is professional, competent, and modern." Pl.'s Ex. 21, Tab "B": Post Report for Bahrain.

Moreover, the Regional Medical Officer stationed in Riyahd, Saudi Arabia visits Bahrain

"routinely." Pl.'s Ex. 21, Tab "S ": Post Report for Saudi Arabia.

Dr. Brown misled the Court, however, about the consequences of assigning Ms. Adams to

Kabul or Baghdad:

> In Kabul and Baghdad, for example, any trip from the embassy compound to the airport usually requires an armed escort . . . . Thus, we do not find it acceptable to place an individual in a situation where there is an increased likelihood that we will have to put lives at risk in order to get that individual to the specialized medical care he or she needs.

Def.'s Ex. 1 (Brown Decl.) at ¶ 22.  Dr. Brown insinuates that providing the wherewithal for Ms. Adams to obtain her six-month breast exam would pose a risk of harm to others who would have to provide an armed escort to drive her to the airport.  What Brown failed to mention was that there is no reason whatsoever for Ms. Adams to leave the Embassy building for her check-ups.  An examination of the medical facilities available in Baghdad is quite illuminating:

> Embassy personnel utilize the Mission Medical Clinic located in the south wing of the Embassy (S-105).  This is a joint DOS/DOD facility staffed by U.S. Army medical personnel and State Department medical providers.  Medical Personnel include one Army medical doctor, one physician assistant, six Army medics, one DOS Regional Medical Officer, . . . and two Foreign Service Health Practitioners.  U.S. Army and DOS providers rotate medical officer duty. The U.S. Army Combat Support Hospital located in the International Zone is used for diagnostic services, specialty consultations, and emergency hospitalizations, including surgery, when required.

> . . . DOS personnel are entitled to administrative rest leave (5 days every 6 weeks) to Amman[13] or Kuwait[14] for a change of scenery and mental health vacation.  It is highly encouraged that people take advantage of this leave.

Pl.'s Ex. 21, Tab "I":  Post Report for Iraq.  Brown also conveniently failed to mention that Foreign Service Officers are entitled to two paid 15-day trips back to the United States per 12-month tour.[15]

---

[13]  Amman has an RMO.  Pl.'s Ex. 21, Tab "J":  Post Report for Jordan.

[14]  Kuwait has an FSHP. Pl.'s Ex. 21, Tab "K":  Post Report for Kuwait.

[15]  Shawn Zeller, *Extreme Diplomacy: Evaluating Embassy Baghdad*, FOREIGN SERVICE JOURNAL, March 2005, at 20.  *Foreign Service Journal* is published by the American Foreign Service Association (AFSA).  A copy of this article is found in Post Report Analysis directly behind

If Ms. Adams were stationed in Baghdad, her own physicians could conduct her follow-up monitoring. Since she will never require an emergency evacuation and would be traveling out of the country at least every six weeks to places where there are ample facilities for her follow-up, it is ridiculous that defendant argues that Ms. Adams poses a risk to herself or others.

Dr. Brown also omitted critical information when he cited Kabul as a situation where travel hazards would make it difficult for Ms. Adams to receive the six-month breast exam she requires. The Embassy employs a locally hired Afghan physician as Post Medical Adviser who would be competent to conduct her breast exams. More importantly, Foreign Service Officers are allowed two trips to London during the year that they serve in Kabul. Pl.'s Ex. 21, Tab "A": Post Report for Afghanistan, at 1-3. Defendant arranges doctor appointments for personnel on leave. Pl.'s Ex. 21, Tab "I": Post Report for India, at 1.

### c.     Defendant regarded Adams as disabled from a class of jobs.

Defendant argues that Ms. Adams is not substantially limited in the area of working because working in the Foreign Service is only one job and "no other field of work aside from the U.S. Foreign Service . . . requires employees to have medical clearance to be assigned <u>anywhere</u> in the world." Def.'s Mot. at 14-15. Even without discovery, however, Ms. Adams has created a genuine issue of fact regarding this issue. The Foreign Affairs Manual provides that 50 agencies other than the Department of State require a clearance from MED. *See* 3 FAM 681.2(a). In fact, the form used for the medical history and examination demonstrates that this type of clearance  is used by other Agencies besides the Department of State. *See* Pl.'s Ex. 25 at 1 (fields 10a and b). In addition,

---

Post Report for Iraq, located behind Tab "I (Pl.'s Ex. 21). *The Foreign Service Career-Candidate Guidebook 2002-2003* lists AFSA on page 56 as a resource for information about the Foreign Service. Pl.'s Ex. 13.

contractors, Fulbright scholars and those on temporary duty for more than 60 days abroad are subject to MED's clearance requirement. Thus, Ms. Adams has created a material issue of fact regarding whether she is "effectively precluded from working in the class or range" of jobs that includes all federal government jobs overseas and the contractors of the federal government who work overseas -- because they all require a clearance from MED. *Duncan*, 240 F.3d at 1115-16. Contrary to defendant's assertion, Ms. Adams need not prove that she is precluded from working in any job for which she would be qualified. *Id.* at 1120 (concurring opinion).

Moreover, the location from which defendant perceives Ms. Adams is barred is an important factor for determining whether it is a class of jobs. The Code of Federal Regulations provides that the location of a group of jobs is relevant to the determination of whether it is a class of jobs. 29 CFR § 1630.2(j)(3)(ii) provides:

> the following factor() may be considered in determining whether an individual is substantially limited in the major life activity of 'working':
>
> > The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, *within that geographical area*, from which the individual is also disqualified because of the impairment.

*Id.* (emphasis added). Thus, if Ms. Adams' post-cancer status is a barrier to worldwide availability, she is (perceptively) barred from all jobs utilizing her skills that require her to live in any foreign country, which is the geographical area at issue here.

### 2.    Ms. Adams can perform the essential functions of a foreign services officer without any accommodation.

Ms. Adams needs no accommodation to perform the duties of a foreign service officer. Defendant contends that Ms. Adams can serve at only 53% of posts because the other 47% have no

"oncologist or general surgeon available."[16]  There is no medical reason, however, that Ms. Adams

needs to be followed by such a specialist.  Indeed, Drs. O'Rourke and Blackwell have stated

repeatedly that any physician or nurse-practitioner can provide the breast exam Ms. Adams requires

in between her annual physicals through 2008.  Additionally, by defendant's own admission, "a full

medical report from the oncologist is required to establish the type of follow-up that is needed."

Thus, in violation of the Rehabilitation Act, defendant has blocked Ms. Adams from advancing in

the workplace by "using qualification standards . . . that screen out or tend to screen out an individual

with a disability."  42 U.S.C. § 12112(b)(6).  As defendant has the resources in place to provide the

follow-up monitoring Ms. Adams requires at defendant's posts, it has "screen[ed]" her out

discriminatorily and unnecessarily.  Def.'s Ex. 1 (Brown Decl.) at ¶ 9.  Discovery not yet having

begun in this case, Ms. Adams has no access to the Post Capabilities Database that figured so

prominently in her rejection as a Foreign Service candidate.  Thus, she cannot present to this Court

the precise percentage of posts at which she could serve if MED had used the Database to assess the

number of posts that have a competent primary-care physician or nurse-practitioner available or

visiting frequently enough to perform a breast exam once per year.

To demonstrate that discovery will likely show that she could obtain a breast exam at any

post overseas, Ms. Adams researched and created her own "Post Capabilities Database" from

information available at Defendant's website (http://foia.state.gov/MMS/postrpt/pr_view_start.asp).

Pl.'s Ex. 19 (Adams Decl) at ¶ 39.  Ms. Adams' analysis is found in the first tab labeled "Analysis"

in the only hard copy exhibit submitted to the Court in a large white binder as Exhibit 21.

---

[16]  Defendant does not contest Ms. Adams' qualifications for the job or her ability to perform
any fo the other functions of the job.  *See* Def.'s Ex. 7 (confirming final clearance).

The Analysis reveals that there is a competent medical authority to conduct Ms. Adams' six-month physical breast exam available in at least 249 of the 254 posts in the website list, specifically:

32      posts to which RMOs (U.S. Foreign Service physicians) are posted;

42      posts at which at least an FSHP (Foreign Service Health Practitioner [U.S. nurse-practitioner or physician's assistant]) is posted;

36      posts that have at least a Post Medical Adviser;

93      posts at which (a) local health care is comparable to that in the U.S., (b) personnel can easily drive over a nearby border for excellent care, or (c) U.S. military facilities provide care;

13      posts visited by RMOs or FSHPs at least 3 to 4 times per year; and

33      posts visited "regularly" or "periodically" by Foreign Service RMOs or FSHPs and/or for which local facilities provide adequate competent health-care providers to provide the minimal supervision Ms. Adams requires.

Pl.'s Ex. 19 (Adams Decl) at ¶ 42.  There were five posts without sufficient data to determine that they had available providers, however, these posts likely have sufficient care providers or are unlikely assignments for Ms. Adams.[17]  Pl.'s Ex. 21 (Report Analysis).  Thus, it appears that if defendant were to apply the qualifications specified by Drs. O'Rourke and Blackwell for the health-care professional competent to perform the six-month physical breast exams she needs between her annual physicals, rather than defendant's specious, arbitrary "general surgeon or oncologist" qualification, Ms. Adams would be able to receive her semi-annual breast exams at 98% of the

---

[17]   Two of these five posts, located in Kavala, Greece and Tangier Morocco are Voice of America stations to which it is doubtful Ms. Adams could be assigned.  Another of the five is in Kaohsiung, Taiwan, which has 2 medical colleges in the city; the Post Report also indicates that Taiwan has "adequate medical care."  Pl.'s Ex. 21, Tab "T":  Post Report for Taiwan at 1-2.  A fourth post with insufficient data is Accra, Ghana, which has an Embassy with 103 U.S. direct-hire employees and a MED Health Unit.  Pl.'s Ex. 21, Tab "G":  Post Report for Ghana at 2.

overseas posts -- and likely at 100% of the posts to which she could be assigned. Only though discovery can plaintiff establish the true number of posts with staff competent to perform a breast exam. Accordingly, Ms. Adams should be permitted to proceed with this case through discovery.

> **3.     Defendant admits that it refused to hire Ms. Adams because she had breast cancer**

Defendant admits that it refused to hire Ms. Adams because of her breast cancer. Thus, defendant's motive and pretext for its adverse action against Ms. Adams are not at issue. *See* Pl.'s Ex. 15 (Evans Decl.) at 2 ("but for the change in her medical condition that led to a change in her medical clearance, and barring some unforeseeable catastrophe of some sort, Ms. Adams would have received a confirmed offer of appointment to join the A-100 class that began in January 2004"). After revising its motion to dismiss, defendant argues that this evidence is insufficient to show motive. Defendant now contends that to show motive, Ms. Adams must prove that the impairment caused by her cancer is what motivated defendant's refusal to hire her, not her cancer. Def.'s Mem. at 13-14 (arguing that Ms. Adams is "conflating" the issues by arguing that her major life activity of sexual contact is impaired but that her disability is breast cancer and that "what is relevant to Defendant's motion is whether Defendant denied Ms. Adams employment based upon her alleged impairment."). This is not the law in the United States.

In *Bragdon v. Abbott*, the United States Supreme Court held that a dentist violated the American's with Disabilities Act because he refused to treat a patient with HIV. *See generally* 524 U.S. 624 (1998). There, the Court held that HIV was a disability within the meaning of the Act because it substantially limited a person's reproduction. *Id.* at 639-41. The Court did not require the plaintiff to show that the defendant denied her service because of her impaired reproduction. 524

U.S. 624.  Rather, the two questions were analyzed separately and it was sufficient that the plaintiff had a disability (HIV status) that substantially limited a major life activity and that the defendant had a policy against filling cavities of HIV-infected patients and was thus motivated by her HIV status and not her reproductive limits. *Id.* at 629. Indeed, at the time of the defendant's discrimination, the plaintiff's HIV infection had not yet become a physical impairment.  *Id.* at 628.

Similarly, in *Arline*, the Supreme Court found it sufficient that the defendant fired an employee because she had tuberculosis.  The Court found that the plaintiff met the definition of disability because the disease "was serious enough to require hospitalization, a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment." 480 U.S. at 281.  The Court did not require the plaintiff to prove that the defendant was motivated by the employee's *hospitalization* in order to show motive.  Rather, it was sufficient that the defendant dismissed the plaintiff because of her tuberculosis.  *Id.* at 276.

Thus, according to the Supreme Court, it is sufficient for a plaintiff to demonstrate that she has a disability that substantially limits a major life activity and that the defendant was motivated by that disability to take an adverse action against her.  Ms. Adams, like the employees in *Abott* and *Arline*, had therefore demonstrated that defendant violated the ADA because she has a disability (breast cancer) that substantially limits a major life activity (sexual intimacy) and that defendant was motivated by that disability (breast cancer status) to deny her a position in the Foreign Service. Contrary to defendant's assertions, a defendant need not make a "finding as to whether there were major life activities in which she was substantially impaired" before discriminating against a disabled employee to violate the Americans with Disabilities Act.

37

**C.     Ms. Adams Would Not Pose a Direct Threat to Herself or Anyone Else If She Were Assigned to a Hardship Post.**

Defendant argues that it can "escape liability" under the Rehabilitation Act because Ms. Adams posed a "Direct Threat" to herself if assigned to hardship posts.  Def.'s Mot. at 17. Defendant bases this argument on false assertions.  First, defendant ignores medical evidence and asserts that only 53% of posts can provide Ms. Adams with a two-minute breast exam.  *Id*. at 18.  Ms. Adams's Post Analysis Report reveals that there is the necessary professional expertise available to conduct her six-month breast exam available in at least 249 of 254 posts.  In addition, her breast exams require no "technological support" (equipment) whatsoever.  Without discovery, plaintiff cannot prove that there is no material issue regarding the capacity of defendant's posts to perform two-minute breast exams.

Second, it is not as if Ms. Adams will ever have to be rushed to a medical facility for an emergency breast exam.  Indeed, both Drs. O'Rourke and Blackwell verify that a delay in Ms. Adams' six-month breast examinations or an interruption of her medication regimen would not present an appreciable threat to her health.  Pl.'s Ex. 1 (O'Rourke letter of 1/12/04) at ¶¶ 17-18; Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 12, 25, and 26; Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶¶ 22-23.

Third, both doctors address every hardship condition defendant lists in its pleadings and website and state that Ms. Adams' "post-cancer status would not be aggravated by hardship or render her more susceptible than other persons to health problems caused by [those] conditions."  Pl.'s Ex. 1 (O'Rourke letter of 1/12/04) at ¶¶ 4-8 and 13; Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 15-19, 21, 23, and 27; Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶¶ 7-11.

Finally, Ms. Adams no longer takes tamoxifen, so the dire concerns defendant expressed

about its side effects are not relevant.  Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 5-11.  Even if she were still

on tamoxifen, the monitoring for its potential side effects requires only the same annual pelvic

examination that is recommended for all women of Ms. Adams' age.  Def's Ex. 1 (Brown Decl.) at

17.

In short, defendant's "direct threat" defense must fail because it is not "based on a reasonable

medical judgment that relies on the most current medical knowledge and/or best available objective

evidence" and "upon an expressly individualized assessment of the individual's present ability to

safely perform the essential functions of the job."  *Chevron, U.S.A., Inc. v. Echazabal*, 536 U. S. 73,

86 (2002).

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss, or, alternatively, for summary

judgment, must be denied.

Respectfully submitted,

_____
David H. Shapiro
D.C. Bar No. 961326
Ellen K. Renaud
D.C. Bar No. 479376
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C.  20005
(202) 483-0300

Attorneys for Plaintiff