UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Kathy E. Adams, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 05-941 |
| ) | |
| Condoleezza Rice, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S STATEMENT OF GENUINE ISSUES**

Pursuant to Local Rule 7.1(h), plaintiff hereby submits her statement of genuine issues in response to the "Statement of Material Facts Not in Dispute" filed by defendant in support of its Motion for Summary Judgment.

**I.   General Response to Defendant's Statements.**

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Mitchell v. DCX, Inc.*, 274 F.Supp.2d 33, 39 (D.D.C. 2003). In a disability discrimination action such as this, the material issues are whether plaintiff has a disability within the meaning of the act and whether she can perform the essential functions of the position.[1] Yet, for the most part, the facts recited in defendant's statement are not "material" to these issues. Thus, even if those facts are accepted, they do not entitle defendant to judgment. *See United States v. Winstead,* 74 F.3d 1313, 1320 (D.C. Cir 1996) ("material fact" defined as "a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction"). Plaintiff

---

[1] The defendant's motives and the legitimacy of any alleged non-discriminatory reasons for defendant's actions are not at issue as defendant has admitted that it denied Ms. Adams a position because she had breast cancer.

further contends that a resolution of these issues of fact in plaintiff's favor, coupled with other material facts which defendant has not disputed or has ignored, are sufficient for a reasonable jury to conclude that plaintiff has been a victim of disability discrimination.

## II.     Genuine Issues of Material Fact.

### A.     Does Ms. Adams Meet the Definition of Disability in the Rehabilitation Act?

#### 1.     *Does Ms. Adams have an impairment that substantially limits the major life activity of sexual contact?*

Ms. Adams states that she has a "deep-seated fear that prospective suitors will reject [her] because of [her] history of cancer, loss of a breast, and current physical appearance." *See* Pl.'s Ex. 19 (Adams Decl.) at ¶¶ 49-51. Because of the physical scars left by her surgery, medication that suppresses libido, and the mistreatment she has suffered because of her history of breast cancer, she is intensely afraid of physical intimacy. *Id*. ("I now find that the prospect of dating and developing an intimate relationship is just too painful and frightening.").

As discovery has not yet been conducted, defendant has not offered any evidence or argument to counter Ms. Adams' claim that she is intensely afraid of sexual contact.

#### 2.     *Does Ms. Adams have a record of impairment that substantially limits one or more major life activities?*

Ms. Adams states that she was hospitalized on two separate occasions related to her breast cancer. First, she had a mastectomy which required three days and two nights in the hospital. Pl.'s Ex. 19 (Adams Decl.) at ¶ 10. For two to three weeks after her discharge, Ms. Adams was unusually fatigued, and her ability to move her right arm was impaired for several weeks, making it impossible to care for herself properly or to drive. *Id*. at ¶ 12. Thus, her mother performed her daily household chores and personal care. Additionally, Ms. Adams was unable to work for nearly a month after her

surgery. *Id*.

Second, Ms. Adams had surgery to remove her ovaries and fallopian tubes as part of her treatment for breast cancer. Pl.'s Ex. 4 (Smith Decl.) at ¶ 2; Pl.'s Ex. 19 (Adams Decl.) at ¶ 27. Her doctor ordered two days of bed rest following the surgery, and Ms. Adams had to again have her mother care for her. Pl.'s Ex. 19 (Adams Decl.) at ¶ 27. Ms. Adams also missed a week of work following an outpatient procedure to reconstruct her nipple -- another surgery related to her breast cancer. *Id*.

As discovery has not yet been conducted, defendant has not offered any evidence or argument to contradict Ms. Adams' claim that she has a record of an impairment that substantially limited her major life activities of working and caring for herself.

>   3.  *Does the Department of State regard Ms. Adams as substantially limited in the major life activity of working?*

Defendant asserts that Ms. Adams must be followed by an oncologist, an oncological surgeon, and/or a general surgeon and that she is, therefore, not worldwide available. Def.'s Ex. 1 (Brown Decl.) at ¶ 18 (concluding that Ms. Adams' two-minute breast exams could only be performed at 53% of posts based on her need to be followed by "surgeons and/or oncologists"). *But see* Pl.'s Ex. 2 (O'Rourke Decl.) at ¶ 14 (emphasizing that a specialist is not required to perform Ms. Adams' breast exams). Because MED denied Ms. Adams a Class I Medical Clearance, she is disqualified from working overseas for more than fifty federal government agencies, working for a government contractor overseas, and any overseas temporary assignment that would last sixty days or more. *See* Attachment A, 3 FAM 681.2(a)(listing 50 agencies other than the Department of State require a worldwide medical clearance from MED); 3 FAM 684.2-3(c) (requiring Civil Service

employees assigned abroad on temporary duty for more than 60 consecutive days to have a current medical clearance); Pl.'s Ex. 21, Tabs "G," "N," and "Y" (noting that contractors must have a medical clearance). *But see* Def.'s Mot. at 14-15 ("Defendant knows of no other field of work aside from the U.S. Foreign Service, which requires employees to have medical clearance to be assigned anywhere in the world, including any number of hardship areas where medical care is virtually nonexistent and transportation in and out of the country can be extremely challenging).

### B. Does Ms. Adams Need an Accommodation to Perform the Essential Functions of a Foreign Service Officer?

1. *Is a certified nurse practitioner or primary care physician qualified to perform a breast exam or does Ms. Adams' six-month breast exam need to be performed by an oncologist, oncological surgeon and/or general surgeon?*

Ms. Adams' treating oncologists "emphasize that any primary care provider -- physician or nurse-practitioner -- can perform Ms. Adams's 6-month breast examinations between her annual physicals;" an oncologist, general or oncological surgeon, or other specialist is not necessary. Indeed, part of the skill set of a primary care physician or nurse-practitioner is the clinical breast exam performed in a screening setting." Pl.'s Ex. 2 (O'Rourke Decl.) at ¶ 14; *accord* Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶¶ 7-11, 17, 19. Defendant, however, conducted its inquiry into whether Ms. Adams could be cared for overseas by assuming that her breast exam could only be performed by "surgeons and/or oncologists." Def.'s Ex. 1 (Brown Decl.) at ¶ 18. Emil Von Arx III, M.D., defendant's physician who rejected Ms. Adams' application for a waiver, asserts that Ms. Adams needed her breast exam performed by "a general or oncologic surgeon." Def.'s Ex. 13. Dr. Von Arx apparently did not think an oncologist was qualified, and Dr. Brown did not consider oncological surgeons qualified to perform Ms. Adams' breast exams.

>    2.    *Will Ms. Adams be able to receive a breast exam every six months at any post overseas?*

Ms. Adams contends that she could likely serve at 100% of the Foreign Services oversea posts. To demonstrate that she could receive a breast exam at any post overseas, Ms. Adams researched and created her own "Post Capabilities Database" from information available at defendant's website (http://foia.state.gov/MMS/postrpt/pr_view_start.asp). (Ms. Adams' analysis is found in the first tab labeled "Analysis" in the only hard copy exhibit submitted to the Court in a large white binder as Exhibit 21 and is hereafter referenced as "Post Report Analysis"). Pl.'s Ex. 19 (Adams Decl.) at ¶ 39 (describing how she researched and compiled the Post Report Analysis). The analysis reveals that there is a competent medical authority to conduct Ms. Adams' 6-month physical breast exam available at least at 249 of the 254 posts in the website list, specifically:

| | |
|---|---|
| 32 | posts to which RMOs (U.S. Foreign Service physicians) are posted; |
| 42 | posts at which at least an FSHP (Foreign Service Health Practitioner [U.S. nurse-practitioner or physician's assistant]) is posted; |
| 36 | posts that have at least a Post Medical Adviser; |
| 93 | posts at which (a) local health care is comparable to that in the U.S., (b) personnel can easily drive over a nearby border for excellent care, or (c) U.S. military facilities provide care; and |
| 13 | posts visited by RMOs or FSHPs at least 3 to 4 times per year; posts visited "regularly" or "periodically" by Foreign Service RMOs or FSHPs and/or for which local facilities provide adequate competent health-care providers to provide the minimal supervision Ms. Adams requires. |

Pl.'s Ex. 19 (Adams Decl.) at ¶ 42.[2]

---

[2]    There were five posts without sufficient data to determine that they had available providers. Two of these five posts are Voice of America stations to which it is doubtful Ms. Adams could be assigned. Another of the five is in Kaohsiung, Taiwan, which has 2 medical colleges in the city; the Post Report also indicates that Taiwan has "adequate medical care." Pl.'s Ex. 21, Tab "T:"

In summary, the Post Report Analysis indicates that if defendant were to apply the qualifications specified by Drs. O'Rourke and Blackwell for the health-care professional competency to perform the 6-month physical breast exams she needs between her annual physicals, rather than defendant's "general surgeon or oncologist" qualification, when it uses its Post Capability Database to determine the percentage of posts at which she is eligible to serve, Ms. Adams would likely be able to receive her semi-annual breast exams at 100% of defendant's posts. *See* Pl.'s Ex. 21.

As discovery has not yet been conducted, defendant has not offered any evidence to contradict Ms. Adams' research.

### III. Specific Responses to "Defendant's Statement of Material Facts to Which There Is No Genuine Issue."

Most of the statements listed in "Defendant's Statement of Material Facts as to Which There is No Genuine Issue" do not address the material questions in this case. However, to the extent that defendant's statements touch on the material facts in this case, there is ample evidence to dispute those facts.

**Statement No. 1:** The State Department has established a health care program to promote and maintain the physical and mental health of members of the U.S. Foreign Service. Declaration of Dr. Laurence G. Brown, Director of the Office of Medical Services (Brown Decl. at ¶ 2) (Exh. 1). See also 22 U.S.C. § 4084(a); .

**Response:** Not Material. Ms. Adams does not dispute that the State Department has a health care plan for its members; however, the reasons the State Department determined that Ms. Adams needed health care provisions above and beyond any other member of the U.S. Foreign Service when her own doctors stated that she needed no such extraordinary care is in dispute. *See* Pl.'s Ex. 1

---

Post Report for Taiwan at 1-2. A fourth post with insufficient data is Accra, Ghana, which has an Embassy with 103 U.S. direct-hire employees and a MED Health Unit. Pl.'s Ex. 21, Tab "G:" Post Report for Ghana at 2.

(O'Rourke Letter of 1/12/04) at ¶ 5; Pl.'s Ex. 5 (Blackwell letter) at ¶8 (stating that Ms. Adams' post cancer status would not be "aggravated by hardship or render her more susceptible than other persons to health problems"). *But see* Pl.'s Ex. 15 (Forsman Decl.) at 3 (stating that Ms. Adams could not be given a clearance because "she needed to be seen every six months for follow-up care (preferably by a specialist)."); Def.'s Ex. 2 (O'Keefe Decl.) at ¶ 10 (claiming that Ms. Adams could not serve overseas because he thought she needed "sophisticated routine medical care").

**Statement No. 2:**   Applicants to the Foreign Service must undergo medical examinations to determine whether they are worldwide available. Brown Decl. at ¶ ¶ 8 (Exh. 1). See also 22 U.S.C. § 4084(b)(1). The Service's medical examination is comprehensive and includes tests for many conditions. Brown Decl. at ¶ 8 (Exh. 1).

**Response:**   Not Material. Ms. Adams does not dispute that applicants to the Foreign Service must undergo medical exams to determine worldwide availability. However, Ms. Adams disputes the motivation for why the Foreign Service determined she was not world available or did not grant a waiver at her request. *See* Plaintiff's Statement of Material Facts in Dispute, Section C.

**Statement No. 3:**   Plaintiff Kathy E. Adams was diagnosed with Stage 1 breast cancer in August 2003, during the course of her application to become a Foreign Service Officer. Complaint at ¶ 11.

**Response:**   Disputed. Kathy E. Adams received her Class 1 Unlimited Medical Clearance for Worldwide Assignment, on July 10, 2003, prior to her diagnosis of breast cancer. Pl.'s Ex. 8. On October 2, 2003, she learned she received her Final Clearance and was eligible for appointment as a Junior Foreign Service Officer. Def.'s Ex. 7 (Evans letter of 9/25/03). Therefore, the cancer diagnosis occurred after and independently from the medical examination necessary for her to become a Foreign Service Officer. Additionally, as far as Ms. Adams was aware, she had no continuing responsibility to inform defendant about any changes in her medical condition during this

time.  Pl.'s Ex. 19 (Adams Decl.) at ¶¶ 16-20.  The only information that Ms. Adams was aware she had an obligation to report were changes in her:

- permanent or current mailing address;
- home or work telephone numbers;
- e-mail address;
- marital or family status (marriage, divorce, birth of a child, etc.);
- place of employment or military status; or
- attainment of additional educational credentials.

Pl.'s Ex. 13 (Guidebook 2002-2003) at 4; Pl.'s Ex. 19 (Adams Decl.) at ¶ 17.  In the State Department materials on *How to Become a Foreign Service Officer*, specific information regarding the medical clearance process appears at pages 2 and 24 of the Guidebook.  Those pages contain no directives instructing applicants to notify defendant if there is any change in their medical status.  Pl.'s Ex. 13. Additionally, defendant's letter of September 25, 2003, informing Ms. Adams that she was eligible for hire reiterated that she was only required to report changes in her address, telephone number, or marital, family, or employment status.  Def.'s Ex. 7 (Evans Letter of 9/25/03).  In fact, defendant's employee, Emil Von Arx, M.D., "commend[ed Ms. Adam's] for honesty in bringing to [Defendant's] attention that [she] had been diagnosed with breast cancer after [she] had originally received a worldwide medical clearance."  Pl.'s Ex. 16 (Von Arx Decl.) at 5.  After Ms. Adams notified MED and the Office of Recruitment and Examination and Employment, Bureau of Human Resources at the Department of State (HR/REE) about her treatment for breast cancer on October 7, 2003, the Department of State to revoked her clearance.  Pl.'s Ex. 19 (Adams Decl.) at ¶ 25; Pl.'s Ex. 17 (Evans Decl.) at 1; Def.'s Ex. 11.  Patricia Evans, the Human Resource Specialist who initially notified Ms. Adams of her Class I Clearance, admitted:

> It was only because Ms. Adams brought her medical problem to my attention and that of the Office of Medical Clearances that her medical clearance was changed from

> Class 1 (worldwide available) to Class 5 (not worldwide available). Therefore, but for the change in her medical condition that led to a change in her medical clearance, and barring some unforeseeable catastrophe of some sort, Ms. Adams would have received a confirmed offer of appointment to join the A-100 class that began in January 2004.

Pl.'s Ex. 15 (Evans Decl.) at 2. These facts raise the inference that Ms. Adams' medical clearance was not revoked simply because she had an obligation to tell MED about any medical issues, but because after she told them of her breast cancer she was perceived as an individual with a disability, despite her physical fitness.

**Statement No. 4:** Standard treatment guidelines for breast cancer emphasize the need for close monitoring during the first five years following diagnosis, during which period there is a heightened risk of recurrence. Brown Decl. at ¶ 15 (Exh. 1).

**Response:** Disputed. Defendant's statement is misleading in that it implies that Ms. Adams needed close monitoring for her condition because of her past history of breast cancer. However, the real material issue in this case is the follow-up treatment Ms. Adams needed and the fact that the State Department was aware of the minimal nature of the follow-up required by Ms. Adams' doctors. On December 5, 2003, Ms. Forsman, a nurse practitioner with MED, received Ms. Adams' medical records, including a letter, dated November 19, 2003, from Ms. Adams' oncologist, Dr. O'Rourke. Pl.'s Ex. 19 (Adams Decl.) at ¶ 28. He commented on her excellent recovery and outlined the medical monitoring she required for the next 5 years, none of which was extensive:

- tamoxifen for 5 years (a hormonal therapy drug which can be ordered in supplies of three months or longer);
- an annual mammogram of her remaining breast; and
- a clinical breast exam at 6-month intervals for the next 5 years.

Def.'s Ex. 9 (O'Rourke letter of 11/19/03). He also stated that her bout with cancer would in no way prevent her from living overseas for extended periods of time. He further stated that "a physician"

could provide the minium follow-up she needed, a statement which shows that Ms. Adams did not need the continuing care of a specialist. He also invited interested parties to call him if they needed further information. Def.'s Ex. 9 (O'Rourke letter of 11/19/03); Pl.'s Ex. 2 (O'Rourke Decl.) at ¶ 14. Dr. O'Rourke has also emphasized that:

    (a)    Ms. Adams had fully recovered from her surgeries with excellent results.

    (b)    Her post-cancer status in no way diminishes her physical fitness to perform the duties of a Foreign Service Officer on a worldwide basis.

    (c)    She will require no emergency treatment dictated by her post-cancer status, so unreliable transportation links and inadequate emergency medical facilities will not pose problems for her.

    (d)    Her post-cancer status is in no way incapacitating.

    (e)    Her post-cancer status in no way prevents her from living and working anywhere in the world for prolonged periods of time.

    (f)    Her post-cancer status presents no physical, neurological, or mental condition that would render her unable to function on a worldwide basis or which otherwise might adversely affect her assignment to any post in the world.

Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶¶ 2, 4-8; *see also* Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 3, 15-19. Dr. Kimberly Blackwell, M.D., the breast-cancer oncologist Ms. Adams consulted at Duke University, concurs with Dr. O'Rourke's assessment in her letter of January 18, 2005. Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶¶ 7-11. In particular she writes that Ms Adams' does not require specialized medical care, she does not have to remain in the United States to receive the minimal medical services she requires, and that a nurse practitioner would be competent to perform Ms.

Adam's semiannual breast exams. *Id*. at ¶¶ 17, 19. Finally, J. David Smith, M.D., the Board-Certified gynecologist who follows Ms. Adams, verified that he needs to see Ms. Adams only on an annual basis. Her yearly gynecological exam is routine and does not require him to provide any additional services over and above that which he renders to any other patient. Pl.'s Ex. 4 (Smith Decl.) at ¶¶ 3, 4, 5.

**Statement No. 5:**     Ms. Adams' instructions from her physician were to have a physical examination every six months for five years. Kathy E. Adams' December 5, 2003 Letter (Exh. 10); Dr. Mark A. O'Rourke's November 19, 2003 Letter (Exh. 9).

**Response:**     Disputed. Ms. Adams' instructions from her doctors were to have a breast exam every six months, not a physical exam. In fact, Ms. Adams' doctors never indicted that she needed even an annual physical exam, but merely an annual pelvic exam and an annual mammogram of her remaining breast, both of which are recommended for any woman of Ms. Adams' age. Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶¶ 9-10. Additionally, there is material dispute in this case as to who could actually perform the examination that Ms. Adams needed every six months. While defendant is correct in its assertion that Ms. Adams had been instructed to have a physical breast examination every six months through 2008, one of those exams could be performed during her annual gynecological exam, which is standard protocol. Pl.'s Ex. 4 (Smith Decl.) at ¶ 4. The other could be performed by a nurse practitioner. Pl.'s Ex. 5 (Blackwell letter of 12/18/05) at ¶¶ 17, 19; Pl.'s Ex. 2 (O'Rourke Decl.) at ¶ 14. However, defendant asserts that Ms. Adams needed a higher level of care. Ms. Forsman, a Nurse Practitioner with MED, stated that Ms. Adams could not be given a clearance because "she needed to be seen every six months for follow-up care (preferably by a specialist)." Pl.'s Ex. 17 (Forsman Decl.) at 3. Emil Von Arx III, M.D., the physician who rejected

-11-

Ms. Adams' application for a waiver, asserts that Ms. Adams needed her breast exam performed by "a general or oncologic surgeon." Def.'s Ex. 13.  Similarly, Mr. O'Keefe, Deputy Assistant Secretary in the Bureau of Human Resources who supervises the Offices of Overseas Employment, claimed that Ms. Adams could not serve overseas because he thought she needed "sophisticated routine medical care." Def.'s Ex. 2 (O'Keefe Decl.) at ¶ 10.  Defendant's determination that Ms. Adams needed a general or oncological surgeon to treat her was made two months after receiving Dr. O'Rourke's letter, which unequivocally stated that any physician or nurse-practitioner was qualified to conduct Ms. Adams' follow-up care (semi-annual two-minute breast exams).  Pl.'s Ex. 1 (O'Rourke letter stating that any physician or certified nurse practitioner "would be competent to perform Kathy's physical breast exams," dated January 12, 2004).

**Statement No. 6:**    Ms. Adams was (and is) taking the medication Tamoxifen for at least five years. Ms. Adams' December 5, 2003 Letter (Exh. 10); O'Rourke's November 19, 2003 Letter (Exh. 9). Tamoxifen can increase the risk of endometrial cancer (uterine cancer), tumors in the uterus, and thromboembolism (blood clots). Brown Decl. at ¶ 16 (Exh. 1).

**Response:**    Disputed.  Ms. Adams is no longer taking tamoxifen.  In late April 2005, after Ms. Adams' six-month check-up, Dr. O'Rourke changed her medication from tamoxifen to a newer and more effective drug, Aromasin.  Her doctor has indicated that there is no appreciable threat to Ms. Adams' health if her supply of Aromasin is interrupted by up to six months. Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 23-24, 26.

Furthermore, by highlighting the potential side effects of tamoxifen, defendant implied that Ms. Adams was not fit for worldwide service, a central issue at dispute in this case.  However, her doctors clearly indicated that the only monitoring they recommended for Ms. Adams was an annual pelvic exam and a breast exam every six months. Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶¶ 9-10;

*accord* Pl.'s Ex. 5 (Blackwell Letter) at ¶¶ 16-17. Her treating physicians also noted that the consequences of an unpreventable interruption in Ms. Adams's supply of tamoxifen of up to six (6) months would not present an appreciable threat to Ms. Adams's health. Pl.'s Ex. 1 (O'Rourke Letter of 1/12/04) at ¶ 18; *accord* Pl.'s Ex. 5 (Blackwell letter) at ¶ 23.

Finally, Brown highlights the fact that tamoxifen can increase the risk of thromboembolism (blood clots). Def. Exh. 1 (Brown Decl.) at ¶ 16. However, this risk is also commonly associated with the risks of using birth control pills. Defendant, in implying that this risk disqualified Ms. Adams from Worldwide Medical Clearance, therefore, also implied that all women taking birth control pills should be barred from Worldwide Medical Clearance. *See* Women' Health, Birthcontrol Pill, MayoClinic.Com, at http://www.mayoclinic.com/health/birth-control-pill/PR00077.

**Statement No. 7:**   Monitoring Ms. Adams' condition regularly is crucial, because early recognition of cancer provides a window for useful intervention and cure. The longer a recurrence of cancer goes unrecognized, the lower are chances for a less radical treatment or cure. In addition, thromboembolism is life-threatening. Brown Decl. at ¶ 19 (Exh. 1).

**Response:**   Disputed. Contrary to defendant's allegation that "[m]onitoring Ms. Adams' condition regularly is crucial," Drs. O'Rourke and Blackwell both attest that a delay of up to six months in any of Ms. Adams' examinations would not present a significant threat to her health. Pl.'s Ex. 2 (O'Rourke Decl.) at ¶ 25; Pl.'s Ex. 5 (Blackwell Letter) at ¶ 22. Moreover, the risk that Ms. Adams' cancer might recur is very small, about 6 to 7%. Pl.'s Ex. 2 (O'Rourke Decl.) at ¶12. To put in perspective how small Ms. Adams' risk really is, it is helpful to understand that 1 in 8 women (13%) will develop breast cancer at some point during their lifetimes. *See* WebMD, Breast Cancer, at http://www.webmd.com/content/article/46/1662_52442?z=1662_00000_0000_rl_02. Also, while thromboembolism is life-threatening, Ms. Adams' switch from tamoxifen to Aromasin eliminated

that risk as a potential complication of her medication regimen. Pl.'s Ex. 2 (O'Rourke Decl.) at ¶ 6.

**Statement No. 8:** The Office of Medical Services of the Department of State did not give Ms. Adams the necessary medical clearance for worldwide availability. December 12, 2003 Letter (Exh. 11).

**Response:** Disputed. This statement is incorrect. Defendant assigned a Class 1 Medical Clearance to Ms. Adams on July 10, 2003. It was only after defendant learned that she was a cancer survivor did it revoke this clearance. Def.'s Ex. 14 (Cole letter of March 29, 2004). The reasons for this revocation are in material dispute in this case. Emil Von Arx III, M.D., whose medical opinion was pivotal in the refusal of the ERC to grant Ms. Adams a waiver of the Class 1 requirement, confirms that Ms. Adams had originally held a Class 1 clearance: " . . . I commend Ms. Adams for her honesty in bringing to our attention that she was diagnosed with breast cancer after she had originally received a worldwide medical clearance." Pl.'s Ex. 16 (Von Arx Decl.) at 5.

**Statement No. 9:** Ms. Adams's application for a waiver of worldwide availability requirement for entry into Foreign Service was denied because it was not in the best interest of the Foreign Service. Bruce Cole's March 29, 2004 Letter (Exh. 12).

**Response:** Disputed. The reason the State Department denied Ms. Adams' waiver is a primary issue in dispute in this case. Ms. Adams contends that the fundamental reason defendant denied her application for a waiver of the Class 1 Clearance requirement was defendant's erroneous belief that Ms. Adams could serve in only 53% of posts. Def's Ex. 1 (Brown Decl.) at ¶ 26. She also contends that she would likely be able to serve at 100% of defendant's overseas posts. *See* Pl.'s Ex. 21; Pl.'s Ex. 19 (Adams Decl.) at ¶ 43 (describing how she researched and compiled the Post Report Analysis).

Additionally, in denying Ms. Adams' waiver, defendant also failed to follow its own

guidelines which require consideration of any critical needs that an applicant may fulfill for the agency thereby rasing an inference of discriminatory motive in denying her waiver. John Campbell, Deputy Assistant Secretary of Human Resources for the Department of State and Chair of the Employee Review Committee (ERC), stated it was the ERC's practice to ask the representative from the Bureau of Examination, Employment and Recruitment about

> the particular skill group of the candidate under consideration. We needed to know whether there was a shortage of candidates with the . . . specialty skills of the candidate . . ..
>
> The ERC's focus is on whether there is a compelling Service need to waive the candidate's ineligibility and on the percentage of posts in which the candidate could serve if he/she were to be waived-in. . . .. It depends on the needs of the Service at any given time and the skills and background of the candidate.

Pl.'s Ex. 6 (Campbell Decl.) at 3-5; *see also* Def.'s Ex. 12 (Cole Decl., 9/13/05) at 3 (noting that it was the responsibility of Von Arx to "present anything additional that the candidate may have provided."). While Ms. Adams' waiver application was pending, the defendant had a "critical need" for speakers of Russian. Pl.'s Ex. 10. Ms. Adams has a B.A. (*magna cum laude*) in Russian Area Studies and speaks Russian. Pl.'s Ex. 12 (Waiver Application) at 3-4. Ms. Adams emphasized her training in Russian in her waiver application. *Id*. at 2-4. However, the statements of Bruce Cole, John Campbell, and John O'Keefe, the deciding officials for her waiver, all indicate that the ERC did not even consider Ms. Adams' capacity to meet this critical need of the Service when making their decision to deny her a waiver. Def.'s Ex. 2 (O'Keefe Decl.) at ¶ 9; Pl.'s Ex. 6 (Campbell Decl.) at 4. Indeed, Bruce Cole states that there was "nothing in Ms. Adams's experience for which there was a compelling need. Thus, the recommendation was to turn her down." Def.'s Ex. 12 (Cole Decl., 9/13/05) at 4.

**Statement No. 10:** Department of State regulations prohibit overseas medical travel for routine medical appointments. Brown Decl. at ¶ 21 (Exh. 1). This is for reasons of safety, because medical TDY ("temporary duty") travel is extremely expensive, and because of the impact it would have on overseas missions if employees left regularly for several days at a time to attend medical appointments. Brown Decl. at ¶¶ 20-25 (Exh. 1); Declaration of John M. O'Keefe Declaration (O'Keefe Decl.) ¶ 10 (Exh. 2).

**Response:** Disputed. Ms. Adams does not dispute defendant's statement that its regulations prohibit *overseas* travel for routine medical appointments. However, the State Department implies through this statement that Ms. Adams would require overseas travel for her medical appointments. Ms. Adams contends that this assertion is incorrect. Ms. Adams has established that, in all likelihood, the routine medical supervision she would require is available at every post. Pl.'s Ex. 21.

Additionally, if there were no competent health-care provider available at post to perform the six-month breast exam Ms. Adams requires, she might use her annual or sick leave to obtain that exam, at her own expense, if necessary. Pl.'s Ex. 13 (2002-2003 Guidebook) at 42; Attachment A, 3 FAM 685.7. Indeed, Health Units at Foreign Service posts can assist in making medical appointments in locales where adequate medical facilities are available "during home leave, R&R, or other travel." Pl.'s Ex. 21, Tab "I": Post Report for India at 1.

**Statement No. 11:** In 2003, approximately 47 percent of all overseas Foreign Service posts lacked the medical health facilities and health care providers to provide Ms. Adams' required monitoring. Memorandum to the Employment Review Committee, March 23, 2004 (Exh. 8). At present, roughly 50 percent of all posts can provide this monitoring. Brown Decl. at ¶ 26.

**Response:** Disputed. *See* Section II-B(2), above.

**Statement No. 12:** Worldwide availability is an essential function of the Foreign Service. O'Keefe Decl. at ¶ 11.

**Response:** Disputed. Defendant's broad assertion that worldwide availability is an essential

-16-

function of the Foreign Service is misleading. While it is true that this requirement is rigorously enforced with respect to applicants for the Foreign Service, the same could not be said of the Foreign Service, as a whole. Brown states that "[t]here are approximately 500 members of the Foreign Service who have Class 2 [not worldwide available] clearances.[3] Def.'s Ex. 1 (Brown Decl.) at ¶ 11. Philippe Lussier, defendant's Chief of the Workforce Planning Division, stated that 15% of Foreign Service Generalists are currently restricted from worldwide availability due to medical conditions. Def.'s Ex. 3 (Lussier Decl.) at ¶ 3. Nowhere in his declaration, however, does Lussier acknowledge that Ms. Adams' restrictions, if any, are in fact temporary and expire in 2008. All of his statistical projections assume permanent restrictions and are not relevant to Ms. Adams' situation.

Indeed, in examining the declarations tendered by defendant's personnel in this action and during the EEOC investigation that preceded it, it is obvious that defendant's personnel have always approached Ms. Adams' need for a semi-annual breast exam as a permanent state of affairs. There is no evidence that Von Arx emphasized, or that the ERC ever considered, the temporary nature of Ms. Adams' situation during its decision-making process, contrary to the clear provisions of 3 FAM 1931.2b(2) that it be one of the four factors the ERC is to consider. This requirement is acknowledged by John Campbell and Bruce Cole, who both attended the ERC meeting at which Ms. Adams' waiver request was discussed, but both deny any recollection of her case. Pl.'s Ex. 6 (Campbell Decl). at 3, 4; Pl.'s Ex. 21(Cole Decl.) at 3, 4.

Defendant's assertions insinuate that Ms. Adams expects defendant to waive the worldwide

---

[3] Brown later states in the same document that "[t]here are several *thousand* participants in MED's health care program who have "Class 2 clearances"; perhaps he includes the personnel and dependents of all U.S. government agencies involved in MED's program. Def.'s Ex. 1 (Brown Decl.) at ¶ 24 (emphasis added).

availability requirement with respect to all applicants. Def.'s Ex. 3 (Lussier Decl.) at ¶¶ 2, 5, and 7; Def.'s Ex. 2 (O'Keefe Decl.) at ¶¶ 6, 11; Def.'s Ex. 1 (Brown Decl.) at ¶¶ 23, 24.  However, Ms. Adams and her oncologists have steadfastly maintained that she is ready, willing, and able to serve at any post.  Contrary to defendant's assertion, Ms. Adams contends that she needs no accommodation.  Def.'s Ex. 9 (O'Rourke letter of November 19, 2003) at 2; Pl.'s Ex. 12 (Adams Waiver Application) at 14; Pl.'s Ex. 19 (Adams Decl.) at ¶ 52; Pl.'s Ex. 1 (O'Rourke Letter 1/12/2004) at ¶¶ 4-8; Pl.'s Ex. 5 (Blackwell Letter) at ¶¶ 7-11; Pl.'s Ex. 2 (O'Rourke Decl.) at ¶¶ 15-21, 27.  Therefore, the integrity of defendant's worldwide availability requirement would not be threatened.  Indeed, at the heart of the material facts in dispute in this case is whether MED made an accurate, good-faith determination that Ms. Adams is not worldwide available, given the unequivocal statements of her oncologist, who insist that she is, and whose care defendant has admitted is "state-of-the-art" and represents the appropriate standard of care. Def's Ex. 15 (Message of October 10, 2003, from Rebecca Forsman, a MED nurse consultant, to Ms. Adams); Pl.'s Ex. 17 (Forsman Decl.) at 3; Def.'s Ex 13 (Von Arx memo.); Pl.'s Ex. 16 (Von Arx Decl.) at 4.

    Respectfully submitted,

_____
David H. Shapiro
D.C. Bar No. 961326
Ellen K. Renaud
D.C. Bar No. 479376
SWICK & SHAPIRO
1225 Eye Street, N.W.
Suite 1290
Washington, D.C.  20005
(202) 483-0300

Attorney for Plaintiff