UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHY E. ADAMS, </br></br> Plaintiff, </br></br> v. </br></br> CONDOLEEZZA RICE, in her capacity as United States Secretary of State, </br></br> Defendant. | ) </br> ) </br> ) </br> ) </br> ) </br> ) Civil Action No.:05CV00941(EGS) </br> ) </br> ) ECF </br> ) </br> ) </br> ) </br> ) |

**SUPPLEMENTAL DECLARATION OF LAURENCE G. BROWN**

1. I hereby supplement my declaration of September 12, 2005, as follows:

2. I understand that Ms. Adams has stated that there are "at least 50 agencies other than the Department of State [that] require a worldwide medical clearance from MED for applicants who will be working overseas." This is not correct. Each of the federal agencies that utilize MED's health care program overseas has different hiring standards. MED does not set the hiring standards for any federal agency. Only the five agencies that utilize the Foreign Service personnel system (i.e., the Department of State, the U.S. Agency for International Development, the U.S. Department of Commerce, the U.S. Department of Agriculture, and the Broadcasting Board of Governors) maintain "worldwide availability" requirements for new entrants to the U.S. Foreign Service. The other agencies typically send federal civil servants or other personnel overseas to specific posts or for finite periods of time. In order to participate in MED's health care program overseas, we require those agencies to obtain a MED "clearance" for the specific

1



GOVERNMENT EXHIBIT
Reply A

post to which they will be assigned, but this is a post-specific clearance determination that is entirely different from the Foreign Service medical clearance process. I would imagine that a person with Ms. Adams' medical needs would be able to obtain post-specific clearance for overseas service in a wide variety of posts and could obtain overseas employment with most of the approximately 50 agencies that utilize MED's health care program.

3. I also understand that Ms. Adams believes she could obtain a breast examination overseas from any general practitioner or nurse practitioner, and such a medical practitioner is available at any post worldwide. There are several problems with this assertion. First, at the time we denied Ms. Adams' medical clearance in December 2003, it had only been four months since her diagnosis with cancer and three months since she had undergone a mastectomy on September 15, 2003. Given that she had so recently had a mastectomy, we felt that there was a higher risk both of recurrence in the wound and in her other breast that warranted careful monitoring by someone with more of a background in cancer treatment than the average general practitioner or nurse practitioner. Certainly, if Ms. Adams had been assigned to a post overseas without an oncologist or surgeon, and a general practitioner or nurse practitioner had found something irregular during the breast examination, Ms. Adams would have had to be medically evacuated to a country where an oncologist or surgeon would be available for further examination and possible treatment.

4. It has now been several years since Ms. Adams' initial diagnosis with cancer, and if she has not experienced a recurrence of her cancer, then she may well be correct that a semi-annual examination by a Western-trained general practitioner or nurse practitioner would be adequate now. However, I stand by MED's determination based on the information we had available to us

2

in December 2003, and would still recommend, based on recommendations from the American Society of Clinical Oncology, that she be followed by a physician familiar with breast cancer treatment and follow-up evaluation, such as an oncologist or surgeon, for five years following her diagnosis.

5.     However, even assuming for the sake of argument that Ms. Adams had only needed a general practitioner or nurse practitioner in 2003 when she applied to the Foreign Service, such personnel simply are not available worldwide. I understand that Ms. Adams believes that adequate medical care is available worldwide and has based this assertion upon her reading of "post reports" available on the State Department's website. However, "post reports" are not what MED uses to determine the availability of adequate medical capabilities overseas, as they are written by non-medical personnel for more general use and not for medical practitioners. As I explained in my declaration of September 12, 2005, MED uses its own Post Capabilities Database in which detailed information is provided by our medical practitioners in the field, and then analyzed by MED personnel in Washington in order to make determinations on medical clearances. We have never relied and would never rely on a "post report" to make a medical clearance determination.

6.     In addition, Ms. Adams appears to assume that, because a general practitioner or nurse practitioner may be available at a post, that individual will possess the skill set necessary to do a breast examination. This is not necessarily the case, as many of the medical personnel who work for MED overseas are locally-hired health care professionals who may not have had the cancer-related training that one would expect from a Western-trained provider. In some areas, we may have only a locally-hired registered nurse, for example. Such personnel may be able to perform

3

basic medical functions, but would not necessarily be qualified to conduct a breast examination on an individual such as Ms. Adams, who has a reconstructed breast. This is why the Post Capabilities Database contains not only a listing of local health care providers, but a rating to see how their training and expertise compares to US standards of care. Based on the data currently contained in our Post Capabilities Database, I would estimate that no more than 85% of our posts worldwide have a physician or nurse practitioner of any kind whom I would feel I could trust to perform an adequate breast examination on a patient like Ms. Adams. I cannot reconstruct this data as it might have appeared in our Post Capabilities Database in 2003 or 2004, but this percentage number was likely around the same, if not lower, several years ago.

7. The medical clearance determinations that are made by MED for Foreign Service applicants are not based upon a "hysteria," as Ms. Adams has suggested, but rather, a realistic assessment of whether an applicant can serve anywhere worldwide without having to leave the post to seek routine medical monitoring. By all accounts, Ms. Adams has apparently recovered well from her breast cancer and will likely be able to dispense with having semi-annual breast examinations in the near future if there are no signs of recurrence. However, this does not change the fact that, in December 2003 there was a significant risk that, had she been sent overseas to a post with unqualified or underqualified medical personnel, she might have experienced a recurrence that would not have been caught during the breast examination and that could have seriously not only endangered her welfare, but undermined the mission of her post of assignment.

I hereby attest under the penalty of perjury that the foregoing is true and correct.

                                            LAURENCE G. BROWN
                                            Director, Office of Medical Services
                                            U.S. Department of State

This 29th day of March, 2006.