**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KATHY E. ADAMS,

Plaintiff,

v.

CONDOLEEZZA RICE, in her capacity as United States Secretary of State,

Defendant.

Civil Action No.: 05CV00941 (EGS)

ECF

**SUPPLEMENTAL DECLARATION OF MARK A. O'ROURKE, M.D.**

1. I hereby supplement my Declaration of October 21, 2005, as follows:

2. Though I stated in my letters of November 19, 2003, and January 12, 2004, that the recipients at the Department of State should feel free to contact me at any time for further information or documentation regarding Ms. Adams's breast cancer, no one from the Department of State ever contacted me.

3. I understand that the Department of State has justified its rejection of Ms. Adams from the Foreign Service by claiming that her treatment with tamoxifen from October, 2003, to May, 2005, increased the chance that she might develop "endometrial cancers (cancers of the lining of the uterus) . . . sarcomas (tumors) of the uterus . . . [and] thromboembolism (blood clots)." Had I been consulted in 2003 about the likelihood that she might develop such complications, I would gladly have explained that such risks were remote. Indeed, if such risks constituted reasonable criteria to reject a woman from the Foreign Service, then the Department of State would have to reject all women taking

birth-control pills or hormone-replacement therapy; the risks presented by tamoxifen therapy are essentially the same. Indeed, had I had any reason to anticipate that physicians at the Department of State would proffer such remote risks as an excuse not to hire her, I would have asked Ms. Adams to put me in touch with those physicians so that I could have addressed their concerns.

4.      Thousands of women are presently taking tamoxifen as a result of their participation in government-sponsored trials to study whether tamoxifen can actually prevent breast cancer. Such studies would not have been sanctioned if the risks set forth by the Department of State were significant.

5.      I understand that the Department of State has now alleged that the medical professional who performs Ms. Adams's breast examinations requires special qualifications because she has a reconstructed breast. (For the record, her reconstruction was effected with a saline implant.) There is no medical basis for that opinion. I would not have stated in my letter of January 12, 2004, that Ms. Adams does not require specialized medical care or that a Department of State nurse practitioner is competent to conduct those examinations if special expertise were required to monitor or examine Ms. Adams. Again, if that were a concern in 2003 and 2004 when the Department of State was making its decisions regarding Ms. Adams, I would have been happy to address it.

6.      I also understand that the Department of State maintains that they "felt that there was a higher risk both of recurrence in the wound and in her other breast that warranted careful monitoring by someone with more of a background in cancer treatment than the average general practitioner or nurse practitioner" and that that development would have

required her to be "medically evacuated." I consistently stated in both the aforementioned letters that the odds that the breast cancer would recur were less than 10%, a prognosis with which my fellow oncologist, Kimberly Blackwell, M.D., of the Duke University Multidisciplinary Breast Program, concurred. Had the Department of State consulted me, I would have been glad to provide any additional information the Department of State needed to reassure them of the very low probability that her cancer would recur and that the risk that she would require medical evacuation was remote and highly speculative.

7.      I also understand that the Department of State "stands by its determination based on the information [they] had available to [them] in December 2003, and would still recommend, based on recommendations from the American Society of Clinical Oncology, that she be followed by . . . an oncologist or surgeon for five years following her diagnosis." I, too, am familiar with both the 2003 and the current guidelines issued by the American Society of Clinical Oncology regarding the necessary expertise of medical professionals following breast-cancer patients after initial treatment. I reviewed one of the articles cited by the Department of State to justify its decision to reject Ms. Adams because they felt she needed specialized medical care: *American Society of Clinical Oncology 1998 Update of Recommended Breast Cancer Surveillance Guidelines*, Journal of Clinical Oncology 1999; 17:1080. Those Guidelines do not indicate that a specialist is required to conduct Ms. Adams's check-ups. Rather, ASCO supports a patient's *right to choose* a specialist to follow her in the interest of non-duplication of costly medical services. Interestingly, the article discussed on page 1081 a

"well-designed" randomized clinical trial in Britain "designed specifically to evaluate whether primary care physicians instead of specialist cancer physicians can provide breast cancer surveillance. . . .. This study found that primary care follow-up of women with breast cancer in remission is ***not*** associated with increase in time to diagnosis of recurrence . . .." (Emphasis added.) There is, therefore, no medical basis for the Department of State's opinion that there was a significant risk that a recurrence of Ms. Adams's breast cancer would have gone undetected had she been examined by primary care providers. My letters made it clear that I was available for consultation on the matter. Had I been asked to do so, I would have been happy to work with the Department of State to assuage the anxieties of its health-care providers about their capacities to provide the minimal medical monitoring Ms. Adams needs.

8. In summary, Ms. Adams was a healthy person, free of cancer in the fall of 2003. Her twice-a-year breast cancer check-up examinations could easily have been done by an ordinarily-qualified primary care provider. As her medical oncologist, I endorsed primary care follow up for her then and I would do the same today. Attached is recent editorial by Khatcheressian in the Journal of Clinical Oncology (Vol. 24, No. 6, (February 20), 2006, 835-837) which supports the conclusion that breast cancer follow-up is as well done by primary care providers as by oncology specialists. Please feel free to contact me at 864-987-7000, x4, x1, or digital pager 864-996-1420.

I hereby attest under the penalty of perjury that the foregoing is true and correct.

                                                                      [signature]

Mark A. O'Rourke, M.D.
Cancer Centers of the Carolinas

This 15th day of ~~May~~ June, 2006.

VOLUME 24 · NUMBER 6 · FEBRUARY 20 2006

JOURNAL OF CLINICAL ONCOLOGY

EDITORIAL

# Randomized Trial of Long-Term Follow-Up for Early-Stage Breast Cancer: A Comparison of Family Physician Versus Specialist Care

James L. Khatcheressian and Thomas J. Smith, *Massey Cancer Center of Virginia Commonwealth University, Richmond, VA*

The article by Grunfeld et al[1] in this issue of the *Journal of Clinical Oncology* is a landmark article for women with breast cancer and their health care providers. It shows conclusively that the health outcomes for women after primary treatment of breast cancer are the same if they are followed by their family physicians or cancer center specialists. Medical, psychosocial, and all other measured outcomes were the same. There really is no other conclusion that can be drawn.

This is not one study; this relates to conclusions from years of research. Grunfeld et al previously showed that in Great Britain, follow-up by a generalist physician led to the same health outcomes as did follow-up by a specialist surgeon,[2] with no change in quality of life,[3] better patient satisfaction,[4] and no change in health care expenditures.[5] Another randomized trial in Great Britain showed that twice as many patients preferred simpler, less frequent follow-up by telephone.[6] There is no a priori reason to expect that patients in the United States would choose differently, and Loprinzi et al demonstrated that the demand for medically inappropriate testing can be reduced by patient education about the specificity, sensitivity, and usefulness of the available tests.[7] In fact, this conclusion corresponds with the American Society of Clinical Oncology (ASCO) guidelines for surveillance of breast cancer patients.[8,9]

Data suggest that current follow-up procedures could be improved. Lash and Silliman followed 303 stage I or II breast cancer patients aged 55 years or older diagnosed at five Boston hospitals, with patient interviews and medical record abstracts.[10] Over 4 years, of the 303 women, 279 had some surveillance testing; the most common test was a mammogram (average, 3.9 in 4 years). Younger women, those treated at a breast cancer center with a unified patient chart, and women who worked, were more likely to complete surveillance; those 75 to 90 years old were less likely to complete guideline-approved surveillance. Mille et al at Centre Regional Leon Berard showed that implementation of clinical practice guidelines on follow-up of patients with localized breast cancer standardized care and a one-third decrease in cost per patient.[11] Earle et al showed that patients followed up by a primary care physician and their oncologist were more likely to receive recommended preventive health services than those followed by their oncologists alone[12]; with more and more survivors each year, this will become increasingly important.

With all that evidence, why are we still uneasy with allocating surveillance care to primary care physicians, without oncology routine follow-up? There are substantial issues that have not yet been addressed.

This study looked at the most important medical events, such as recurrence and new primary cancers. Are there data that show how frequently oncologists or primary care physicians inquire about some of the "softer" but important issues of body image, sexuality, sexual functioning, adaptation back to normal life, cognitive dysfunction, neuropathic pain, bone health, depression, menopause, or the myriad symptoms left after modern treatment? We know these issues are important, and we know we can fix some of them; we just don't know in everyday practice how frequently they are addressed and controlled. A prospective study of a one-page follow-up check list would give the answers.

Do patient outcomes for specific symptoms due to treatment, such as chronic breast pain, sexual function, menopause symptoms, depression, and so on vary between the two groups? The Hospital Anxiety and Depression Scale (HADS) and 36-item short form (SF-36) are good instruments for global function, but are not designed for breast cancer survivor symptoms. Are there data to suggest that any practitioner group is better? We do know that oncologists are not very good at assessing emotional health. For example, in a study of 204 patients and five oncologists, patients reported many more symptoms than their oncologists perceived, and the oncologists had better sensitivity and specificity for physical symptoms than psychosocial. The oncologists had sensitivity rates up to 80% for fatigue, nausea, vomiting, and hair loss, but recognized only 17% of the patients with anxiety and only 6% of those with clinical depression.[13]

Do patient outcomes for important issues such as genetic testing and secondary chemoprevention vary between the two groups? No data are provided. Are there data to suggest that oncologists provide good care in this regard? Data from our institution suggest underreferral of patients with potentially detectable genetic changes associated with breast and colorectal cancer for genetic consultation (personal communication, Joann N. Bodurtha, MD, MPH, October 23, 2005) compared with national recommendations,[14] so there is work to be done.

Are there data on the diffusion of new knowledge, such as adding letrozole after 5 years of primary treatment with tamoxifen,[15]

*Journal of Clinical Oncology*, Vol 24, No 6 (February 20), 2006: pp 835-837
DOI: 10.1200/JCO.2005.04.5153

switching from tamoxifen to exemestane after 2 to 3 years of primary treatment,[16] or recalling patients who missed out on trastuzamab during their adjuvant therapy? How will ASCO inform members of such practice-altering events? How will family practice and primary care physicians learn? How can patients keep up to date? How well will physicians perform in getting patients to reduce their dietary fat intake, and to exercise? The data from a 2,400-woman randomized controlled trial showed that recurrence risk was reduced by 25% to 49% with reduction in dietary fat from 51 to 31 g/d.[17] That reduction in risk is more than many standard interventions such as chemotherapy or hormonal manipulation; if confirmed in the full published report, it should change practice, hopefully overnight, not after years of diffusion.

What is the best unbiased way to educate all who follow breast cancer patients in the many issues that are present during survivorship? Not all will read the *New England Journal of Medicine* or the *Journal of Clinical Oncology*. Pharmaceutical and industry representatives could expand their call circles to include family physicians and primary care physicians about aromatase inhibitors after or in place of tamoxifen, and *BRCA1/2* testing. But how about those issues without a drug fix, such as cognitive dysfunction, neuropathy from taxanes, or sexual dysfunction? What safeguards could be put in place to update those who deliver care in a rapidly changing oncology practice? And should we entrust the process of keeping informed to pharmaceutical representatives?

How will oncology nurses and physicians respond when they see no "well" patients? Will this contribute to burnout and loss of job satisfaction?

What are practical steps that can be taken to improve follow-up of women with breast cancer, regardless of who does it?

(1) We can work with patient advocacy groups to educate their members on what medical science can and cannot do, and work with them to evolve the most efficient methods of follow-up.

(2) Grunfeld et al included the one-page follow-up guideline given to the family physician group. This can be incorporated into the office visits. Such simple prompts appear to help improve communication about important health issues.[18] The ASCO surveillance group can devise a similar one page form with important issues to be addressed. This can be jointly done with primary care physicians.

(3) We should experiment with patient-controlled follow-up methods, such as giving each patient a USB flash drive with a form for the health care professional to complete each time. This could list the most common concerns and practical tips for fixing them, along with allergies, problem list, radiographs, and so on. In the absence of a single electronic medical record this may be a useful compromise.

(4) We can follow the guidelines we already have in place. They are simple, straightforward, can be done in a short time,[19] and will lead to equal care at less cost. As Loprinzi et al have demonstrated, people will not want tests such as the CA 27.29 and carcinoembryonic antigen if they are not recommended and do not add value.

We recognize that this is a substantial change in practice and attitudes. The only way to demonstrate to "nonbelievers" that generalists and specialists are equal would be to have individual patient level detail on symptoms such as pain, anemia, brain metastases, or other visceral metastatic complications, and that early intervention made a difference. The rarity of such individual events makes such trials impossible; there are no data suggesting that oncologists are better at recognizing those symptoms than primary care health care professionals, and there are no data that early intervention makes a difference. The evidence from multiple randomized clinical trials suggests that ASCO should begin partnering with our primary care colleagues and our shared patients to better improve the follow-up process.

## REFERENCES


1. Grunfeld E, Levine MN, Julian JA, et al: Randomized trial of long-term follow-up for early-stage breast cancer: A comparison of family physician versus specialist care. J Clin Oncol 24:848-855, 2006
2. Grunfeld E, Mant D, Yudkin P, et al: Routine follow up of breast cancer in primary care: Randomised trial. BMJ 313:665-669, 1996
3. Grunfeld E, Yudkin P, Adewuyl-Dalton R, et al: Follow up in breast cancer: Quality of life unaffected by general practice follow up. BMJ 311:54, 1995
4. Grunfeld E, Fitzpatrick R, Mant D, et al: Comparison of breast cancer patient satisfaction with follow-up in primary care versus specialist care: Results from a randomized controlled trial. Br J Gen Pract 49:705-710, 1999
5. Grunfeld E, Gray A, Mant D, et al: Follow-up of breast cancer in primary care vs specialist care: Results of an economic evaluation. Br J Cancer 79:1227-1233, 1999
6. Gulliford T, Opomu M, Wilson E, et al: Popularity of less frequent follow up for breast cancer in randomised study: Initial findings from the hotline study. BMJ 314:174-177, 1997
7. Loprinzi CL, Hayes D, Smith T: Doc, shouldn't we be getting some tests? J Clin Oncol 18:2345-2348, 2000
8. Smith TJ, Davidson NE, Schapira DV, et al: American Society of Clinical Oncology 1998 update of recommended breast cancer surveillance guidelines. J Clin Oncol 17:1080-1082, 1999
9. Khatcheressian J, Davidson NE, Schapira DV, et al: American Society of Clinical Oncology 2005 update of recommended breast cancer surveillance guidelines. J Clin Oncol (in press)
10. Lash TL, Silliman RA: Medical surveillance after breast cancer diagnosis. Med Care 39:945-955, 2001
11. Mille D, Roy T, Carrere MO, et al: Economic impact of harmonizing medical practices: Compliance with clinical practice guidelines in the follow-up of breast cancer in a French Comprehensive Cancer Center. J Clin Oncol 18:1718-1724, 2000
12. Earle CC, Neville BA: Under use of necessary care among cancer survivors. Cancer 101:1712-1719, 2004
13. Newell S, Sanson-Fisher RW, Girgis A, et al: How well do medical oncologists' perceptions reflect their patients' reported physical and psychosocial problems? Data from a survey of five oncologists. Cancer 83:1640-1651, 1998
14. U.S. Preventive Services Task Force. Genetic risk assessment and BRCA mutation testing for breast and ovarian cancer susceptibility: Recommendation statement. Ann Intern Med 143:355-361, 2005
15. Goss PE, Ingle JN, Martino S, et al: A randomized trial of letrozole in postmenopausal women after five years of tamoxifen therapy for early-stage breast cancer. N Engl J Med 349:1793-1802, 2003
16. Coombes RC, Hall E, Gibson LJ, et al: Intergroup Exemestane Study: A randomized trial of exemestane after two to three years of tamoxifen therapy in postmenopausal women with primary breast cancer. N Engl J Med 350:1081-1092, 2004
17. Chlebowski RT, Blackburn GL, Elashoff RE, et al: Dietary fat reduction in postmenopausal women with primary breast cancer: Phase III Women's Intervention Nutrition Study (WINS). J Clin Oncol 23:3s, 2005 (abstr 10)
18. Detmar SB, Muller MJ, Schornagel JH, et al: Health-related quality-of-life assessments and patient-physician communication: A randomized controlled trial. JAMA 288:3027-3034, 2002
19. Smith TJ: The American Society of Clinical Oncology Recommended Breast Cancer Surveillance Guidelines can be done in a routine office visit. J Clin Oncol 23:6807, 2005

ONCOLOGY NEWS CENTER

# For Early Breast Cancer, Family Physicians Shown to Provide Same Quality of Long-term Follow-up Care as Specialists

*By Eric T. Rosenthal*

Family physicians can provide the same level of long-term follow-up care for early-stage breast cancer patients as oncologists, according to a Canadian study published in the *Journal of Clinical Oncology (2006;24:835-837).*

The study by Eva Grunfeld, MD, DPhil, of Dalhousie University, and colleagues, confirmed results from a similar study she had conducted in the United Kingdom a decade before (*BMJ 1996;313:665-669*).

Eva Grunfeld, MD, DPhil: "The study tested the hypothesis that follow up by a patient's family physician is a safe, acceptable alternative to follow up by an oncologist, and showed that women should not be concerned about recurrence-related serious clinical events occurring more frequently, or their health-related quality of life being affected negatively."

In an accompanying editorial to the new study, James L. Khatcheressian, MD, and Thomas J. Smith, MD, both from Massey Cancer Center of Virginia Commonwealth University, refer to the original report as a landmark article for women with breast cancer and their health care providers, noting that it shows conclusively that health outcomes for women after primary treatment of breast cancer are the same if they are followed by their family physicians or cancer center specialists.

"Medical, psychosocial, and all other measured outcomes were the same. There really is no other conclusion that can be drawn," the editorial said.

## Call for ASCO to Partner with Primary Care Doctors

Despite the double endorsement, the editorial goes on to raise questions and offer some practical steps to improve follow-up of breast cancer patients, including a call for the American Society of Clinical Oncology to begin partnering with primary care physicians and for shared patients to further improve the follow-up process.

In a telephone interview, Dr. Grunfeld, Director of the Cancer Outcomes Research Program and Professor of Medicine at Dalhousie in Halifax, Nova Scotia, clarified that the study focused more on follow-up surveillance than treatment of women completing primary treatment for early-stage disease.

"The study tested the hypothesis that follow-up by a patient's family physician is a safe, acceptable alternative to follow-up by an oncologist, and showed that women should not be concerned about recurrence-related serious clinical events occurring more frequently, or their health-related quality of life being affected negatively."

## Study Details

The randomized, controlled trial conducted at six regional cancer centers in Ontario, involved 968 women with early-stage breast cancer who had completed adjuvant treatment, were disease free, and were nine to 15 months post-diagnosis; some patients may still have been receiving adjuvant hormonal therapy.

Patients were enrolled between January 1997 and June 2001, and were observed until their fifth-year anniversary on the trial, or June 30, 2003, depending on which came first.

The patients were randomly allocated to be seen by either their oncologist or own family physician.

Family physicians were given a one-page guideline on follow-up care that recommended physical examination and taking a medical history every three to six months for three years, every six months for two years, and then annually; yearly mammograms; and diagnostic tests to investigate possible signs or symptoms of recurrence or a new primary tumors—however, these tests were not to be performed routinely.

> *It was significant that both the Canadian and UK studies came to the same conclusion in two completely different health care settings.*

In addition, physicians seeing patients on tamoxifen were also instructed to take a history of vaginal bleeding every visit, and perform a pelvic exam yearly. If patients had a recurrence or new primary, they were to be referred back to the cancer center.

Of those seen by family physicians, 54 had recurrences (11.2%) and 29 died (6%). Those followed up by oncologists had 64 recurrences (13.2%) and 30 died (6.2%).

Seventeen (3.5%) of the family practice-followed patients experienced recurrence-related serious clinical events as contrasted with 18 patients (3.7%) of those seen by oncologists.

In addition, there were no statistically significant differences between the two groups for the secondary outcome health-related quality of life.

James L. Khatcheressian, MD: "What we don't know is how good or comfortable family practitioners would be at continuing hormonal therapy when patients will need it for another five years, or how good they will be at addressing other survivorship issues including such side effects of treatment as hot flashes, depression, anxiety, vaginal dryness, and urogenital atrophy. Those things still have to be addressed."

## Unique Opportunity to Work in Cancer Center as Family MD

Dr. Grunfeld's interest in the study evolved from her own practice experience, she noted. Trained as both a family physician and epidemiologist, and serving as a clinician scientist, she had the unique opportunity to work in a cancer center as a family physician seeing mostly breast cancer and some colorectal cancer patients.

"I was struck by two things," she said. "The huge volume of breast cancer patients that had to be seen at the clinic, and the fact that many of those patients were having well checkups and had no problems. I also saw that when patients did have a problem there was almost no time to deal with them because of the overload—a poignant example of our focusing our energies in the wrong direction.

"And the other part was that I was fresh out of my family medicine training program, and was very junior at that point, but I felt very confident in my skills. I didn't see patients in that follow-up who I felt I didn't have the required skills."

She noted that although she was not trained to prescribe chemotherapy or make decisions about radiotherapy, she was comfortable doing the patient follow-up, and began to think about the issue of rehabilitation and the philosophy of survivorship, leading to her first study in the UK.

Dr. Grunfeld said it was significant that both the Canadian and UK studies came to the same conclusion in two completely different health care settings.

## Definition of Family Physicians

She also said family physicians in Canada were defined as those physicians receiving two years post-medical school training in family medicine, rather than the four-years training required of specialists, adding that general internists and other physicians, such as gynecologists, who could be considered as primary care physicians in the United States, were not included in the Canadian study, and that family physicians were called general practitioners in the UK.

However, she said that any physician in the US who considered himself or herself a primary care physician and had breast cancer patients, would be appropriate to partner with oncologists in continuing patient care.

## Differences in Situations in US vs Canada

In a telephone interview, Dr. Khatcheressian, Assistant Professor at Virginia Commonwealth, said it was noteworthy that the family physicians in Canada had less education than many US counterparts and had still performed as well as the oncologists. He pointed out that both the Canadian and UK health systems are publicly funded, while in the US, most medical care other than Medicare is private.

*(continued on page 8)*

JUL 20 2006

# Surveillance

*continued from page 7*

"The *JCO* study answers a very specific question that it's safe for patients to get their surveillance follow-up care from family physicians—that's the landmark part of the study," he said.

"What we don't know is how good or comfortable family practitioners would be at continuing hormonal therapy when patients will need it for another five years, or how good they will be at addressing other survivorship issues including such side effects of treatment as hot flashes, depression, anxiety, vaginal dryness, and uro-genital atrophy. Those things still have to be addressed.

"Most oncologists don't know this," he continued, "but only about 30% to 40% of breast cancer recurrences are actually found during clinician visits. The vast majority are found between scheduled visits, and they could be local or regional recurrences or metastatic disease."

**Patricia A. Ganz, MD: "Patients should be in the driver's seat when making decisions about their care, and now I have a paper I can pull out and show them with confidence that they have a choice in their follow-up care."**

## Practical Steps to Improve Follow-up Care

Dr. Khatcheressian and Dr. Smith, Professor and Chairman, Hematology/Oncology and Palliative Care at Massey, provided a number of practical steps—for all physicians, specialist or generalist—to improve follow-up care for breast cancer patients, including:

- Working with patient advocacy groups to educate their constituents about what medical science can and cannot do, and to evolve the most efficient methods of follow up.
- Developing and incorporating a one-page follow-up guideline into family physicians practices.
- Experimenting with patient-controlled follow-up methods such as USB flash drives issued to patients with a form to be completed by medical professionals following each visit.
- Following the guidelines already in place.

During his interview, Dr. Khatcheressian discussed the need to offload follow-up patients in busy clinics when oncologists can't see new patients in a timely matter. He also expressed concern that third-party payers in this country could potentially use this study to deny referrals to oncologists for follow-up care.

"This study reflects the evidence of what's been found—and we need to practice evidence-based medicine," he said.

## Need for Oncologists to be More Organized in Writing End-of-Treatment Plans?

Patricia A. Ganz, MD, Professor of Health Services and Medicine at the UCLA School of Public Health, and Director of the Division of Cancer Prevention and Control Research of UCLA's Jonsson Comprehensive Cancer Center, is also an Associate Editor of *JCO* and a member of ASCO's Board of Directors.

Dr. Ganz and ASCO President Sandra J. Horning, MD, are Co-chairs of ASCO's Survivorship Task Force, and Dr. Ganz was a member of the Institute of Medicine Committee that wrote the IOM' recent survivorship report, "From Cancer Patient to Cancer Survivor: Lost in Transition," released last November.

During a phone interview, Dr. Ganz concurred with Dr. Khatcheressian's comment about the value of practicing evidence-based medicine as it pertains to the Canadian study. She also noted the need to make room for new patients in practices filled with survivors.

But she acknowledged that many oncologists could be more organized in writing end-of-treatment plans.

"Here I am, a survivorship expert, and I don't do this. We should be doing a better job of developing survivorship plans to be given to patients and primary care physicians. We need to find a better way to keep people in the loop and work on a transition plan," she said, adding that many oncologists and patients might be reluctant to part from each other because of the intense personal relationship fostered during treatment.

"Patients should be in the driver's seat when making decisions about their care, and now I have a paper I can pull out and show them with confidence that they have a choice in their follow-up care."

## Recommendation for Reimbursement for Level 4-5 Visit

She said this transition process could be aided if oncologists were reimbursed for a level four or five comprehensive visit for scheduling a 40-minute end-of-treatment visit with their patients, and that this kind of recognition could help move a lot of things forward.

**Clifford A. Hudis, MD: "Implementing this would require a really tightly coordinated, robust system tying family doctors back to the oncologist, and this isn't something you can necessarily count on, especially with the mobility of Americans."**

## Related Events at ASCO Annual Meeting

Dr. Ganz said that ASCO is currently preparing survivorship guidelines that will be discussed during an educational session at the annual meeting in June, and that the Society will debut its new Patient and Survivor Care track at the meeting.

Dr. Grunfeld's study had been presented as a poster at ASCO's 2004 meeting in New Orleans, and Dr. Grunfeld said she had encountered two types of reactions from oncologists at that time: "One was 'my patients won't need me anymore'—it was almost a sense of abandonment.

"My response to that," Dr. Grunfeld said, is that since the oncologists' experience is so valued and has proven to provide such enormous benefits in terms of improving survival and alleviating symptoms, then it seems that those efforts should be channeled where they are needed the most.

"The other point raised was about oncologist burnout. Oncologists said that if they didn't see well patients, they couldn't deal just with sick and dying patients all the time. My response to this is that oncologists see a lot of patients during treatment where the goal is survival, and it's a very tough road, but there is a very positive outcome they know will result for it.

"My ultimate objective for patients," she continued, "is to be offered a choice by being able to make an informed decision. There will always be a proportion of patients who don't wish to be followed by their family physicians and will continue their care in a specialist's office. And alleviating the enormous numbers and bringing it down to a manageable size could also help the burnout.

"And finally, it's what the patient needs, not the oncologist."

## Some Resistance

Dr. Grunfeld noted there had been a certain degree of resistance to her thesis and study, which she said she attributed partly to territoriality and partly to selection bias—i.e., clinicians remember unusual cases and oncologists will remember the case when a family physician might have missed something or had a problem with a patient, influencing decisions in subsequent situations.

"Of course, the problem is it's the oncologist's perspective; from the family physician's perspective, it will be the mistakes that the oncologist made that will be remembered."

She said family physicians have been welcoming and supportive of the study, with two corollaries—they get the guidelines that tell them what to do; and they have access to specialists when they need them.

Dr. Grunfeld is now looking at factors that affect follow-up care and is involved in a study testing interventions that will facilitate transition from intensive treatment to survivorship for patients.

> *"Most oncologists don't know this, but only about 30% to 40% of breast cancer recurrences are actually found during clinician visits. The vast majority are found between scheduled visits, and they could be local or regional recurrences or metastatic disease."*

## 'Presumes Static Situation'

One oncologist who doesn't think the study will have much impact on his clinical practice is Clifford A. Hudis, MD, Chief of the Breast Cancer Medicine Service at Memorial Sloan-Kettering Cancer Center.

"I don't dispute the results of the trial," he explained. "I think it's a well-done study that looks at an important question. But it does presume a static situation going forward, and presumes that other components of care will be perfect and that family physicians will be able to keep up with evolving developments in late management of early-stage breast cancer.

"Implementing this would require a really tightly coordinated, robust system tying family doctors back to the

*(continued on page 9)*