Lorenzo TAYLOR, Appellant

v.

Condoleezza RICE, in her official capacity as United States Secretary of State, Appellee.

No. 05–5257.

United States Court of Appeals, District of Columbia Circuit.

Argued April 27, 2006.

Decided June 27, 2006.

**Background:** Prospective employee brought action claiming that State Department violated Rehabilitation Act when it refused to hire him as Foreign Service Officer because he was HIV-positive. The United States District Court for the District of Columbia, Rosemary M. Collyer, J., 2005 WL 913221, granted summary judgment for State Department. Prospective employee appealed.

**Holdings:** The Court of Appeals, Randolph, Circuit Judge, held that:

(1) fact issue existed as to extent to which Foreign Service Officers had to be available to serve in overseas posts;

(2) fact issue existed as to whether accommodation or adjustment proposed by prospective employee effectively would have eliminated function essential to employer;

(3) fact issue existed as to whether accommodation requested by prospective employee was reasonable; and

(4) fact issue existed as to whether prospective employee's pulmonary condition was non-discriminatory reason for rejecting his application to Foreign Service.

Reversed and remanded.

**1. Federal Civil Procedure ⇐2497.1**

Genuine issue of material fact existed regarding extent to which Foreign Service Officers had to be available to serve in overseas posts, precluding summary judgment on State Department's direct threat defense, in lawsuit brought by prospective employee claiming that State Department violated Rehabilitation Act when it refused to hire him as Foreign Service Officer because he was HIV-positive. 22 U.S.C.A. §§ 3901(a)(4), 3984(a); Fed.Rules Civ.Proc. Rule 56, 28 U.S.C.A.; Rehabilitation Act of 1973, § 501, 29 U.S.C.A. § 791; 22 C.F.R. § 11.1(e)(2); 29 C.F.R. §§ 1630.2(n, r), 1630.15(b)(2).

**2. Federal Civil Procedure ⇐2497.1**

Genuine issue of material fact existed as to whether accommodation or adjustment proposed by prospective employee effectively would have eliminated function essential to employer, precluding summary judgment on State Department's undue hardship defense, in lawsuit brought by prospective employee claiming that State Department violated Rehabilitation Act when it refused to hire him as Foreign Service Officer because he was HIV-positive. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.; Rehabilitation Act of 1973, § 501 et seq., 29 U.S.C.A. § 791 et seq.; 29 C.F.R. § 1630.2(*o*, p).

**3. Civil Rights ⇐1020**

Under the Rehabilitation Act, an accommodation may be reasonable on its face, i.e., ordinarily or in the run of cases, or it may be reasonable as applied, i.e., on the particular facts of the case. Rehabilitation Act of 1973, § 501, 29 U.S.C.A. § 791 et seq.

**4. Civil Rights ⇐1366**

Under the Rehabilitation Act, an employer invoking the undue hardship defense must use statutory factors to show special circumstances that demonstrate undue hardship in the particular circumstances. Rehabilitation Act of 1973, § 501, 29 U.S.C.A. § 791.

**TAYLOR v. RICE**  899
Cite as 451 F.3d 898 (D.C. Cir. 2006)

**5. Federal Civil Procedure ⟲2497.1**

Genuine issue of material fact existed as to whether accommodation requested by prospective employee was reasonable, precluding summary judgment on State Department's undue hardship defense, in lawsuit brought by prospective employee claiming that State Department violated Rehabilitation Act when it refused to hire him as Foreign Service Officer because he was HIV-positive. Fed.Rules Civ.Proc. Rule 56, 28 U.S.C.A.; Rehabilitation Act of 1973, § 501 et seq., 29 U.S.C.A. § 791 et seq.; 29 C.F.R. § 1630.2(*o*, p).

**6. Civil Rights ⟲1225(2)**

Under the Rehabilitation Act, an employer is not required to fundamentally alter the nature of its medical program for a prospective employee. Rehabilitation Act of 1973, § 501 et seq., 29 U.S.C.A. § 791 et seq.

**7. Civil Rights ⟲1225(2)**

Under the Rehabilitation Act, the fact that an accommodation would require a change in policy does not necessarily demonstrate unreasonableness or undue hardship. Rehabilitation Act of 1973, § 501, 29 U.S.C.A. § 791; 29 C.F.R. § 1630.2(*o*)(2)(ii).

**8. Federal Civil Procedure ⟲2497.1**

Genuine issue of material fact existed as to whether prospective employee's pulmonary condition was non-discriminatory reason for rejecting his application to Foreign Service, precluding summary judgment, in lawsuit brought by prospective employee claiming that State Department violated Rehabilitation Act when it refused to hire him as Foreign Service Officer because he was HIV-positive. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.; Rehabilitation Act of 1973, § 501, 29 U.S.C.A. § 791.

**9. Civil Rights ⟲1540**

On a claim under the Rehabilitation Act, an employer's claim that it refused a job application for reasons unrelated to the person's handicap is evaluated under the *McDonnell Douglas* burden-shifting framework. Rehabilitation Act of 1973, § 501 et seq., 29 U.S.C.A. § 791 et seq.

---

Appeal from the United States District Court for the District of Columbia (No. 03cv01832).

Jonathan Givner, pro hac vice, argued the cause for appellant. With him on the briefs was Leslie M. Hill.

Arthur B. Spitzer was on the brief for amicus curiae HIV Medicine Association in support of appellant.

Teal Luthy Miller, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General, and Marleigh D. Dover, Special Counsel.

Before: SENTELLE, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge.

Lorenzo Taylor appeals from a district court order granting the Secretary of State's motion for summary judgment. Taylor claimed that the State Department violated the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796*l*, when it refused to hire him as a Foreign Service Officer because he is HIV-positive. This case presents the question whether an otherwise qualified individual with HIV would pose a direct threat to himself if employed by the U.S. Foreign Service, which requires officers to be "available to serve in assignments throughout the world." 22 U.S.C. § 3901(a)(4).

I.

Taylor applied to the Foreign Service in July 2001. After extending a conditional

**900**                **451 FEDERAL REPORTER, 3d SERIES**

offer of employment, the State Department declined to hire him because he is HIV-positive, and perhaps because he also has apulmonary condition. Taylor sued the Secretary of State under § 501 of the Rehabilitation Act, alleging that the State Department discriminated against him on the basis of his HIV-positive status. Discovery followed, and the Secretary moved for summary judgment, which the district court granted. The evidence, viewed in Taylor's favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), was as follows.

The mission of the U.S. Foreign Service, part of the State Department, is to advocate American foreign policy, protect American citizens, and promote American interests throughout the world. Foreign Service Officers are of two types. Generalists perform traditional diplomatic responsibilities, including trade promotion, political and economic reporting, and consular services and protection. Specialists have positions requiring special skills, such as construction engineering, information technology, and regional security.

During the period relevant to this case, the Foreign Service maintained 263 posts around the world. About 65 percent of these posts are considered "hardship" posts—locations generally outside of Western Europe, Canada, and Australia—because factors such as climate, quality of local health care, and pollution levels render living conditions more arduous than in the United States. The State Department frequently assigns junior Foreign Service Officers to hardship posts during their first four years of service to determine their qualifications for tenure as career Foreign Service Officers.[1] Because serving in a hardship post is challenging, the State Department seeks to equalize employee service at these posts and reward those who complete such service.[2]

To ensure that it hires qualified applicants to fill these posts, the Foreign Service has a rigorous hiring process. Candidates must successfully take the Foreign Service Written Exam and pass an oral assessment. *See* 22 C.F.R. § 11.1(b), (c). They then join the List of Eligible Hires, from which candidates are drawn in rank order to receive conditional offers of employment based on the hiring needs in various career tracks within the Foreign Service. The offers are conditional because they are subject to satisfactory completion of security, medical, and overall suitability reviews. *See id.* § 11.1(d), (e), (f). These reviews are designed to ensure that in all respects candidates are able to fulfill Congress's aspiration for Foreign Service Officers: to be "representative of the American people, aware of the principles and history of the United States and informed of current concerns and trends in American life, knowledgeable of the affairs, cultures, and languages of other countries, and available to serve in assignments throughout the world." 22 U.S.C. § 3901(a)(4).

Most relevant to this appeal are the State Department's medical review proce-

---

1. Assignments are made through a bidding process in which Foreign Service Officers submit requests for desired assignments drawn from a list of current openings. After close consultation with an officer, the Bureau of Human Resources selects an appropriate assignment. The Bureau takes into account personal and professional factors, though the needs of the Foreign Service remain paramount.

2. For this reason, the Secretary represents that the State Department would have a morale problem if it hired individuals who cannot serve in hardship posts, particularly if this required other officers to serve in back-to-back hardship posts.

**TAYLOR v. RICE**
Cite as 451 F.3d 898 (D.C. Cir. 2006)

901

dures for Foreign Service candidates. *See id.* §§ 3941(b), 4084(b)(1). According to State Department regulations, the purpose of the medical examination is "to determine the candidate's physical fitness to perform the duties of a Foreign Service officer on a worldwide basis and ... to determine the presence of any physical, neurological, or mental condition of such a nature as to make it unlikely that they would be able to function on a worldwide basis." 22 C.F.R. § 11.1(e)(2). The State Department's Foreign Affairs Manual requires that "[a]ll candidates who have received conditional offers of employment in the Foreign Service ... receive a medical examination and be issued a medical clearance." 3 U.S. DEPARTMENT OF STATE, FOREIGN AFFAIRS MANUAL (FAM) § 1931.1(b). Class 1 clearances are "[i]ssued to examinees who have no identifiable medical conditions that would limit assignment abroad." *Id.* § 1931.3–1(1). The State Department refers to those with a Class 1 clearance as "worldwide available." Class 2 clearances are "[i]ssued to examinees who have a medical condition that requires periodic and/or specialized medical evaluation or treatment, or whose medical condition would be aggravated by conditions at specific posts."[3] *Id.* § 1931.3–1(2). Class 5 clearances—there is no Class 3 or Class 4—are "[i]ssued to examinees who have a medical condition which is incapacitating or for which necessary specialized medical care is best obtained in the United States. Employees ... with a Class 5 medical clearance may not be assigned outside the United States." *Id.* § 1931.3–1(3). Class 1 clearance is necessary for a Foreign Service candidate to complete the medical examination successfully.

Upon completing the medical examination, candidates not receiving Class 1 clearances are issued Class 5 clearances and "may request ... an administrative waiver of the medical standards for employment."[4] *Id.* § 1931.1(b). Waiver decisions are made by the Director General of the Foreign Service or a Deputy Assistant Secretary of Human Resources, and such decisions are final. *Id.* § 1931.2(a), (c). Various factors enter the waiver calculus, including the percentage of posts for which the candidate is eligible, the permanence of the disqualifying condition, the nature of the position sought, and any extraordinary skills the candidate possesses. *Id.* § 1931.2(b). The Secretary represents that because a candidate's special skills are relevant to waiver determinations, *id.* § 1931.2(b)(4), the vast majority of waivers go to Specialist candidates, not Generalists.

The State Department has specific policies about hiring HIV-positive candidates and retaining current employees who contract HIV.[5] As a general rule, the State

---

3. Class 2 clearance is used for anyone capable of serving at 99 percent or fewer overseas posts.

4. Though the record is unclear, it appears that the Foreign Service reserves Class 2 clearance for candidates who receive waivers and for current employees who develop medical conditions requiring a downgrade in classification. For example, between 1998 and 2002 the Foreign Service hired twelve employees who were denied Class 1 clearances for medical reasons (asthma), but granted waivers and given Class 2 clearances. A current officer who contracts HIV typically is given a Class 2 clearance.

5. As described by Dr. Joel E. Gallant, Associate Professor of Medicine in the Division of Infectious Diseases at the Johns Hopkins University School of Medicine in Baltimore, "HIV is a retrovirus that infects a particular type of white blood cell known as the CD4+ lymphocyte." When a person's CD4+ lymphocytes decrease in number, "the body becomes less able to fight infections that it otherwise would be able to defeat..... If not treated, the loss of CD4+ cells eventually results in death, usually due to 'opportunistic

Department considers "HIV positive individuals, even those who are stable with respect to their disease, a[s] not [being] worldwide available" and therefore ineligible for Class 1 medical clearance. This follows from the State Department's belief that HIV-positive Foreign Service Officers can safely be stationed only at overseas posts that have both a physician with experience treating HIV-positive patients and laboratories comparable to U.S. domestic standards, capable of performing testing to monitor the virus's course. Qualified physicians and laboratories were available at approximately 68 percent of the State Department's overseas posts at times pertinent to this appeal.[6] Despite the general rule, "it is [the State Department's] policy to retain Foreign Service members who become HIV positive after appointment," and to assign them "abroad as their medical conditions permit." This is consistent with the State Department's treatment of current employees who develop some kind of medical condition that limits their availability.

Foreign Service Officers who experience medical complications—including HIV—while serving in overseas posts have limited options. To the extent satisfactory local medical facilities are available, they are expected to seek treatment there. But when local treatment is not available—which can happen in hardship posts—the Foreign Affairs Manual provides that an officer "shall be eligible to travel at government expense to the nearest facility" where he can get the treatment he needs. 3 FAM § 686.1–1. However, "[t]ravel will not be authorized for employees ... to take routine medical examinations or to receive routine immunizations."[7] *Id.* § 686.1–4. Because Foreign Service Officers undergo comprehensive physical examinations roughly every two years, an officer who develops a physical or mental health condition limiting future availability—including HIV—can be re-assigned a Class 2 clearance.[8] Thus, even though

---

infections' that appear in people with suppressed immune systems.'' For this reason, HIV-positive individuals must monitor the number of CD4+ lymphocytes in their bodies on a regular basis. Until 1996, an HIV infection was invariably fatal. At that time, however, the introduction of a new class of antiretroviral medications combined with other drugs, proved able to suppress HIV and to prevent deteriorating compromise of patients' immune systems. *See generally Bragdon v. Abbott,* 524 U.S. 624, 633–37, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

**6.** This figure comes from Dr. Michael H. Merson's affidavit testimony. Dr. Merson formerly worked at the Department of Health and Human Services's Centers for Disease Control and Prevention and served as the Dean of Public Health and Chair of Yale University School of Medicine's Department of Epidemiology and Public Health for ten years. He testified that ''in July 2002, one likely could find physicians qualified to monitor and treat HIV-positive patients at approximately 217 (82%) of the State Department's 263 overseas posts. In July 2002, one likely could find both qualified physicians *and* laboratory facilities capable of performing both CD4+ and viral load testing ... at approximately 178 (68%) of the State Department's 263 overseas posts.'' At times relevant to this appeal, the Secretary believed Taylor could serve at fewer than half of all posts ''because of the lack of HIV-capable physicians and/or the unavailability of HIV-capable laboratories.'' Final Br. for Def.-Appellee 18.

**7.** The record suggests that this is because the State Department ''considers it unsafe to post individuals where they cannot receive their needed routine care locally,'' and because travel in and out of many overseas locations is costly, unreliable, and sometimes dangerous.

**8.** If a Foreign Service Officer develops a medical condition requiring his classification to be downgraded to Class 2, the State Department ''makes every effort to accommodate'' the individual by limiting his post assignments to locations where appropriate medical care is available, including hardship posts.

**TAYLOR v. RICE**  903
Cite as 451 F.3d 898 (D.C. Cir. 2006)

*candidates* for the Foreign Service without Class 1 clearances generally are rejected because they are not "worldwide available," *experienced officers* with the same limitations often are retained and dispersed as their health allows because the State Department values their experience and expertise.

Taylor submitted his application to become a Generalist Foreign Service Officer after serving for many years in jobs preparing him for a career in foreign diplomacy. He passed the written and oral examinations and received an offer of employment in November 2001. The offer was conditioned on his passing the medical and security clearance screenings. When he reported to the Examination Clinic of the State Department Medical Office in December 2001, he was given a one-page document entitled "HIV TESTING INFORMATION," which stated that "[b]ecause new applicants for the Foreign Service must be worldwide available (Class 1), those who are HIV positive will not be eligible for employment." Taylor proceeded with the examination and returned a week later to discuss his results with Dr. Lori Brandshaft in the Examination Clinic. Although the results of the HIV test were not yet reported, he voluntarily revealed his HIV-positive status to Dr. Brandshaft.

Taylor had learned of his infection when he tested positive for HIV antibodies in March 1985. He describes his condition today as "a chronic manageable condition" that "requires only periodic monitoring and the use of anti-retroviral medication, not constant medical attention." Dr. Douglas J. Ward, Taylor's treating physician, monitors his HIV infection three times a year, though he has told Taylor that as a Foreign Service Officer he would need to be monitored only twice a year. Dr. Ward is on record saying that Taylor "faces no greater health risk in countries with substandard health care than individuals who are not HIV-positive."

On January 3, 2002, Dr. Ward sent a letter to Dr. Brandshaft describing Taylor's stable condition and stating that it should not pose an obstacle to his employment in the Foreign Service. Four days later Taylor met with the Chief of the Examination Clinic, who reiterated that Taylor was not eligible for employment as a Foreign Service Officer because he is HIV-positive. On January 17, 2002, the State Department notified Taylor officially that he would not be hired.[9] A few days later Taylor sent a letter seeking a medical waiver. His request was rejected by letter in July 2002. In August 2002, when Taylor sent a letter to the State Department expressing his opinion that its hiring policy unfairly discriminated against people with HIV, the Director General of the Foreign Service stated in a responsive letter that Taylor had been denied employment not just because of his HIV status, but also because of his "asthma." (This apparently was the first time that the State Department indicated to Taylor that his pulmonary condition had anything to do with the decision not to hire him.[10])

Taylor had noted his pulmonary condition on a Foreign Service medical examination form, reporting that he had asthma and that he took three different asthma medications daily. He also reported hav-

---

9. A contemporaneous State Department evaluation form dated December 2001 cited only Taylor's HIV-positive status as the reason he was disqualified for overseas duty.

10. An internal State Department "fact sheet" dated June 28, 2002, which was used to evaluate Taylor's waiver request, lists two separate issues under the heading "MEDICAL PROBLEM": HIV infection and "moderate obstruction to airflow (asthma) with some improvements after bronchodilators" that has nonetheless "never normalized."

ing at least one acute asthma episode since August 2001 that required inhalation therapy. Based on this information, the State Department concluded that Taylor "could not be safely posted to approximately 30% of . . . overseas locations."

Taylor developed evidence in the district court indicating that he was misdiagnosed with asthma, and that he experiences eosinophilic pneumonia—a benign, self-limiting inflammatory condition that affects his lungs. His doctor, Charles A. Read, Jr., Associate Professor of Medicine at Georgetown University Medical Center, stated that "there is no reason that [Taylor] should not be able to travel and live anywhere in the world," as his "prognosis is very good, and his condition is very easy to treat, even from afar."

After the State Department rejected his waiver request, Taylor exhausted his administrative remedies and filed suit in district court. The parties conducted discovery and the Secretary moved for summary judgment. The district court granted the Secretary's motion, concluding that "reasonable worldwide availability"—the ability to serve at many but not all of the State Department's overseas posts—is an essential function of the Foreign Service, and that, because of his HIV-positive status, Taylor is not capable of fulfilling that function without posing a direct threat to himself. In so holding, the court determined that the significant risk to Taylor's health could not be reduced by any reasonable accommodation without also imposing undue hardship on the State Department. The court did not evaluate the Secretary's alternative argument that Taylor's pulmonary condition was an independent justification for the State Department's decision not to hire him.

Taylor claims that the district court wrongly resolved genuine issues of material fact in the Secretary's favor and erred as a matter of law in concluding that his proposed accommodations are unreasonable and would impose undue hardship on the State Department. Taylor describes the two accommodations he proposes as follows: (1) "the Department [c]ould grant him Class II clearance and place him at a post where he can access local HIV physicians and diagnostic laboratories," or (2) "the Department [c]ould permit him to use his allotted leave time to access routine medical care while posted abroad." Appellant's Final Opening Br. 13–14. The Secretary defends the district court's decision, and also claims that "Taylor's asthma provides a separate and independent reason for affirming the district court's decision." Final Br. for Def.-Appellee 35.

II.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To determine what factual disputes were "material" and whether the Secretary was entitled to judgment as a matter of law, "the logical place to begin is with the 'law,' here the Rehabilitation Act of 1973, and its amendments." *Langon v. Dep't of Health & Human Servs.,* 959 F.2d 1053, 1056 (D.C.Cir.1992); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Our review is de novo. *Breen v. Dep't of Transp.,* 282 F.3d 839, 841 (D.C.Cir.2002).

[1] Taylor accuses the Secretary of violating § 501 of the Rehabilitation Act, 29 U.S.C. § 791, the "basic tenet" of which "is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue

**TAYLOR v. RICE** 905
Cite as 451 F.3d 898 (D.C. Cir. 2006)

hardship would result," *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C.Cir.1993). *See* 22 U.S.C. § 3905(e)(4) (expressly applying § 501 to the Foreign Service). Section 501(b) requires federal employers to take "affirmative action" when making "hiring, placement, and advancement" decisions regarding "individuals with disabilities." 29 U.S.C. § 791(b).[11] As relevant here, the statute defines "individual with a disability" as anyone who "has a physical or mental impairment which substantially limits [a] major life activit[y]," "has a record of such an impairment," or "is regarded as having such an impairment." *Id.* § 705(20)(B)(i)-(iii).[12]

The statute instructs courts to use the "standards" of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213, to evaluate a complaint like Taylor's "alleging nonaffirmative action employment discrimination." 29 U.S.C. § 791(g);[13] *see* 29 C.F.R. § 1614.203(b) (applying the regulations set forth in 29 C.F.R. pt. 1630 to claims under § 501). The Disabilities Act prohibits discrimination against any "*qualified* individual with a disability." 42 U.S.C. § 12112(a) (emphasis added); *see* 29 C.F.R. § 1630.4. An "individual with a disability" under the Rehabilitation Act, 29 U.S.C. § 705(20)(B), therefore must be "qualified" to be protected by the Disabilities Act—that is, he or she, "with or without reasonable accommodation," must be able to "perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see* 29 C.F.R. § 1630.2(m); *Breen*, 282 F.3d at 841 (applying 42 U.S.C. § 12111(8) to a plaintiff suing under § 501 of the Rehabilitation Act).

Defendants have at their disposal a number of defenses to Rehabilitation Act liability, two of which the Secretary employs in this case. First, a defendant may avoid liability by demonstrating that the employee's disability "pose[s] a direct threat to [the employee's] health or safety" in a manner that cannot be reasonably accommodated. 29 C.F.R. § 1630.15(b)(2); *see id.* § 1630.2(r); *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86–87, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002).[14] Second, a defendant may avoid liability by "demonstrat[ing] that the accommodation"—even if reasonable—"would impose an undue hardship on the operation of its business." 29 C.F.R. § 1630.9(a); *accord id.* § 1630.15(d); *see US Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002); *Barth*, 2 F.3d at 1186–87; *see also Langon*, 959

---

11. More precisely, the statute requires federal agencies to create affirmative action "plans," 29 U.S.C. § 791(b), but courts have "recognized private actions challenging individual employment decisions." *Langon*, 959 F.2d at 1057.

12. The parties have stipulated that Taylor is an "individual with a disability" within the meaning of the Rehabilitation Act because he is HIV-positive. *See Bragdon v. Abbott*, 524 U.S. 624, 637–39, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (concluding that HIV infection is a disability that can substantially limit the "major life activity" of reproduction); *see also* 29 C.F.R. pt. 1630, app. (note discussing § 1630.2(j)) ("HIV infection [is] inherently substantially limiting.").

13. Section 791(g) adopts "the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of section 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment."

14. In light of our disposition, we need not decide who bears the burden of proving that the plaintiff poses a direct threat to his health or safety. *See generally Branham v. Snow*, 392 F.3d 896, 906 n. 5 (7th Cir.2004) (identifying circuit split on burden of proof). The parties did not argue the issue.

**906**         **451 FEDERAL REPORTER, 3d SERIES**

F.2d at 1060. The district court concluded that the Secretary was entitled to judgment as a matter of law on both theories. We begin with the "direct threat" defense.

An employer may require, as a "qualification standard," "that an individual ... not pose a direct threat to [his] health or safety ... in the workplace." 29 C.F.R. § 1630.15(b)(2); *see also* 42 U.S.C. § 12113(b). "Direct threat" in this context "means a significant risk of substantial harm to the health or safety of the individual ... that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r); *see also* 42 U.S.C. § 12111(3). In *Chevron U.S.A. Inc. v. Echazabal,* the Supreme Court explained what this entails:

> The direct threat defense must be "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence," and upon an expressly "individualized assessment of the individual's present ability to safely perform the essential functions of the job," reached after considering, among other things, the imminence of the risk and the severity of the harm portended.

536 U.S. at 86, 122 S.Ct. 2045 (quoting 29 C.F.R. § 1630.2(r)). As the district court recognized, to evaluate "the individual's present ability to safely perform the essential functions of the job," *id.* (quoting 29 C.F.R. § 1630.2(r)) (internal quotation mark omitted), we must first determine what functions are essential—a matter the parties contest.

Essential functions are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). To determine which job duties are fundamental, one must consider, among other things, the Secretary's "judgment as to what functions of a job are essential," 42 U.S.C. § 12111(8), "[t]he work experience of past incumbents in the job," 29 C.F.R. § 1630.2(n)(3)(vi), and "[t]he current work experience of incumbents in similar jobs," *id.* § 1630.2(n)(3)(vii). The essential function at issue here is a Foreign Service Officer's ability to be worldwide available, and the question is to what extent Foreign Service Officers must be available to serve at overseas Foreign Service posts. In particular, must officers be able to serve at nearly "100 percent" of overseas posts, as the Secretary claims, or only at a "substantial number" of overseas posts, as Taylor claims? The district court concluded that "some reasonable level of worldwide availability is an essential function of the job," and that Taylor's availability to serve in, at most, 68 percent of overseas posts was unreasonable. We believe this conclusion cannot be reached without resolving material factual disputes in the Secretary's favor.

The Foreign Service Act and regulations thereunder indicate that Foreign Service Officers must serve "abroad," 22 U.S.C. § 3984(a), "in assignments throughout the world," *id.* § 3901(a)(4), and "on a worldwide basis," 22 C.F.R. § 11.1(e)(2). *See* 29 C.F.R. § 1630.2(n)(2)(i) ("A job function may be considered essential ... because the reason the position exists is to perform that function ...."). These general terms do not specify how many posts officers must be available to fill. The fact that a candidate cannot go everywhere in the world does not necessarily mean that he is not available "on a worldwide basis." 22 C.F.R. § 11.1(e)(2). For example, after stating that candidates "must be available for worldwide assignment," the *Foreign Service Career–Candidate Guidebook 2001–2002* states that "Foreign Service employees must be able to serve in a wide variety of overseas posts." *See* 42 U.S.C. § 12111(8) ("[I]f an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of

**TAYLOR v. RICE** 907
Cite as 451 F.3d 898 (D.C. Cir. 2006)

the essential functions of the job."). The Foreign Service statute and regulations therefore do not indicate precisely what level of worldwide availability is essential for Foreign Service Officers.

The record no more conclusively establishes the Secretary's position. There is evidence suggesting that, in practice, the Secretary does not require every Foreign Service Officer to be available to serve everywhere in the world. This is apparent from the fact that some candidates unable to serve at every overseas Foreign Service post are nevertheless hired with Class 2 clearances. The Secretary admits that between 1998 and 2002 the Foreign Service hired twelve candidates who were given Class 2 medical clearances because of their asthma. *See Breen*, 282 F.3d at 842–43. Other evidence is to the same effect. Ambassador A. Peter Burleigh, who spent more than thirty years as a Foreign Service Officer, testified that "the day-to-day realities of Foreign Service assignment procedures and practices ... often deviate substantially from th[e] formal requirements." *See* 29 C.F.R. § 1630.2(n)(3)(vi) (considering "[t]he work experience of past incumbents" as "[e]vidence of whether a particular function is essential"); 29 C.F.R. pt. 1630, app. (note discussing § 1630.2(n)) (same). He explained that "[a]t any given time ... between one-quarter and one-third of in-service [Foreign Service Officers] ... are not available for worldwide assignment" for a variety of reasons. He further testified that "[t]his is true for junior, mid-level, and senior [Foreign Service Officers]."[15] One of the Secretary's witnesses—William R. Mullican, Office Director in the Bureau of Human Resources—gave similar testimony, estimating that "15% of the Generalists and 16% of the Specialists are currently restricted from world-wide availability due to medical conditions," a figure that does not account for other Foreign Service Officers who might be unavailable for other reasons.

The record therefore reveals a genuine issue of material fact regarding the extent to which Foreign Service Officers must be available to serve in overseas posts. *Compare Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929, 934–35 (D.C.Cir. 1999). For this reason, the Secretary was not entitled to summary judgment on the ground that Taylor's availability to serve in 68 percent of overseas posts rendered him unqualified to serve in the Foreign Service.

[2] The district court went on to conclude that Taylor would pose a "'significant risk' to his own health or safety" if he were posted anywhere in the world,[16] and that no reasonable accommodation could eliminate that risk without imposing undue hardship on the State Department. Taylor's quarrel is with the court's conclusion that any such risk could not reasonably be accommodated without imposing undue hardship on the State Department. Recall the two accommodations that Taylor proposed: (1) granting him Class 2 clearance

---

15. This testimony is also counter to the Secretary's evidence that while some experienced officers do not need to be able to travel everywhere, candidates and junior officers must be available to travel almost everywhere in the world. The same is true of Ambassador Burleigh's testimony that "there is no difference between the essential functions of the job for a ... applicant and an in-service [officer]."

16. As discussed above, the "direct threat" defense turns on whether an individual can "safely perform the essential functions of the job." *Echazabal*, 536 U.S. at 86, 122 S.Ct. 2045 (quoting 29 C.F.R. § 1630.2(r)) (internal quotation mark omitted). Because the parties genuinely dispute what functions are essential, the district court's determination that Taylor would pose a significant risk to himself in performing those functions depended on disputed facts.

**908**                **451 FEDERAL REPORTER, 3d SERIES**

and only placing him at overseas posts "where he can access local HIV physicians and diagnostic laboratories," or, alternatively, (2) sending him to any overseas post, but "permit[ting] him to use his allotted leave time to access routine medical care." Appellant's Final Opening Br. 13–14.

[3] An accommodation may be "reasonable on its face, *i.e.*, ordinarily or in the run of cases," *Barnett,* 535 U.S. at 401, 122 S.Ct. 1516; *accord Barth,* 2 F.3d at 1187, or it may be reasonable as applied, *i.e.*, "on the particular facts" of the case, *Barnett,* 535 U.S. at 405, 122 S.Ct. 1516. Whether a proposed accommodation is reasonable and whether it imposes undue hardship are separate inquiries. But the analyses often overlap, *see Sch. Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *Barth,* 2 F.3d at 1187, especially when evaluating as-applied claims of reasonableness—the inquiry particularly pertinent here.[17] This is because an employer's undue hardship claim depends on "the particular circumstances" of the case, *Barnett,* 535 U.S. at 402, 122 S.Ct. 1516; *see also Barth,* 2 F.3d at 1187, just as an employee's claim of as applied reasonableness turns "on the particular facts" of the case, *Barnett,* 535 U.S. at 405, 122 S.Ct. 1516.[18]

The Disabilities Act does not provide a comprehensive definition of "reasonable accommodation," but it gives examples of what the term "may include." 42 U.S.C. § 12111(9); 29 C.F.R. § 1630.2(*o*)(2); *see id.* § 1630.2(*o*)(1) (defining "reasonable accommodation" as "[m]odifications or adjustments" to application processes, work environment, and access to benefits and privileges of employment). Among these are accommodations such as providing a "modified work schedule[ ]" for an employee, 42 U.S.C. § 12111(9)(B), or adjusting the circumstances under which the employee performs his job responsibilities, 29 C.F.R. § 1630.2(*o*)(2). While Taylor's proposed accommodations might be seen as falling generally within these examples, still we must determine whether his proposed modifications or adjustments are reasonable. An accommodation may be unreasonable "if it either imposes 'undue financial and administrative burdens' . . . or requires 'a fundamental alteration in the nature of [the employer's] program.'" *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (quoting *Se. Cmty. Coll. v. Davis,* 442 U.S. 397, 410, 412, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)).

[4] An accommodation—even a reasonable one—imposes undue hardship on an employer if it "requir[es] significant difficulty or expense, when considered in light" of several statutory factors. 42 U.S.C. § 12111(10)(A); *see* 29 C.F.R. § 1630.2(p)(1). Those factors include "the nature and cost of the accommodation," 42 U.S.C. § 12111(10)(B)(i), and the "composition, structure, and functions of the [employer's] workforce," *id.* § 12111(10)(B)(iv). *See also* 29 C.F.R. § 1630.2(p)(2); *id.* pt. 1630, app. (note discussing § 1630.2(p)). An employer invoking the undue hardship defense must use these factors to "show special (typically case-specific) circumstances that demon-

---

17. Taylor argues that his accommodations are reasonable on their face and as applied to the circumstances of this case. Because we find genuine issues of material fact concerning whether the accommodations are reasonable as applied to the facts of Taylor's case, we leave for another day his arguments concerning the facial reasonableness of his proposed accommodations, unless specifically addressed in the text.

18. We are mindful that Taylor must prove the accommodations are reasonable and that the Secretary must prove they impose undue hardship, but the burden allocation makes no difference here because we find genuine issues of material fact.

**TAYLOR v. RICE**      **909**
Cite as 451 F.3d 898 (D.C. Cir. 2006)

strate undue hardship in the particular circumstances." *Barnett*, 535 U.S. at 402, 122 S.Ct. 1516.

As to Taylor's first proposed accommodation—his request for Class 2 clearance and placement only at overseas posts where HIV physicians and diagnostic laboratories are available—the district court found it unreasonable because it requires the State Department "to waive an essential function of the job." [19] Even if an accommodation that effectively dispenses with an essential function is unreasonable, *see Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir.1998), the parties genuinely dispute the level of worldwide availability essential for Foreign Service Officers. We therefore have no way of knowing whether this proposed accommodation would effectively do away with an essential function. In any event, the Secretary's claim that granting Taylor Class 2 clearance is unreasonable and would impose undue hardship is suspect because the Secretary admits that between 1998 and 2002 the Foreign Service hired twelve employees who were denied Class 1 clearances because of asthma, but granted waivers and Class 2 clearances.[20]

[5] As to Taylor's second proposed accommodation—permitting him to use his allotted leave time to obtain medical care while posted abroad—the district court concluded this was unreasonable for three reasons. The court first held that to determine how often Taylor would need to travel for "routine medical monitoring," the State Department could rely on the Department of Health and Human Services's *Guidelines for the Use of Antiretroviral Agents in HIV–1–Infected Adults and Adolescents*, which recommends medical monitoring three or four times a year, rather than on Taylor's treating physician, Dr. Ward, who testified that Taylor needed medical monitoring only twice a year. The court then concluded that because Taylor proposed less routine medical care than Health and Human Services has indicated is safe, this accommodation is unreasonable.

In the language of the Rehabilitation Act, the district court seems to have concluded that it would be unreasonable "in the run of cases" for an employee to receive less medical care than public authorities recommend is safe. *Barnett*, 535 U.S. at 401, 122 S.Ct. 1516. If that is correct [21]

---

19. Likewise, the court concluded the accommodation would impose undue hardship because "[t]he inevitable impact of such an accommodation would be a *de facto* elimination of worldwide availability as a pre-requisite for all similarly-situated entry-level [officers]."

20. Nor can we agree with the district court's conclusion that Taylor would experience "significantly-beneficial treatment" because other officers would have to serve in the "least-desirable and most-dangerous locations in his stead," thereby creating undue hardship on the State Department. The Secretary presents no evidence supporting this proposition. And there is evidence suggesting that Taylor could serve in at least 112 hardship posts around the world. The record gives us no way of knowing whether others would have to serve in the "least-desirable and most-dangerous locations," and no basis for concluding

that this proposed accommodation "would ultimately result in the State Department having to change the very nature of its program." There is also the Foreign Service's bidding process for assignments, which takes personal and professional considerations into account when assigning officers overseas. *See supra* note 1. For the same reasons, the Secretary's representations regarding the detrimental affect on employee morale if Taylor were accommodated are not determinative. *See supra* note 2.

21. *But see Bragdon*, 524 U.S. at 650, 118 S.Ct. 2196 ("In assessing the reasonableness of petitioner's actions, the views of public health authorities ... are of special weight and authority. The views of these organizations are not conclusive, however.") (citations omitted); *id.* at 651–52, 118 S.Ct. 2196 (indicating that a court should not rely on CDC Guidelines or

**910**  **451 FEDERAL REPORTER, 3d SERIES**

—and we do not say it is or is not—Taylor's claim that his "special circumstances warrant a finding that . . . the requested 'accommodation' is 'reasonable' on the particular facts" still remains. *Id.* at 405, 122 S.Ct. 1516. Taylor presented medical testimony that he faces no specific risk of experiencing acute complications as a result of his HIV status. Dr. Ward testified that Taylor's immune system is strong enough to enable him to serve throughout the world without increased risk of harm and that he needs medical monitoring only twice a year. This evidence is more than enough to create a genuine issue of material fact regarding the reasonableness of the proposed accommodation.

Accepting for the sake of argument Dr. Ward's estimate of how often Taylor would need medical monitoring, the district court found a second reason why Taylor's second proposed accommodation fails—that it is unreasonable for "an employee to miss several days [of work] to obtain medical care in another city or country at the government's expense." Taylor disputes both the number of days he would miss for medical care and the significance of the expense. The State Department grants to junior Foreign Service Officers thirteen days of annual leave, ten days of leave for U.S. federal holidays, and thirteen sick days each year, the latter being designed to allow Foreign Service Officers "to obtain medical, dental, or optical care." An employee's proposed accommodation seeking to use leave time to receive necessary medical care will be reasonable in many circumstances. *See* 29 C.F.R. pt. 1630, app. (note discussing § 1630.2(*o*)) (identifying as a reasonable accommodation "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment [and] making employer provided transportation accessible"); *see also Criado v. IBM Corp.,* 145 F.3d 437, 443 (1st Cir.1998); *Hudson v. MCI Telecomms. Corp.,* 87 F.3d 1167, 1168–69 (10th Cir.1996). This is precisely what Taylor proposes doing, and he has presented evidence suggesting that the leave to which junior Foreign Service Officers are entitled is sufficient for him to receive the medical care he would need. His evidence tended to show that every Foreign Service post is within one day's travel of a city with adequate HIV medical care and that his medical visits would involve examinations typically lasting but thirty minutes. This conflicts with the Secretary's evidence suggesting that Taylor would need to spend between six to ten days away from work for each medical visit. Nor is it clear from the record that it would be unreasonable for the government to pay for Taylor's travel expenses.[22] Ambassador Burleigh testified that "it is actual day-to-day [State] Department practice" to allow Foreign Service Officers "to travel a few times a year for routine medical monitoring," and that this "does not pose a significant or unusual burden on the Department, either financially or administratively."

[6, 7] The district court's third reason for finding unreasonable Taylor's second proposed accommodation is that it would contravene the State Department's prohi-

---

ADA Policy Statements that "recommend[ ] certain universal precautions" but "do not necessarily contain implicit assumptions conclusive of the point to be decided. The Guidelines set out the CDC's recommendation that the universal precautions are the best way to combat the risk of HIV transmission. They do not assess the level of risk.").

22. On appeal, Taylor represents that he "has not requested that the Department bear the financial cost of any . . . travel." Appellant's Final Opening Br. 26. Obviously if he were to bear the cost of travel himself this would not burden the government.

bition against authorizing travel for routine medical care—a policy "created based on legitimate concerns for the safety" of State Department employees. *See* 3 FAM § 686.1–4.[23] Ambassador Burleigh's testimony quoted above regarding the day-to-day practice of the State Department bears on this subject. If Taylor's proposal turns out to be consistent with the State Department's day-to-day practice, that would tend to support its reasonableness. And as a legal matter, the fact that an accommodation would require a change in policy does not necessarily demonstrate unreasonableness or undue hardship. *See Barnett*, 535 U.S. at 397, 122 S.Ct. 1516 ("[T]he fact that the [proposed] difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach."); 29 C.F.R. § 1630.2(*o*)(2)(ii) ("Reasonable accommodation may include ... appropriate adjustment or modifications of ... policies ...."); *McAlindin v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir.1999); *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir.1992).[24] Because there were disputed material facts regarding Taylor's second accommodation, the Secretary was not entitled to summary judgment on either of the asserted defenses—direct threat or undue hardship.

[8, 9] The Secretary urges us to affirm on an altogether different basis—that Taylor's pulmonary condition renders him unqualified for the Foreign Service. We evaluate an agency's claim that "it refused a job application ... for reasons unrelated to the person's handicap," *Barth*, 2 F.3d at 1186, under the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Barth*, 2 F.3d at 1185 (discussing *McDonnell Douglas* and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The initial burden is on the plaintiff to produce evidence making out a prima facie case of discrimination. If the plaintiff does so, the employer has the burden of presenting evidence supporting its claim that it had a non-discriminatory reason for the personnel action. If the employer carries this burden, it is up to the plaintiff to prove to the trier of fact that the employer's reason was pretextual and that intentional discrimination occurred. *Barth*, 2 F.3d at 1185 (discussing *Burdine*, 450 U.S. at 252–56, 101 S.Ct. 1089).[25] We shall assume, as does the Secretary, that Taylor made out a

---

23. The final basis for the district court's undue hardship determination was that "the State Department would have to change its current medical policy, which prohibits employees from traveling out of the country at government expense for routine medical examinations or to receive routine immunizations."

24. In its undue hardship analysis, the district court did not think the State Department is required "to fundamentally alter the nature of its medical program" for Taylor. That is correct as a general matter. *See Arline*, 480 U.S. at 287 n. 17, 107 S.Ct. 1123. But when an employer "admits that it restricts the assignments of certain of its current [employees] for medical and family reasons," as the Secretary does, "there can be no claim that such an accommodation would mark a 'fundamental alteration' in the nature of [the employer's] program." *Barth*, 2 F.3d at 1188. Moreover, as discussed above, Taylor has presented evidence genuinely disputing whether the State Department routinely allows travel for medical care of this sort.

25. The Secretary misapprehends this framework in arguing that Taylor's failure to "contend[ ] that his asthma constituted a disability ... is fatal." Final Br. for the Def.-Appellee 36. Taylor has not tried to make any showing regarding asthma; it is the Secretary who is asserting it in defense. It cannot be "fatal" to Taylor that he did not anticipate the Secretary's allegedly non-discriminatory basis for not hiring him. The Secretary bears the burden of producing evidence that Taylor's application was rejected for non-discriminatory reasons. *Barth*, 2 F.3d at 1185.

prima facie case. The question is whether the Secretary produced evidence that Taylor's pulmonary condition was a "non-discriminatory reason" for rejecting his application to the Foreign Service.

On that subject there are numerous unsettled factual issues. For instance, because the Secretary admits hiring twelve Foreign Service candidates with asthma between 1998 and 2002, the fact that a candidate has a pulmonary disorder may not in itself be disqualifying. The parties dispute the severity of Taylor's pulmonary condition. The record does not indicate how Taylor compares to the candidates with asthma who the State Department has hired in the past. And as discussed above, the parties genuinely dispute the extent to which Foreign Service Officers must be available to serve worldwide—a dispute that affects any determination about whether Taylor's pulmonary condition disqualifies him from performing this alleged essential function. Even if the Secretary had established that Taylor's pulmonary condition was a non-discriminatory disqualifying characteristic, Taylor has some evidence suggesting that his pulmonary condition was a pretext—that his HIV-positive status is the true reason he was not hired. *See* 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2732.3, at 198–205 (3d ed. 1998) ("[I]n suits charging ... disability discrimination, summary judgment often has been denied because of the presence of material fact questions involving motive or intent.") (footnote omitted). In light of these factual disputes, the Secretary was not entitled to summary judgment on this theory.

For the foregoing reasons the judgment of the district court is reversed and the case is remanded for further proceedings.

*So ordered.*

